# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-40836 |
| | § | |
| DENTON LONE OAK HOLDINGS, L.P., | § | |
| A/K/A HOLIDAY INN & SUITES DENTON | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

## DEBTOR'S DISCLOSURE STATEMENT

## ARTICLE I: INTRODUCTION

**A.**    **General**

1.    Denton Lone Oak Holdings, L.P. ("Debtor") provides this Disclosure Statement to all of the Debtor's[1] known creditors entitled to same pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "Code"). The purpose of this Disclosure Statement is to provide creditors of the Debtor with such information as may be deemed material, important and necessary in order for the creditors to make a reasonably informed decision in exercising the right to vote on the Plan presently on file with the Bankruptcy Court and described below.

2.    A copy of the Plan accompanies this Disclosure Statement as Exhibit "A" and is incorporated herein by reference. The definitions found in Article 1.0 of the Plan are incorporated herein by reference and should be referred to in reading and analyzing the Plan and this Disclosure Statement.

3.    **NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO THE FUTURE BUSINESS OPERATIONS, THE VALUE OF**

---

[1]    Unless otherwise noted, all capitalized terms herein shall have the same meaning as in the Plan.

**ASSETS, ANY PROPERTY OR CREDITOR'S CLAIMS INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED.** Any representations or inducements made to secure your acceptance or rejection, which are other than as contained in this Disclosure Statement, should not be relied upon by you in arriving at your decision.

4.  The financial information contained herein has not been subject to an audit, certified or otherwise. **FOR THIS REASON AND BECAUSE OF FINANCIAL CONSTRAINTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES, ALTHOUGH DEBTOR HAS MADE AN EFFORT TO PRESENT SUCH INFORMATION FAIRLY AND ACCURATELY.** Additional information can be found in Debtor's Statement of Financial Affairs and its Schedules of Assets and Liabilities and its operating reports on file with the Bankruptcy Court.

5.  The Debtor proposes the Plan which accompanies this Disclosure Statement. **THE DEBTOR RECOMMENDS A VOTE "FOR ACCEPTANCE" OF THE PLAN.**

**B.  <u>Manner of Voting</u>**

1.  All creditors entitled to vote on the Plan may cast votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to be received no later than 4:00 p.m., prevailing central time, on _____ ___, **2010,** at the following address: Jason M. Katz, Hiersche, Hayward, Drakeley & Urbach, P.C., 15303 Dallas Parkway, Suite 700, Addison, Texas 75001.

**C.** **Confirmation of Plan**

1. <u>Solicitation of Votes</u>. By the order entered on _____ ___, 2010, the Bankruptcy Court approved this Disclosure Statement in accordance with Section 1125 of the Bankruptcy Code. This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor and each creditor who has filed a proof of claim. This Disclosure Statement is intended to assist creditors in evaluating the Plan and in determining whether to accept the Plan. **UNDER THE BANKRUPTCY CODE, YOUR VOTE FOR ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNLESS YOU RECEIVE A COPY OF THIS DISCLOSURE STATEMENT PRIOR TO OR CONCURRENTLY WITH SUCH SOLICITATION.** The solicitation of votes on the Plan is governed by the provisions of Section 1125(b) of the Code, the violation of which may result in sanctions by the Court, including disallowance of the solicited vote and loss of the "safe harbor" provisions of Section 1125(e) of the Code.

2. <u>Persons Entitled to Vote on the Plan</u>. Only the votes of members of classes of claimants which are impaired under the Plan are counted in connection with confirmation of the Plan.

3. <u>Hearing on Confirmation of the Plan</u>. The Bankruptcy Court has set _____ _____, **2010 at __:___ __.m.,** for a hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. Each creditor will receive either with this Disclosure Statement or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of the Plan. Any objections to confirmation of the Plan must be filed in writing with the Bankruptcy Court and served upon Russell W. Mills and

Jason M. Katz so as to be received by _____:_____ _____.m. on _____ ___, **2010**, at the address noted in paragraph B above.

4.  <u>Acceptance Necessary to Confirm Plan</u>.  At the scheduled hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the impaired classes.  Under Section 1126 of the Code, an impaired class is deemed to have accepted the Plan if at least two-thirds in amount and more than one-half in number of claims of class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.

5.  <u>Confirmation of Plan Without Necessary Acceptance</u>.  The Plan may be confirmed even if it is not accepted by all of the impaired classes if one of the impaired classes accepts it and the Bankruptcy Court finds the Plan does not discriminate unfairly against and is fair and equitable to the dissenting class.  This provision is set forth in Section 1129(b), a relatively complex provision of the Code.  This summary is not intended to be a complete statement of the law.  The Debtor may choose to rely upon this provision [Section 1129(b)] to seek confirmation of the Plan if it is not accepted by an impaired class or classes of creditors.

## ARTICLE II: DESCRIPTION OF THE DEBTOR AND STATUS OF THE CASE

1.  <u>Ownership Of The Debtor</u>.

The Debtor is a Texas limited partnership incorporated on July 18, 2007. The Debtor is owned by two limited partners and one general partner.  The largest limited partner is Lone Oak Hospitality, Ltd. with an 89% interest.  Rainer Income & Growth Fund is a limited partner and with a 10% interest. Lone Oak GP, LLC is the general partner with a 1% interest.

2.  <u>The Debtor And Its Market</u>.

In 2003, Gaylord Hall approached the owners of 6.1 acres of real property located at 1434 Centre Place Drive in Denton, Texas 76205 ("Property") about building a hotel and acquiring a

Holiday Inn franchise/license agreement. After several months of discussions and meetings, the parties reached an agreement to proceed with the construction of a hotel at the Property and acquire a Holiday Inn franchise/license agreement. In 2004, Gaylord Hall obtained the Holiday Inn franchise/license agreement. In March 2007, the construction of the hotel at the Property was completed and started operating as The Holiday Inn & Suites Denton (the "Hotel").

The Hotel is phase 1 of Denton Station, which is a master planned mixed use development featuring retail, restaurants and multi-family housing as well as student housing. The Hotel is a four story corridor hotel that (a) offers 153 guest rooms including 28 suites (8 have kitchenettes) and (b) has a bar and grill, 167 surface spaces, an indoor swimming pool, fitness room, Jacuzzi, 5,000 square feet of flexible conference and banquet space, 24 hour business center, 24 hour convenience store/gift shop area, guest laundry services, an ATM machine and a patio. Each guest room has the following amenities: TV, armoire, desk and chair, side chair, end table, lamps, mini-refrigerator, wet bar (junior suites), cook top with four burners (executive suites), countertops and cabinets stocked with cookware, dishes and flatware (suites only), two telephones, wired for high-speed internet connection, iron/ironing board, coffeemaker, clock radios, hair dryer, microwave oven, floor-to-ceiling draperies and sheers, wall-mounted headboard, lounge chairs or sleeper sofa (Suites only), wood-finished side tables and/or coffee tables and wooden entry door with brass hardware, peephole, deadbolt and electronic "smart" lock.

The Hotel is approximately 30 miles northwest of Dallas, 20 miles northeast of Fort Worth and is ideally located in the center of the triangle between the University of North Texas, Downtown Denton and the Denton Regional Medical Center providing accessibility to all of the economic centers in the area. Some of the major employers in the Denton area include University of North Texas, Denton Independent School District, Texas Woman's University, Denton County, Denton

State School, Peterbilt Motors Company, City of Denton, Denton Regional Medical Center, Thermadyne Industries and Presbyterian Hospital of Denton. The Hotel is approximately one mile from Denton Crossing, which is a 334,659 square foot shopping center built in 2004 containing stores like Kroger, Bed Bath & Beyond, Wal-Mart Supercenter, and Best Buy. The Hotel is also near the following recreational opportunities: Lewisville Lake (approximately seven miles), Texas Motor Speedway (approximately 13 miles), North Lakes Park (approximately 4 miles) and Lake Ray Roberts (approximately 6 miles).

The Hotel is still proving to be a great place to stay for travelers. For example, on March 27, 2010, the Hotel received a three star rating after a AAA inspection/evaluation, which is above average for a Holiday Inn. The inspector commented that the "[h]ousekeeping and maintenance is impeccable." and "Staff was friendly and accommodating."

3.     Debtor's Financial And Operational Difficulties.

On July 30, 2007, the Debtor executed a (a) promissory note in the principal amount of $12,850,000 (the "Original Note") in favor of Morgan Stanley Mortgage Capital Holdings, LLC ("Lender"), (b) Deed of Trust and Security Agreement ("Deed of Trust") and (c) Assignment of Leases and Rents ("ALR"). The Deed of Trust and ALR are collectively referred to as Security Instruments. Approximately three days after executing the Note, a financial crisis hit the economy and interest rates rose 200 basis points in one day. Luckily for the Debtor, the Note contained a 6.81% fixed interest rate with a 30 year amortization with a balloon payment after 10 years. Approximately 60 days after the execution of the Note, the Lender approached the loan broker who had obtained the loan for the Debtor and informed him that the Lender would discount the loan by 10% if the Debtor could pay off the Note. The Debtor had no luck with refinancing the Note as the credit markets had collapsed.

Since the execution of the Note, the Lender has been very aggressive in its dealings with the Debtor. The Lender has over-escrowed taxes, insurance, FF&E to such a degree that the Debtor was eight days late on a mortgage payment in January 2008 and the Lender declared the Note in default. In approximately June 2008, the Debtor reached a deal with the Lender to restructure the Note for 6 months wherein the Debtor paid the Lender $120,360 in fees plus an approximate amount of $800,000 (which reduced the principal amount of the Note to $12,036,938.10) with an option to extend the loan an additional 6 months for payment of $120,360. Specifically, on June 2, 2008, the Original Note was amended and restated by (a) the amended and restated promissory note dated June 2, 2008 (effective May 8, 2008) in the principal amount of $12,036,938.10 ("Amended Note") in favor of Lender and (b) a Loan Reinstatement and Modification Agreement. In December 2008, the Lender extended the Amended Note for another 6 months after the Debtor paid the Lender $120,360.

In January 2009, the previous management company declared a bonus of $200,000 and, without prior notification to the Debtor, took the money from the Debtor's accounts. The previous management company then demanded an immediate cash call payment of $150,000. The Debtor did not have the necessary funds to pay the $150,000 call. In February 2009, the Debtor filed a lawsuit against the previous management company over the $200,000. The Debtor reached a settlement with the previous management company, terminated the previous management company and DePalma Hotel Corporation took over the management duties of the Hotel. The termination of the previous management company created another default with the Lender.

On July 10, 2009, the Debtor further modified the Amended Note by entering into the (a) Second Loan Reinstatement and Modification Agreement, (b) Cash Management Agreement and (c) Restricted Account Agreement (collectively, the "Second Modification"). The Amended Note is

secured by the Security Instruments and Second Modification, which purported to grant Lender, at a minimum, a lien in certain of the Debtor's assets, specifically the Property, and any additional land, improvements, easements, fixtures and personal property, leases and rents, insurance proceeds, condemnation awards, and tax refunds (the "Collateral") including, without limitation, its cash from the operation of the hotel. The Second Loan Modification reduced the $12,036,938.10 mortgage to $11,536,000 by paying an additional $500,000 in principal. In December 2009, Midland Loan Services, the loan servicing agent for the Lender, notified DePalma Hotel Corporation that they had underestimated the tax escrow required by the Second Loan Modification. Midland Loan Services demanded payment of an additional $200,000 within 30 days. In January 2010, Midland Loan Services and the Debtor entered into an agreement where Midland Loan Services would advance further funds for 30 days while the Debtor worked on obtaining the additional $200,000. Within the 30 day period, the Debtor had gathered approximately $140,000 of the $200,000 requested by Midland Loan Service. The Debtor requested an additional week to obtain the remaining funds. The Lender refused to extend the Amended Note and Second Loan Modification. As a result, the Debtor filed its chapter 11 petition on March 15, 2010.

4.    Debtor's Ability to Fund Reorganization, Its Financial Forecast And Its Business Plan.

The Debtor intends to reorganize its business through a restructuring of the debt owing to the Lender and continued operation of the Hotel. This plan gives the Debtor time to operate while providing the Lender reasonable payments and adequate collateralization. The Debtor's financial forecast is attached hereto as Ex "B" and incorporated herein by reference. Exhibit "B" shows that Debtor will be able to service its plan obligations during the period from August 2010 until December 2015.

5. Funds Available.

As of April 30, 2010, the Debtor had approximately $203,939.24 in cash and will have on hand funds paid for the New Partnership Interests.

6. The Bankruptcy Filing and The Status Of The Bankruptcy Case.

On March 15, 2010, the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code. Soon thereafter, the Debtor filed (a) Application pursuant to 11 U.S.C. §§ 327, 328 & 329 and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure for an order authorizing the retention of Hiersche, Hayward, Drakeley & Urbach, P.C.; (b) Motion For Entry of Interim Order Authorizing Use Of Cash Collateral Pursuant to 11 U.S.C. § 363; and (c) Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a) and 366 Prohibiting Utilities from Discontinuing, Altering, or Refusing Service, and Establishing Procedures for Determining Adequate Assurances of Payment and (d) Emergency Motion to Approve Payment of Prepetition Wages, Salaries, Commissions, Reimbursable Expenses and benefits in the Ordinary Course of Business (and subsequent Amended Motion).

On March 18, 2010, the Court entered its Order wherein it approved the Debtor to pay prep-petition employee obligations. On March 19, 2010, the Court entered its Interim Order Regarding the use of cash collateral allowing the Debtor to use cash collateral until April 5, 2010 on certain terms. (the court entered a subsequent agreed order regarding the use of cash collateral allowing the Debtor to use cash collateral until April 29, 2010 on certain terms).

On April 7, 2010, the Court entered its Order wherein it approved the employment of HHDU. On April 9, 2010, the Court entered its Order approving the adequate protection proposal made by the Debtor, approved the Debtor's proposed procedures for dealing with objections and prohibited utilities from altering, refusing or discontinuing service to the Debtor for non-payment of prepetition

debt.

On April 21, 2010, the Debtor filed an (a) Application to Employ Accountants, (b) Application to Employ Mike Massey as Expert Witness and (c) Application to Employ DePalma Hotel Corporation To Provide Additional Management to the Debtor and to Designate Joe N. DePalma as Chief Executive Officer. On April 29, 2010, the Debtor filed an Amended Application to Employ DePalma Hotel Corporation To Provide Additional Management to the Debtor and to Designate Joe N. DePalma as Chief Executive Officer. On May 3, 2010, the Debtor withdrew its Application to Employ Accountants. On May, 2010, the Court entered its Final Order Regarding the use of cash collateral allowing the Debtor to use cash collateral through the effective date of a confirmed plan of reorganization on certain terms. On May 13, 2010, the Debtor filed another Application to Employ Accountants. On May 18, 2010, the Court entered its Order wherein it approved the employment of Massey as an expert witness. On May 19, 2010, the Court entered its Order wherein it approved the employment of DePalma Hotel Corporation as the management company of the Debtor and approving DePalma as the CEO of the Debtor.

On May 19, 2010, Task Force Logistics, Ltd. filed a motion for 2004 examination of Denton County Title Company. On May 21, 2010, Task Force Logistics, Ltd. filed a motion for 2004 examination of the Debtor. The Court has not ruled on either of these motions.

On June 2, 2010, the Court entered its order wherein it approved the employment of Crowder as Debtor's accountants.

## ARTICLE III: SELECTED SIGNIFICANT
## EXCERPTS FROM THE PLAN OF REORGANIZATION

The following is a brief summary of the Plan attached as Exhibit "A", and is qualified in its entirety by the full text of the Plan itself. The Plan, if confirmed, will be binding upon the Debtor

and its creditors. All creditors are urged to read the Plan carefully. If and when the Plan is confirmed, the Debtor expects to be able to fully perform its obligations to all classes of creditors as set forth in the Plan through the operating revenues of the Debtor.

## ARTICLE 2

## CLASSIFICATION OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

2.1    The following is a designation of the Classes of Claims and Current Partnership Interests under this Plan. Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the following classes in accordance with section 1123(a)(1) of the Bankruptcy Code. A Claim or Current Partnership Interest shall be deemed classified in a particular Class only to the extent that the Claim or Current Partnership Interest qualifies within the description of that Class. A Claim or Current Partnership Interest is in a particular Class only to the extent that the Claim or Current Partnership Interest is an Allowed Claim or Current Partnership Interest in that Class.

2.2    Claims and Current Partnership Interests:

Class 1 – Morgan Stanley Claim

Class 2 – Secured Denton County/City Tax Claim

Class 3 – Priority Employee Claims

Class 4 – Comptroller Claims

Class 5 – Unsecured Claims

Class 6 – TFL Claims

Class 7 – Subordinated Insider Claims

Class 8 – Current Partnership Interests

## ARTICLE 3

## IDENTIFICATION OF IMPAIRED CLASSES OF
## CLAIMS AND CURRENT EQUITY INTERESTS

3.1    Impaired Classes of Claims and Equity Interests. All Classes of Claims and Current Equity Interests are impaired under the Plan.

3.2    Impairment Controversies. If a controversy asserted in an objection to confirmation or other written pleading arises as to whether any Class of Claims or Current Equity Interest is impaired under the Plan, the Bankruptcy Court shall determine such controversy after notice and a hearing and, if no such pleading is filed, then the identity of any impaired class will be conclusively determined by Section 3.1 of the Plan.

## ARTICLE 4

## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

4.1    Administrative Expenses. All Administrative Expenses against the Debtor shall be treated as follows:

(1)    Administrative Expenses Bar Date. The holder of any Administrative Expense other than: (i) a claim for professional fees and expenses for services rendered up to and including the Confirmation Date, (ii) a liability incurred and paid in the ordinary course of business by the Debtor; or (iii) an Allowed Administrative Expense, must file with the Bankruptcy Court and serve on the Debtor and its counsel, notice of such Administrative Expense within fifteen (15) days after the Confirmation Date. Such notice must identify: (i) the name of the holder of such Claim; (ii) the amount of such Claim; (iii) the basis of such Claim; and (iv) all written documentation supporting such Claim. Failure to file this notice timely and properly shall result in such claim for the Administrative Expense being forever barred and discharged.

(2)    Allowance of Administrative Expenses. An Administrative Expense with respect to which notice has been properly filed pursuant to Section 4.1(a) of the Plan shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the filing and service of notice of such Administrative Expense. If an objection is timely filed, the Administrative Expense shall become an Allowed Administrative Expense only to the extent Allowed by Final Order.

(3)    Payment of Allowed Administrative Expenses. Each holder of an Allowed Claim for an Administrative Expense other than a professional holding such a claim shall receive, at the Debtor's option: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the tenth Business Day after such Claim becomes an Allowed Claim; (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iii) such other treatment as may be agreed to in writing by the holder of such Administrative Expense and the Debtor.

(4)    Payment of Allowed Administrative Expenses To Professionals. Each holder of an Allowed Administrative Claim that is a professional shall be paid in full by Debtor and/or Hall on the date upon which an order approving such claim becomes final and nonappealable. Debtor shall make payment of such fees and expenses in full. Professional fees and expenses incurred after the Confirmation Date shall be the obligation of the Reorganized Debtor and shall be payable by the Reorganized Debtor and/or Hall promptly and without the need for application to or approval by the

Bankruptcy Court. Hall's guarantee of payment of professional fees and expenses is reaffirmed by Hall and shall continue until all of such fees and expenses are paid in full.

4.2     Priority Tax Claims. Each holder of a Priority Tax Claim, unless addressed otherwise herein, shall receive, at the Debtor's option: (a) the amount of such holder's Allowed Claim in one Cash payment on the Effective Date; or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Debtor.

4.3     Unmatured Secured Tax Claims. Each holder of an Unmatured Secured Tax Claim shall be paid by the Debtor at the time the Unmatured Secured Tax Claim becomes due and payable and in accordance with the Debtor's ordinary practice.

## ARTICLE 5

## TREATMENT OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

5.1     Class 1 – Morgan Stanley Claim.     The value of the Collateral securing the Morgan Stanley Claim is $11,766,131.54 and the amount of the Morgan Stanley Claim shall be $11,766,131.54. No part of the Allowed Claim of Morgan Stanley shall be unsecured and nothing herein shall impair the Lien of Morgan Stanley in the Collateral. On or before the Effective Date, the Debtor will execute the New Bank Note in the amount of the Morgan Stanley Claim which will supercede and replace the Current Bank Note. The New Bank Note will mature on a date that is eighty-four (84) months from the Effective Date at which time Debtor shall pay all outstanding principal and unpaid accrued interest. The New Bank Note shall bear interest at the rate stated in the Current Bank Note provided that no default rate of interest may be charged on any default that may have occurred prior to the Effective Date. Monthly payments of principal and accrued interest will be paid on the New Bank Note with the first payment being due on the first day of the first month following the Effective Date and with all other subsequent monthly payments being due on the first day of each succeeding month. The monthly payments shall be calculated based on a twenty-five (25) year amortization schedule. Payments shall first be applied to accrued interest, next to unpaid principal, then to any costs or expenses for which Borrower is obligated under the Loan Documents. The monthly payment obligations due under the New Bank Note will be made as follows: a) *first,* Morgan Stanley shall make such monthly payments from the Interest Reserve until depleted. Morgan Stanley shall no longer charge or collect from the Debtor any funds to secure payment of Debtor's interest obligations; b) *second,* Morgan Stanley shall make such monthly payments from the Insurance Reserve until the Insurance Reserve holds an amount sufficient to pay Debtor's prior year insurance obligations. Morgan Stanley shall no longer charge or collect any funds from the Debtor to secure payment of Debtor's insurance obligations in excess of such amounts; c) *third,* Morgan Stanley shall make such monthly payments from the Tax Reserve until the Tax Reserve holds an amount sufficient to pay Debtor's prior year tax obligations. Morgan Stanley shall no longer charge or collect from the Debtor any funds to secure payment of Debtor's tax obligations in excess of such amounts; d) *fourth,* Morgan Stanley shall make such monthly payments from the FF&E Reserve until the FF&E Reserve is depleted. Morgan Stanley shall no longer charge or collect from the Debtor any funds to secure Debtor's furniture, fixture and equipment obligations except, for periods beginning forty-eight (48) months following the Effective date, an amount not to exceed four percent (4%) of

the Debtor's prior year gross revenues; d) *fifth,* Morgan Stanley shall make such monthly payments from any other monies paid to Morgan Stanley by the Debtor and held in reserve for future obligations; and e) *sixth,* the Debtor shall make all payments thereafter. To the extent inconsistent with the terms of this Plan, the Loan Documents are amended, renewed, extended, restructured and modified on the terms herein. Upon confirmation, any and all defaults that have occurred under the Loan Documents shall be deemed cured. Once any Specified Reserve Account is either depleted or reduced to the maximum amount allowed herein, Morgan Stanley will pay the applicable expense from that Specified Reserve Account when it comes due. Morgan Stanley may thereafter charge Debtor an amount necessary to replenish a Specified Reserve Account only as allowed herein.

     5.2    Class 2 – Secured Denton County/City Tax Claims. Denton County/City shall retain any lien it currently holds and will receive payment in full of its Allowed Denton County/City Tax Claim in accordance with Section 7.4(b) and 10.2.

     5.3    Class 3 – Priority Employee Claims. Each holder of an Allowed Priority Employee Claim against the Debtor shall be paid in accordance with the Debtor's pre-petition custom and practice, if not already paid pursuant to order of the Bankruptcy Court entered March 18, 2010. No interest will be paid on Priority Employee Claims.

     5.4    Class 4 – Comptroller Claims. The Texas Comptroller Of Public Accounts will receive on account of its Allowed Comptroller Claims one hundred (100%) percent of its Allowed Comptroller Claims to be paid on or before thirty (30) days after the Effective Date. No interest will be paid on Comptroller Claims.

     5.5    Class 5 – Unsecured Claims. Each holder of an Allowed Unsecured Claim will receive on account of its Allowed Unsecured Claim one hundred (100%) percent of their proportionate share of the following yearly payments: 2010 - $60,000; 2011 -$20,000; 2012- $30,000; 2013-$67,000; 2014-$67,000; and 2015-$66,044. Debtor will make such payments yearly but only until each holder is paid in full. No interest will be paid on Unsecured Claims.

     5.6    Class 6. - TFL Claims. Upon full payment to all holders of Class 5 Allowed Unsecured Claims, TFL will receive on account of its Allowed TFL Claim an amount equal to ten percent (10%) of its Allowed TFL Claim. Following full payment to Class 5 Claims, Debtor will pay thirty percent (30%) of its yearly Net Profit to TFL in an amount necessary to satisfy its obligation herein to TFL. Debtor will make such payments yearly. TFL will receive no funds herein unless and until Class 5 Claims are paid in full. No interest will be paid on TFL Claims.

     5.7    Class 7 - Subordinated Insider Claims. Upon full payment to all holders of Class 6 Allowed TFL Claims, each holder of a Subordinated Insider Claim will receive on account of its Allowed Subordinated Insider Claim their proportionate share of thirty percent (30%) of the Debtor's yearly Net Profit until paid in full. Debtor will make such payments yearly. No interest will be paid on Subordinated Insider Claims.

     5.8    Class 8 – Current Partnership Interests. All Current Partnership Interests in the Debtor shall be canceled on the Effective Date and New Partnership Interests shall be issued to the

New Partnership Owners making Partnership Contributions except as provided in Paragraph 7.6 of the Plan.

## ARTICLE 6

## ACCEPTANCE OR REJECTION OF PLAN

6.1     Classes Entitled to Vote.  Each impaired Class of Claims and Current Partnership Interests shall be entitled to vote separately to accept or to reject the Plan.  Any unimpaired Class of Claims or Current Partnership Interests shall not be entitled to vote to accept or to reject the Plan. Classes 1, 2, 3, 4, 5, 6, 7 and 8 are impaired and holders of such Allowed Claims therefore are entitled to vote on the Plan.

6.2     Class Acceptance Requirement.  A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.  A Class of Partnership Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) of the number of the Allowed Current Partnership Interests in such Class that actually have voted on the Plan.

6.3     Cramdown.  This Section shall constitute the Debtor's request, pursuant to section 1129(b)(1), that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) may not be met.

6.4     Cure Payments and Release of Liability.  All cure payments that may be required by Bankruptcy Code Section 365(b)(1) under any executory contract or unexpired lease that is assumed, or assumed and assigned, under this Plan shall be made by the Debtor on or as soon as practicable after the Effective Date; provided, however, in the event of a dispute regarding the amount of any cure payments, the cure of any other defaults, the ability of the Debtor to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Debtor shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by Bankruptcy Code Section 365(b)(1), following the entry of a Final Order resolving such dispute.  To the extent that a party to an assumed executory contract or unexpired lease has not filed an appropriate pleading with the Bankruptcy Court on or before the thirtieth (30th) day after the Effective Date disputing the amount of any cure payments offered to it by the Debtor, disputing the cure of any other defaults, disputing the promptness of the cure payments, or disputing the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters.

## ARTICLE 7

## MEANS OF IMPLEMENTATION OF THE PLAN

7.1     On the Effective Date, the Reorganized Debtor shall assume all obligations to pay all Allowed Claims pursuant to this Plan.

7.2     On the Effective Date, all right, title, and interest in and to the Assets shall vest in the Reorganized Debtor.

7.3     The Reorganized Debtor shall have the powers and duties specified in this Plan together with all other powers of a Texas partnership. Such powers shall include, without limitation, the power to object to Claims, to administer Cash and Cash on Hand and to operate the business of the Reorganized Debtor subject only to any limitations imposed by the Plan. The Reorganized Debtor may operate without approval from the Bankruptcy Court.

7.4     The Reorganized Debtor shall own all Avoidance Actions and all Litigation Claims and shall have full power to institute, proceed to trial and appeal, settle or dismiss any Avoidance Action or Litigation Claim without approval from the Bankruptcy Court.

7.5     Rainier/Lacey has submitted a bid in the amount of $20,000 to purchase the New Partnership Interest and, in the event that they are the successful bidders, they will receive the New Partnership Interests. A New Partnership Interest Bidder may submit a bid for the New Partnership Interest to the Debtor's counsel on or before the close of business at 5:00 p.m. Central Standard Time on or before ten (10) business days prior to the Confirmation Hearing. The New Partnership Interest Bid must include a cashier's check payable to the Debtor in the amount of the New Partnership Interest Bid. All New Partnership Interest Bids shall be for cash only. The New Partnership Bid Amount will be returned to the New Partnership Interest Bidder if the New Partnership Interest Bid is not accepted. In the event a New Partnership Interest Bidder properly submits a New Partnership Interest Bid, Rainier/Lacey shall have two (2) business days to submit a higher bid that shall include a cashier's check in such amount. All New Partnership Interest Bids must be in increments of at least $5,000.00, and must include a cashier's check for such increment. New Partnership Interest Bidders may thereafter continue to make competing bids at intervals of two (2) business days until the highest bid is received. The successful New Partnership Bid Amount will be deemed a Partnership Ownership Contribution and the successful New Partnership Interest Bidder will become a New Partnership Interest Owner with all the rights, responsibilities, and obligations of a New Partnership Interest Owner under the Plan and Loan Documents.

7.6     In the event that no New Partnership Interest Bid is timely and properly received, the Reorganized Debtor shall be authorized to issue New Partnership Interests in the Reorganized Debtor whereupon Rainier/Lacey will become New Partnership Interest Owners.

7.7     The New Partnership Owner(s) shall appoint a general partner of the Reorganized Debtor on the Effective Date. That general partner shall have all of the duties, responsibilities, and powers of a general partner of a Texas limited partnership.

7.8     Confirmation of the Plan shall be deemed to constitute a permanent injunction against maintenance or commencement of any action against Debtor arising out of any events occurring prior to the filing of this case and all holders of Claims against Debtor are permanently enjoined with respect to such Claims: (a) from commencing or continuing any action or proceeding of any kind with respect to any such Claim against the Reorganized Debtor and/or the Assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order

against the Assets and/or the Reorganized Debtor; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Assets and/or the Reorganized Debtor; (d) from asserting any right of subrogation or recoupment of any kind against any obligation due the Debtor or the Reorganized Debtor; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and all Claims and causes of action held by all Entities against the Debtor and the Reorganized Debtor are released and discharged except the obligations of the Reorganized Debtor pursuant to the provisions of the Plan; provided, however, that each holder of a Contested Claim may continue to prosecute its proof of Claim in the Bankruptcy Court and all holders of Claims and Partnership Interests shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan.

7.9     Confirmation of the Plan shall also be deemed to constitute an injunction against maintenance and/or prosecution of the Guaranty Litigation. Such injunction shall continue so long as Debtor is current on its obligations under Section 5.1 to Morgan Stanley.

7.10    The Reorganized Debtor shall: (i) be solely responsible for pursuing and/or settling all causes of action owned by the Reorganized Debtor and for distribution of all cash distributions contemplated by the Plan; (ii) have the right and power to enter into any contract or agreements binding the Reorganized Debtor in connection with the performance of its duties; (iii) have power to issue or arrange for the issuance of its Partnership Interests to New Partnership Interest Owners; (iv) have power to borrow funds and/or obtain investors and/or sell or encumber its real estate for valid business purposes including funding any cash obligations pursuant to the Plan, funding expansion of Debtor's business as contemplated by Debtor's business plans submitted in support of confirmation of the Plan; (v) have power to do all acts contemplated by the Plan; and (vi) have sole discretion to settle or compromise any claim, cause of action, chose-in-action or litigation and settle any such claim, cause of action, chose-in-action or litigation, without approval of the Bankruptcy Court.

7.11    Subject to the following, the Debtor reserves the right to revoke and withdraw this Plan before the entry of the Confirmation Order. If the Debtor revokes or withdraws this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or to prejudice in any manner the rights of the Debtor, or person in any further proceedings involving the Debtor or to provide the basis for any claim against Debtor.

## ARTICLE IV: FINANCIAL INFORMATION REGARDING DEBTOR

Debtor's Statement of Financial Affairs, detailed schedules of assets and liabilities, and amendments thereto, and the periodic Operating Reports and interim statements required to be filed by the Bankruptcy Court, have been filed with the Court. Due to the complexity and volume of data contained in said documents, this Disclosure Statement can only summarize such information.

More specific information regarding the Rainier/Lacey bid to purchase the New Partnership Interests is attached hereto as Ex. "C" and incorporated herein by reference.

As of the petition date, the Lender held the following approximate amounts in escrow: FFE Reserve Account ($113,420.88), Interest Reserve Account ($209,326.53), Insurance Reserve Account ($72,565.90), and Tax Reserve Account ($0).

**ADDITIONAL FINANCIAL INFORMATION AND CLARIFICATION CAN BE FOUND IN THE ABOVE DESCRIBED DOCUMENTS ON FILE WITH THE U.S. BANKRUPTCY CLERK.**

## ARTICLE V: CONSIDERATIONS IN VOTING ON THE PLAN

The Debtor has proposed a Plan that it believes treats all creditors fairly and equitably and is in the best interest of the creditors. In order to assist the creditors in evaluating the Plan, the Debtor provides the following summary of items which Debtor believes to be significant considerations for creditors in deciding how to vote on the Plan. References are made to paragraphs in this Disclosure Statement and Plan of Reorganization which discuss and have summarized topics in greater detail. **THE FOLLOWING IS ONLY A BRIEF SUMMARY AND SHOULD NOT BE RELIED UPON EXCLUSIVELY FOR VOTING PURPOSES. YOU ARE URGED TO READ ALL OF THIS DISCLOSURE STATEMENT, THE PLAN OF REORGANIZATION IN FULL AND ALL OTHER RELEVANT ORDERS AND DOCUMENTS ON FILE IN THESE PROCEEDINGS.**

1. <u>Possible Tax Consequences</u>. Implementation of the Plan will result in income, gain, or loss for federal income tax purposes to holders of claims against and interests in Debtor. Tax consequences to a particular Creditor or holder of an interest in Debtor may depend on the particular circumstances or facts regarding the Claim of the Creditor or the interest of such holder in Debtor.

To the extent that a holder of a Claim receives a distribution under the Plan which is less than the full amount of the Claim, and the remainder of the Claim is being discharged under the Plan, that holder of a Claim may be entitled to a deduction from taxable income to the extent of the realized loss on the Claim (but only to the extent the loss has not been recognized in prior tax years).

Each holder of an interest in Debtor will recognize taxable income or gain as a result of the implementation of the Plan to the extent that the holder's allocable share of the gain from the transfer of the Property and/or income from cancellation of indebtedness due to the modification and/or discharge of Claims under the Plan.

**THE TAX CONSEQUENCES TO EACH CLAIMANT RESULTING FROM ANY REORGANIZATION OF DEBTOR OR LIQUIDATION OF DEBTOR'S ASSETS ARE COMPLEX AND MAY VARY AND WILL DEPEND UPON THE PARTICULAR CIRCUMSTANCES OF EACH CLAIMANT. CONSEQUENTLY, EACH CLAIMANT IS URGED TO CONSULT HIS OWN TAX ADVISOR WITH SPECIFIC REFERENCE TO HIS PARTICULAR CIRCUMSTANCES AND TO THE TAX CONSEQUENCES OF BOTH THE PLAN AND ANY ALTERNATIVE TO THE PLAN AND NO CLAIMANT IS AUTHORIZED TO RELY FOR TAX ADVICE OR INFORMATION ON THIS DISCLOSURE STATEMENT.**

## ARTICLE VI: LIQUIDATION ANALYSIS

1. <u>Liquidation Analysis</u>

The present value of the Debtor's real estate is less than the amount of the Lender's Claim of $11,766,131.54 because the Debtor would be forced to sell Property at a heavily discounted price. The proceeds of sale would be insufficient to pay the Lender's Claim and unsecured creditors would receive nothing in the event the Debtor's real estate were foreclosed upon by the Lender or sold by a

Chapter 7 trustee.

<u>Debtor's Recommendation</u>:

**BASED ON THE CONTENTS OF THIS DISCLOSURE STATEMENT, THE DEBTOR BELIEVES IT IS IN THE BEST INTERESTS OF ALL CREDITORS THAT THE PLAN AS PROPOSED BY THE DEBTOR BE APPROVED BY ITS CREDITORS. DEBTOR BELIEVES THAT REORGANIZATION WOULD PRODUCE MORE DISTRIBUTION TO CREDITORS THAN IF THE DEBTOR WERE LIQUIDATED. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT ITS CREDITORS VOTE TO CONFIRM THE PLAN AS FILED BY THE DEBTOR.**

(Remainder of the Page Intentionally Left Blank)

Dated: June 7, 2010.

DENTON LONE OAK HOLDINGS, LP

By: _____
    Joe N. DePalma, Chief Executive Officer

Submitted by:

HIERSCHE, HAYWARD, DRAKELEY
    & URBACH, P.C.

By: _____
    Russell W. Mills (SBN 00784609)
    Jason M. Katz (SBN 24038990)

15303 Dallas Parkway, Suite 700
Addison, Texas 75001
Telephone: (972) 701-7000
Facsimile: (972) 701-8765