**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENTON LONE OAK HOLDINGS, LP, | ) | Case No. 10-40836 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## OBJECTION TO DISCLOSURE STATEMENT

Morgan Stanley Mortgage Capital Holdings LLC ("**Morgan Stanley**")[1] files this objection (the "**Objection**") to the Disclosure Statement [Docket No. 85] (the "**Disclosure Statement**") filed by Denton Lone Oak Holdings, LP (the "**Debtor**") in connection with the Debtor's Plan of Reorganization [Docket No. 86] (the "**Plan**"). In support of the Objection, Morgan Stanley respectfully shows this Court as follows:

## I.    PRELIMINARY STATEMENT

1.    The Debtor's Disclosure Statement and accompanying Plan lack adequate information to allow Morgan Stanley, creditors, and other parties in interest to make an intelligent and informed decision on whether to accept or reject the Plan. First, the Disclosure Statement fails to provide adequate disclosure of key information in numerous substantive areas. Second, numerous drafting errors and factual misstatements render the Disclosure Statement ambiguous, misleading, and incomplete. Accordingly, the Court should reject the Debtor's request for authority to disseminate the Disclosure Statement and Plan to creditors and other parties in interest.

---

[1]    Capitalized terms not otherwise defined in the Preliminary Statement are defined below.

2.      Without any factual detail or support, the Debtor asks Morgan Stanley, creditors, and other parties in interest to rely blindly on the Debtor's general statements concerning, among other things discussed below: (i) the nature or amount of the claims comprising the classes of claims; (ii) the reason for separately classifying unsecured claims; (iii) how the Debtor concluded that the "value of the Collateral securing the Morgan Stanley Claim" is equal to Morgan Stanley's claim against the Debtor, including, without limitation, who valued the Property, when the Property was valued, and the assumptions relied upon to reach the purported value;[2] (iv) what impact there will be on unsecured creditors if the Debtor's value conclusion is wrong; (v) how the Debtor intends to implement its "new-value-by-mail" auction, including, without limitation, how the process will work, who will determine whether to accept bids, what parameters will govern that decision, and what happens if there are several rounds of bids, given that the Disclosure Statement states that there will be competing bids in two business day intervals until the highest bid is received; (v) why certain classes of creditors are designated "impaired" when the putative creditors in those classes will be paid in full; and (vi) the anticipated future of the reorganized debtor (especially in light of the fact that the Debtor's budget shows that in twenty-six out of sixty months postconfirmation, the Debtor will lack sufficient funds to pay debt service to Morgan Stanley, even under its substantially modified note, which fails to satisfy Section 1129(b)(2)(A)(i)(II)).

3.      A disclosure statement is much like a prospectus in that it should provide a hypothetical investor with adequate information to determine whether to accept or reject a debtor's plan.  The Debtor's Disclosure Statement, however, falls short of providing adequate

---

[2]      On June 23, 2010, the Debtor filed an objection to Morgan Stanley's Motion for Relief from the Automatic Stay [Docket No. 105], in which the Debtor attached a Restricted Use Appraisal dated April 26, 2010, prepared by Michael M. Massey (the "**Massey Appraisal**").  Notwithstanding the existence of the Massey Appraisal, based on statements in the Disclosure Statement, it does not appear that the Debtor intends to rely upon the Massey Appraisal in connection with the Plan.

information.  Indeed, Section 1125 of the Bankruptcy Code requires much more to bridge the information gap between what the Debtor knows and what its creditors should know about the Debtor's prospect of reorganization.

4.     Although the Debtor's Plan has significant legal deficiencies that ultimately render it unconfirmable, Morgan Stanley recognizes that these issues are for another day.[3]  Thus, through this Objection, Morgan Stanley seeks only to obtain the quantity and quality of information required by the Bankruptcy Code so that Morgan Stanley, creditors, and other parties in interest can appropriately understand the Debtor's Plan.  Because the Debtor's Disclosure Statement and Plan requires significant amendments to pass muster under Section 1125 of the Bankruptcy Code, this Court should find that the Debtor's Disclosure Statement lacks adequate information.

## II.     FACTUAL BACKGROUND

5.     On March 15, 2010 (the "**Petition Date**"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and property as a debtor in possession under Sections 1107 and 1108 of the Bankruptcy Code.

6.     The Debtor owns real property and improvements, including a 153-room, four story hotel known as the Denton Holiday Inn & Suites, which was built in 2007 (the "**Hotel**") and which is located on a 6.1-acre site in Denton County, Texas (the "**Property**").

---

[3]     Morgan Stanley is mindful of the distinction between the different purposes of the Disclosure Statement hearing and the Plan confirmation hearing and respects those distinctions here.  But the Plan likely contains so many flaws to render it patently unconfirmable.  *See, e.g., In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988 (holding that a debtor should not engage in a "wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the proposed plan when it is unconfirmable on its face").  Accordingly, in the interests of judicial economy and to preserve the time and expense associated with the solicitation procedures and confirmation hearing, this Court should not approve the Debtor's Disclosure Statement.

### A. Prepetition Financing and Other Financial Accommodations

7.     In 2007, Morgan Stanley made a mortgage loan to the Debtor evidenced by, among other things, a Promissory Note, dated June 30, 2007, in the original principal amount of $12,850,000.00 (the "**Original Note**").

8.     Morgan Stanley secured the Original Note by, among other things, (i) a Deed of Trust and Security Agreement, dated June 30, 2007, which was recorded as Instrument No. 2007-90723, Denton County, Texas (the "**Security Instrument**") and (ii) an absolute Assignment of Leases and Rents, which was recorded as Instrument No. 2007-90724, Denton County, Texas (the "**ALR**").

9.     In the Security Instrument and ALR, the Debtor granted Morgan Stanley first priority liens and security interests on and in substantially all the Debtor's real and personal property (the "**Collateral**"), including the Debtor's cash and cash equivalents from the Hotel's operation (the "**Cash Collateral**").

10.     In January 2008, the Debtor defaulted on its payment obligations to Morgan Stanley. After receiving proper notice of the payment default from Morgan Stanley, the Debtor failed to cure its default. Accordingly, Morgan Stanley exercised its right to accelerate the entire principal outstanding balance under the Original Note and demanded payment in full.

### B. First Loan Modification

11.     On June 2, 2008, the Debtor requested that Morgan Stanley reinstate the loan. As a condition to reinstating the loan, the Debtor executed an Amended and Restated Promissory Note in the principal amount of $12,036,938.10, with an effective date of May 8, 2008 (the "**Amended Note**").

12.     Contemporaneously with the Amended Note, the Debtor and Morgan Stanley entered into a Loan Reinstatement and Modification Agreement, dated June 2, 2008 (the "**First Modification Agreement**").

13.     Section 3(b) of the First Modification Agreement and Article XI of the Amended Note clarify that, unlike the Original Note, the Amended Note is a full recourse obligation of the Debtor.

14.     The Amended Note provided for monthly "interest only" payments, commencing June 15, 2008 and ending December 9, 2008, at which time the Debtor was required to pay "the balance of the principal sum and all interest accrued thereon and all other amounts due." Amended Note, Article I, §§ (b)-(c).

15.     On November 10, 2008, the Debtor extended the maturity date to June 9, 2009, pursuant to Article XVIII of the Amended Note.

**C.     Second Loan Modification**

16.     In early 2009, the Debtor again defaulted on its payment obligations to Morgan Stanley by failing to make monthly interest only payments provided for under the Amended Note and First Modification Agreement.  After receiving proper notice of the payment default from Morgan Stanley, the Debtor failed to cure its default.  Accordingly, Morgan Stanley again exercised its right to accelerate the entire principal outstanding balance under the Amended Note and demanded payment in full.

17.     Thereafter, on June 10, 2009, the Debtor and Morgan Stanley reached an agreement to reinstate the loan.  The Debtor and Morgan Stanley then entered into the Second Loan Reinstatement and Modification Agreement, dated July 10, 2009 (the "**Second**

**Modification Agreement**," and together with the Original Note, Security Instrument, ALR, Amended Note, and the First Modification Agreement, collectively, the "**Loan Documents**").

### D. The March 2010 Monetary Default

18.    In March 2010, before the Petition Date, the Debtor suffered a monetary default under the Amended Note and Second Modification Agreement by, among other things, failing to repay Morgan Stanley for over $100,000.00 in advances Morgan Stanley made on the Debtor's behalf.

19.    Consequently, as of the Petition Date, the amount due and owing to Morgan Stanley was $11,766,131.54 (the "**Indebtedness**").[4]  *See* Docket No. 64, Agreed Final Order Authorizing Debtor's Use of Cash Collateral (the "**Final Cash Collateral Order**").

### E. Value of the Property

20.    In its schedules, the Debtor stated that the current value of the Property is "unknown." *See* Docket No. 34, Schedule A.

21.    In the Disclosure Statement, the Debtor states that "[t]he value of the Collateral securing the Morgan Stanley Claim is $11,766,131.54 and the amount of Morgan Stanley Claim shall be $11,766,131.54." Disclosure Statement § 5.1 at 13.

22.    On June 23, 2010, the Debtor filed an objection to Morgan Stanley's Motion for Relief from the Automatic Stay, in which the Debtor attached a Restricted Use Appraisal dated April 26, 2010 prepared by Michael M. Massey (the "**Massey Appraisal**").  *See* Docket No. 105.  The Massey Appraisal concludes that the Property's value is $13,140,000.00.

---

[4]    As provided in the Loan Documents, the Indebtedness includes all unpaid fees, expenses, costs, and other charges incurred by Morgan Stanley in connection with the Loan Documents and all unpaid interest payments.  As such, the Indebtedness is subject to increase.

23.     Despite the existence of the Massey Appraisal (which the Debtor received on April 26, 2010), based on statements in the Disclosure Statement, it does not appear that the Debtor intends to rely on the Massey Appraisal in connection with the Plan (which was filed on June 7, 2010).

24.     After the Petition Date, Morgan Stanley requested from CB Richard Ellis ("**CBRE**") a current appraisal (the "**Appraisal**") of the Debtor's fee simple interest in the Property to determine the value of its Collateral.

25.     On April 16, 2010, CBRE issued its Appraisal, concluding that as of April 9, 2010, the "as is" value of the Property was $9,100,000.00.

## III.     OBJECTION AND CITATION OF AUTHORITY

### A.     Disclosure Statement Standard

26.     The Debtor's Disclosure Statement is deficient because it lacks adequate information regarding numerous and important gating issues, which the Debtor must disclose for purposes of Plan confirmation.  Courts in this circuit and elsewhere have repeatedly emphasized the importance of the disclosure statement and the "adequate information" requirement to the plan process.  *See, e.g.*, *Eastover Bank for Sav. v. Smith (In re Little)*, 126 B.R. 861, 867 (Bankr. N.D. Miss. 1991) (explaining that "[t]he preparing and filing of a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor . . . [and] [t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *Westland Oil Dev. Corp. v. MCorp Mgt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993) (noting that "[d]isclosure is the 'pivotal' concept in chapter 11 reorganization."); *Ryan Operations G.P.*

*v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (stating that "[b]ecause creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

27.    The Disclosure Statement is important because it is the primary medium through which the Debtor gives creditors information necessary for them to determine whether to accept or reject the Plan.  *In re Applegate Property Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) (stating that "[a] court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take.").  As such, Section 1125 of the Bankruptcy Code requires the Debtor's Disclosure Statement to contain "adequate information," which the Bankruptcy Code defines as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125.  Although the determination of whether a disclosure statement contains adequate information is subjective and analyzed on a case-by-case basis, the Disclosure Statement should nonetheless set forth "'all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan.'"  *Compare Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) *with In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

28.     Within this district, courts have enumerated certain factors that this Court can use as a starting point in determining whether the Debtor's Disclosure Statement contains adequate information:

a.     The events that led to the filing of a bankruptcy petition;

b.     A description of available assets and their value;

c.     The anticipated future of the company;

d.     The source of information stated in the disclosure statement;

e.     A disclaimer;

f.     The present condition of the debtor while in Chapter 11;

g.     The scheduled claims;

h.     The estimated return to creditors under a Chapter 7 liquidation;

i.     The accounting method used to produce financing information and the accountant's name who was responsible for such information;

j.     The future management of the debtor;

k.     The Chapter 11 plan or a summary thereof;

l.     The estimated administrative expenses, including attorneys' and professionals' fees;

m.     The collectability of accounts receivable;

n.     Financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

o.     Information relevant to the risks imposed to creditors under the plan;

p.     The actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

q.      Litigation likely to arise in a nonbankruptcy context;

r.      Tax attributes of the debtor; and

s.      The relationship of the debtor with any affiliates.

*In re United States Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996) (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)). This list is not exhaustive, and disclosure of all the above information may still be insufficient to provide holders of claims or interests adequate information. *In re Scioto Valley Mortgage Co.*, 88 B.R. at 171. The Debtor's Disclosure Statement fails to provide adequate information for numerous of the above factors, as well as other important areas unique to this case. Consequently, this Court should not approve the Disclosure Statement.

**B.      The Disclosure Statement Lacks Adequate Information**

Before addressing the factual misstatements, drafting errors, and other infirmities in the Debtor's Disclosure Statement, which render the Disclosure Statement ambiguous, misleading, and incomplete, Morgan Stanley submits that the following areas lack adequate disclosure. In these areas, the Debtor's inadequate disclosure (or complete failure to disclose) falls short of achieving the critical goal underlying Section 1125 of the Bankrutpcy Code.

**1.      Areas Lacking Substantive Disclosure**

***a)      Valuation of the Property***

29.     Factor (b) above requires the Debtor to adequately disclose "a description of available assets *and their value.*" *In re United States Brass Corp.*, 194 B.R. at 424-25 (emphasis added). Disclosure of information, however, cannot be "adequate" if one fails to provide any information at all. Such is the case with the Debtor's statements as to the Property's value. Because the Debtor's Disclosure Statement is silent on arguably one of the most important gating

issue to confirmation of its Plan—how the Debtor valued its property—the Court should not approve the Disclosure Statement.

30.     For example, the Debtor provides absolutely no information regarding: (i) the methodology it used, if any, to arrive at a valuation that matches exactly the outstanding debt due to Morgan Stanley as of the Petition Date; (ii) when the appraisal or other determination of value, if any, was made; and (iii) the identity of who issued the appraisal or otherwise determined the value of the Property as stated in the Plan.  Moreover, the Debtor fails to disclose that Morgan Stanley has submitted a valuation that indicates that the Property's value is less than the indebtedness to which the Debtor has already stipulated and what impact Morgan Stanley's assertion would have on the Debtor's Plan and the treatment of creditors thereunder if Morgan Stanley's assertions are proved true.  Similarly, the Debtor fails to explain why it disregarded the Massey Appraisal for purposes of the Plan, but used that same appraisal to argue that the Debtor has equity in the Property in its objection to Morgan Stanley's motion for relief from the automatic stay.  *See* Docket No. 105.  This information is critical to Morgan Stanley and other creditors and parties in interest.

### b)      The Debtor's Budgeted Projections

31.     Factors (c) and (n) above require the Debtor to adequately disclose "the anticipated future of the company" and "financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan."  *In re United States Brass Corp.*, 194 B.R. at 424-25.  Although the Debtor attached a budget to its Plan, the Debtor fails to disclose who calculated those projections and how it calculated those projections—that is, are the projections based on historical information with certain built-in assumptions and, if so, what are those assumptions.  For example, from present to 2015, the Debtor's average room rate

increases from $92.86 to $107.45—a $14.59 increase over a five-year span. Is this rate hike in line with the market forces in the Denton County area, and if not, what factors support an corresponding increase in demand from a 56.62% average occupancy in 2005 to a 63.14% average occupancy in 2015? This information is important because it affects the Debtor's ability to meet its obligations under the proposed Plan, including its debt service obligations to Morgan Stanley. What is more, without adequate disclosure of information underlying these assumptions, Morgan Stanley is left to assume that the Debtor is attempting to paint an unrealistic and rosy future for itself and its prospect for reorganization by inflating its bottom line. This lack of disclosure also contravenes factor (o) above, which requires the Debtor to adequately disclose "information relevant to the risks imposed to creditors under the plan." *In re United States Brass Corp.*, 194 B.R. at 424-25.

32.     Further, the Debtor states in Article II § 4 of its Disclosure Statement that the Debtor's financial forecast "shows that the Debtor will be able to service its plan obligations during the period from August 2010 until December 2015." *See* Disclosure Statement, Article II § 4 at 8. Yet the Debtor's obligations to Morgan Stanley under the Plan run through 2017 because the Debtor's Plan extends the maturity on the indebtedness due to Morgan Stanley until 2017. *See* Plan § 5.1 (stating that "[t]he New Bank Note will mature on a date that is eighty-four (84) months from the Effective Date."). The Debtor therefore fails to disclose whether it can satisfy its obligations to Morgan Stanley from 2015 to 2017. Because the Debtor has failed to develop fully the facts supporting its financial projections and its ability to satisfy its obligations under the Plan, this Court should not approve the Disclosure Statement.

### c) The Nature, Treatment, and Classification of Claims

33. Factor (g) above requires the Debtor to adequately disclose "the scheduled claims." *In re United States Brass Corp.*, 194 B.R. at 424-25. The Disclosure Statement fails to describe adequately each creditor and their respective claims.

     a.    <u>The TFL Claim</u>—The Debtor fails to provide any details as to what the TFL Claim is. Instead, the Debtor circularly and unhelpfully defines the TFL Claim as "the claim asserted by TFL." *See* Plan § 1.85. There is no discussion or detail as to: (i) the nature of the TFL Claim; (ii) whether it is secured, priority, or unsecured; (iii) the amount of the TFL Claim; or (iv) any business reason for separately classifying the TFL Claim.

     b.    <u>Secured Denton County/City Tax Claim</u>—The first problem with the Secured Denton County/City Tax Claim (the "**Denton Claim**") is that the Debtor states that this claim will be paid "in accordance with Section 7.4(b) and 10.2." *See* Plan § 5.2. But there is no Section 7.4(b) or 10.2 in the Plan. Second, in Section 6.1, the Debtor states that the Denton Claim is impaired, but the Debtor fails to provide information regarding why the Denton Claim is impaired if it will be paid in full. Third, the Debtor does not disclose the prepetition amount due and owing on the Denton Claim.

     c.    <u>Priority Employee Claims</u>—There is no discussion or detail as to: (i) the identity of the entities holding Priority Employee Claims; (ii) the respective amounts due to such holders; and (iii) what interest, if any, is due to such holders and why such holders are entitled to interest. Further, the Disclosure Statement is misleading because the Debtor states it will

pay Priority Employee Claims according to "pre-petition custom and practice," but fails to explain what the Debtor's prepetition custom and practice was. *See* Plan § 5.3. Finally, the Debtor fails to disclose how the Priority Employee Claims are impaired when the Debtor has already admitted in its Schedule E that all prepetition employee claims were paid in full. *See* Docket No. 34 and 93.

d. <u>Comptroller Claims</u>—There is no discussion or detail as to: (i) what part of this claim is secured or priority; (ii) the amount due; and (iii) what interest, if any, is due to such holders and why such holders are entitled to interest. To the extent the Debtor is attempting to separately classify priority tax claims under 11 U.S.C. § 507(a)(8), the Debtor would violate 11 U.S.C. § 1123(a)(1).

e. <u>Subordinated Insider Claims</u>—There is no discussion or detail as to (i) the amount of these claims, (ii) the basis for these claims, or (iii) what makes these claims subordinated.

f. <u>Current Partnership Interests</u>—The Disclosure Statement lacks adequate information regarding why the equity holders are entitled to vote on the Plan when the Plan provides that current equity interests are being cancelled under the Plan. *Compare* Plan § 5.8 *with* Plan § 6.1. Under 11 U.S.C. § 1126(g), the equity holders are deemed to reject the Plan.

### *d) Avoidance Actions and Litigation Claims*

34. Factors (p) and (q) above require the Debtor to adequately disclose "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers" and the

- 14 -

"litigation likely to arise in a nonbankruptcy context." *In re United States Brass Corp.*, 194 B.R. at 424-25. The Disclosure Statement lacks any information on what claims exist, the substance of any particular action, the likelihood of recovery, the costs necessary to fund such litigation, or the source of such funding. Instead, the Debtor merely reserves its right to pursue all causes of action. *See* Plan § 11.1. But "the disclosure statement must give . . . creditors holding allowed claims who are entitled to participate (vote and object) in the confirmation process adequate notice of and information regarding the claims that the reorganized debtor will be bringing against them under the plan." *In re Mickey's Enter., Inc.*, 165 B.R. 188, 194 (Bankr. W.D. Tex. 1994) (holding that general language purporting to reserve such claims is insufficient). As such, the Debtor's provision of information regarding avoidance actions and other litigation is deficient. Moreover, the Debtor makes a passing reference to two lawsuits—the "Stump Lawsuit" and the "Bank Litigation"—which are undefined and not discussed anywhere else in the Plan. *See* Plan § 11.1. Accordingly, the Debtor has failed to comply with Section 1125.

### e) The Debtor Fails to Disclose the Amount of Administrative Claims

35. Factor (l) above requires the Debtor to adequately disclose "the estimated administrative expenses, including attorneys' and professionals' fees." *In re United States Brass Corp.*, 194 B.R. at 424-25. Although the Debtor discloses how administrative claims will be treated in Article 4 of the Plan, nowhere does the Debtor disclose the estimated administrative expenses, including attorneys' and professionals' fees. Disclosure of these amounts is vital to the Plan because the Debtor must pay administrative expenses in full on the effective date of the Plan. *See* 11 U.S.C. § 1129(a)(9). As such, the Disclosure Statement lacks adequate information regarding the amount of administrative claims the Debtor has incurred and will incur up to Plan confirmation.

*f)* ***There is Inadequate Information Regarding the "New-Value-By-Mail" Auction.***

36.     The discussion regarding the proposed "new-value-by-mail" auction is illusory because the Disclosure Statement fails to explain the process and procedures underlying the purported new value contribution. *See* Plan § 7.5. For instance, if an entity submits a bid for the putative "New Partnership Interests," *see* Plan § 1.60, how will the Debtor determine if that entity is a qualified bidder and what procedures will govern the Debtor's decision to accept or reject the bid? If the Debtor rejects a bid, will the Debtor provide that entity the reason it decided to reject the bid?

37.     The Debtor should also disclose: (i) why and how the proposed "new value" is necessary to and beneficial for the Debtor's Plan and its future operations; (ii) how a $20,000.00 contribution is substantial enough to permit insiders to retain partnership interests in the Debtor; (iii) whether the insiders holding "Current Partnership Interests" will receive any remuneration on account of their existing equity interests; and (iv) what happens to bidding if several rounds of bid occur, given that bidding begins ten business days before the confirmation hearing and each round of bidding occurs at two business day intervals. Moreover, any auction should be a live, bona fide auction, not one that takes place by mail. For these reasons, the Disclosure Statement does not contain sufficient information.

*g)* ***There is Insufficient Disclosure of the Basis for the Injunction in the Plan.***

38.     The Debtor fails to disclose the justification for imposing what appears to be a temporary injunction against Morgan Stanley's lawsuit to recover on its guaranty claims against two non-debtors—Mr. Gaylord Hall ("**Hall**") and Mr. Glenn J. Gunter ("**Gunter**")—pending in the United States District Court for the Northern District of Texas, Case No. 3:10-cv-00974-K.

*See* Plan § 7.9.  To be sure, the Debtor neither discloses how such an injunction is allowed under Section 524(e) of the Bankruptcy Code, nor how this Court has jurisdiction to issue such an injunction, given that the Plan and Disclosure Statement fail to show that Hall or Gunter will have any postconfirmation responsibility with respect to the management or operations of the Debtor.

### h)  There is a Lack of Adequate Information Regarding the New Bank Note.

39.     The Debtor seeks to force a modified loan on Morgan Stanley without providing Morgan Stanley with sufficient information to truly assess its credit risk and conduct its due diligence.  The Debtor's Plan seeks to stretch maturity for seven years, which includes a balloon payment at maturity.  Over those seven years, the indebtedness due to Morgan Stanley is based on a twenty-five year amortization, which, according to the Debtor's budget, will result in monthly payments of approximately $72,000.00.  These payments will not begin until the Debtor modifies and drains every reserve that is provided for under the current loan with Morgan Stanley.  *See* Plan § 5.1.  The Disclosure Statement and Plan stop there, thereby rendering the Disclosure Statement incomplete and inadequate.

40.     The Debtor should disclose: (i) how it intends to pay the balloon payment to Morgan Stanley at maturity (for example, a sale or refinancing); (ii) what the Debtor intends to do if it cannot pay the balloon payment; (iii) what affect will there be on the Debtor's Plan if the Debtor cannot satisfy the balloon payment; (iv) what provisions will be included in the New Bank Note, such as covenants, default provisions, cure, and whether these provisions will be customary in the industry; and (v) when the Debtor intends to close the New Bank Note.  Moreover, the Plan attempts to modify or remove many terms and protections Morgan Stanley had in place under the Amended Note and Second Modification Agreement, which has a

corresponding impact on, among other things, the interest rate Morgan Stanley should be paid under the Plan. The Debtor fails to disclose how an increased interest rate might affect its Plan and the distributions to Morgan Stanley and other creditors. Without this information, the Disclosure Statement contains inadequate information.

### 2. Factual Misstatements, Drafting Errors, and Other Infirmities

41. Not only does the Disclosure Statement lack adequate information in key substantive areas, but also the Disclosure Statement is riddled with factual misstatements, drafting errors, and other infirmities, which render it ambiguous, misleading, and incomplete.

    a.    The Plan defines "Bankruptcy Court" as "the Bankruptcy Court for the Northern District of Texas, but the case is pending in the Eastern District. *See* Plan § 1.9.

    b.    The defined term "Deemed Collateral Value" in Section 1.34 of the Plan is confusing and ambiguous, not to mention the fact that it is not used anywhere in the Plan.

    c.    In Article VI of the Disclosure Statement, the Debtor states that "[t]he *present value* of the Debtor's real estate is less than the amount of the Lender's Claim of $11,766,131.54." *See* Disclosure Statement, Article VI, at 19. Although this statement is in the liquidation analysis, it seems to conflict with the Debtor's previous statements as to the value of the Property. *Compare* Disclosure Statement, Article VI, at 19 *with* Plan § 5.1. Coupled with the Debtor's statement that "NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO THE VALUE OF THE ASSETS HAVE BEEN

AUTHORIZED" creates ambiguity as to what the Debtor contends as the true value of the Property. *See* Disclosure Statement at 1-2.

d.     The Debtor also misstates the events leading up to the filing of its bankruptcy petition. In Article II, § 3 of the Disclosure Statement, the Debtor attempts to cast Morgan Stanley as being "very aggressive in its dealings with the Debtor," alleging that Morgan Stanley declared a default because the Debtor was eight days late on one payment. Disclosure Statement, Article II, § 3 at 7. This statement is inaccurate. In fact, the Debtor missed more than one payment to Morgan Stanley before Morgan Stanley declared a default.

e.     One page seven of the Disclosure Statement, the Debtor characterizes the fact that it extended the maturity on the note to Morgan Stanley as some onerous condition Morgan Stanley forced the Debtor to do; to the contrary, the Debtor voluntarily chose to extend the maturity on the note.

f.     The Debtor's statements about the cash on hand are misleading. On page nine of the Disclosure Statement, the Debtor chooses an arbitrary date, stating that as of April 30, 2010, the Debtor had approximately $203,939.24 in cash. *See* Disclosure Statement, Article II, § 5 at 9. This statement is misleading because the Debtor is required pursuant to the Final Cash Collateral Order to pay Morgan Stanley 50% of its excess cash flow. *See* Docket No. 64. Thus, the Debtor fails to disclose that it paid Morgan Stanley $85,198.95 of its cash on hand after April 30, 2010.

# IV.    CONCLUSION

42.    Intentional or not, the lack of disclosure in the Disclosure Statement has created a veil of secrecy regarding the Debtor's intentions under the Plan.    The Bankruptcy Code, however, "'requires adequate disclosure, not *selective* disclosure.'"    *In re Mickey's Enter., Inc.*, 165 B.R. at 194.    Because of the Debtor's ostensibly selective disclosure, which has shrouded its Plan in secrecy, the Court should deny approval of the Disclosure Statement until the Disclosure Statement provides Morgan Stanley (and other creditors and parties in interest) with information sufficient to inform Morgan Stanley "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."    *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).    In short, the Debtor's Disclosure Statement creates more questions than it answers.

WHEREFORE, Morgan Stanley respectfully requests that the Court deny the approval of the Debtor's Disclosure Statement and grant Morgan Stanley other and further relief as the Court deems just and appropriate.

**ALSTON & BIRD LLP**

*/s/ Joshua P. Martin*

Joshua P. Martin
Texas Bar No. 24037030
2200 Ross Avenue, Suite 3601
Dallas, Texas  75201
Telephone:  (214) 922-3400
Facsimile:  (214) 922-3899
josh.martin@alston.com

Jason H. Watson (admitted *pro hac vice*)
David A. Wender (admitted *pro hac vice*)
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia  30309-3424

Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777
jason.watson@alston.com
david.wender@alston.com

*Counsel for Morgan Stanley Mortgage Capital Holdings LLC.*