# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-40836 |
| | § | |
| **DENTON LONE OAK HOLDINGS, L.P.,** | § | |
| **A/K/A HOLIDAY INN & SUITES DENTON** | § | |
| | § | **CHAPTER 11** |
| **Debtor.** | § | |

## DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT

## ARTICLE I: INTRODUCTION

### A.  General

1.  Denton Lone Oak Holdings, L.P. ("Debtor") provides this First Amended Disclosure Statement ("Disclosure Statement') to all of the Debtor's[1] known creditors entitled to same pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "Code"). The purpose of this Disclosure Statement is to provide creditors of the Debtor with such information as may be deemed material, important and necessary in order for the creditors to make a reasonably informed decision in exercising the right to vote on the Plan presently on file with the Bankruptcy Court and described below.

2.  A copy of the First Amended Plan (the "Plan") accompanies this Disclosure Statement as Exhibit "A" and is incorporated herein by reference.  The definitions found in Article 1.0 of the Plan are incorporated herein by reference and should be referred to in reading and analyzing the Plan and this Disclosure Statement.

3.  **NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO THE FUTURE BUSINESS OPERATIONS, THE VALUE OF**

---

[1]     Unless otherwise noted, all capitalized terms herein shall have the same meaning as in the Plan.

**ASSETS, ANY PROPERTY OR CREDITOR'S CLAIMS INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED.** Any representations or inducements made to secure your acceptance or rejection, which are other than as contained in this Disclosure Statement, should not be relied upon by you in arriving at your decision.

4.      The financial information contained herein has not been subject to an audit, certified or otherwise. **FOR THIS REASON AND BECAUSE OF FINANCIAL CONSTRAINTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES, ALTHOUGH DEBTOR HAS MADE AN EFFORT TO PRESENT SUCH INFORMATION FAIRLY AND ACCURATELY.** Additional information can be found in Debtor's Statement of Financial Affairs and its Schedules of Assets and Liabilities and its operating reports on file with the Bankruptcy Court.

5.      The Debtor proposes the Plan which accompanies this Disclosure Statement. **THE DEBTOR RECOMMENDS A VOTE "FOR ACCEPTANCE" OF THE PLAN.**

**B.      Manner of Voting**

1.      All creditors entitled to vote on the Plan may cast votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to be received no later than 4:00 p.m., prevailing central time, on _____ ___, **2010,** at the following address: Jason M. Katz, Hiersche, Hayward, Drakeley & Urbach, P.C., 15303 Dallas Parkway, Suite 700, Addison, Texas 75001.

**C.**     **Confirmation of Plan**

1.     Solicitation of Votes.  By the order entered on _____ ___, 2010, the Bankruptcy Court approved this Disclosure Statement in accordance with Section 1125 of the Bankruptcy Code.  This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor and each creditor who has filed a proof of claim.  This Disclosure Statement is intended to assist creditors in evaluating the Plan and in determining whether to accept the Plan. **UNDER THE BANKRUPTCY CODE, YOUR VOTE FOR ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNLESS YOU RECEIVE A COPY OF THIS DISCLOSURE STATEMENT PRIOR TO OR CONCURRENTLY WITH SUCH SOLICITATION.**  The solicitation of votes on the Plan is governed by the provisions of Section 1125(b) of the Code, the violation of which may result in sanctions by the Court, including disallowance of the solicited vote and loss of the "safe harbor" provisions of Section 1125(e) of the Code.

2.     Persons Entitled to Vote on the Plan.  Only the votes of members of classes of claimants which are impaired under the Plan are counted in connection with confirmation of the Plan.

3.     Hearing on Confirmation of the Plan.  The Bankruptcy Court has set **_____ _____, 2010** at **__:___ __.m.**, for a hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied.  Each creditor will receive either with this Disclosure Statement or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of the Plan.  Any objections to confirmation of the Plan must be filed in writing with the Bankruptcy Court and served upon Russell W. Mills and Jason M. Katz so as to be received by **____:___ ___.m.** on **_____ ___, 2010**, at the address noted in paragraph B above.

4. <u>Acceptance Necessary to Confirm Plan</u>. At the scheduled hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the impaired classes. Under Section 1126 of the Code, an impaired class is deemed to have accepted the Plan if at least two-thirds in amount and more than one-half in number of claims of class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.

5. <u>Confirmation of Plan Without Necessary Acceptance</u>. The Plan may be confirmed even if it is not accepted by all of the impaired classes if one of the impaired classes accepts it and the Bankruptcy Court finds the Plan does not discriminate unfairly against and is fair and equitable to the dissenting class. This provision is set forth in Section 1129(b), a relatively complex provision of the Code. This summary is not intended to be a complete statement of the law. The Debtor may choose to rely upon this provision [Section 1129(b)] to seek confirmation of the Plan if it is not accepted by an impaired class or classes of creditors.

## ARTICLE II: DESCRIPTION OF THE DEBTOR AND STATUS OF THE CASE

1. <u>Ownership Of The Debtor</u>.

The Debtor is a Texas limited partnership incorporated on July 18, 2007. The Debtor is owned by two limited partners and one general partner. The largest limited partner is Lone Oak Hospitality, Ltd. ("LO Hospitality") with an 89% interest. Rainer Income & Growth Fund III, LLC ("Rainier") is a limited partner with a 10% interest. Lone Oak GP, LLC ("LO GP"), the general partner, is a 1% interest owner. ***All of the owners support the Plan***.

However, there is a dispute presently as to who will be the general partner of the Debtor postconfirmation. Basically, the dispute involves who is the general partner of LO Hospitality and is therefore able to determine the general partner of the Debtor. On or about March 2010, Teasley

Partners, Ltd. ("Teasley), a 60% limited partner in LO Hospitality, purported to remove Lone Oak Hospitality, Texas, LLC ("LO Hospitality Texas"), the 1% general partner in LO Hospitality, as the general partner of LO Hospitality and replaced LO Hospitality with Glenn Gunter ("Gunter") as the general partner. Gaylord Hall, the owner of LO Hospitality Texas, denies that LO Hospitality Texas was removed as general partner of LO Hospitality and denies that Gunter is the general partner of LO Hospitality.

Asserting that LO Hospitality Texas was removed as the general partner of LO Hospitality, Gunter, acting as purported general partner of LO Hospitality, and Rainier purport that they then took action to remove LO GP as the general partner of the Debtor and to replace LO GP with Torreon, LLC ("Torreon") to be effective July 16, 2010. Torreon is owned 100% by Randy Lacey ("Lacey") who also owns an interest in Teasley. At present, Lacey is the sole managing member of Torreon but this will be changed to also include Gunter and a representative of Rainier. According to Rainier, the documents necessary to complete this removal have been signed or will be signed and the replacement will be in accordance with the applicable operating agreements. It is expected that LO GP, through Hall, will deny that LO GP can be removed as general partner of the Debtor. To avoid having any effect on the Plan process, Torreon and Rainier have committed that they will take no further action to seek the actual removal of LO GP, the general partner of the Debtor, until after the Plan is confirmed.

LO GP, LO Hospitality, Rainier, and LO Hospitality Texas all supported the bankruptcy filing and they, along with Torreon now, all support the Plan, all agree that this dispute shall have no affect on the ability to have the Plan confirmed or to perform under the Plan, and all support the continued management by DHC. There are some differences expected, however, about actions that either

Torreon or LO GP might take under the Plan. Most notably, these involve: (a) whether objections might be made by the Debtor to the claims of TFL, however, both agree that, if the TFL Claim is allowed by the Court, it will be paid as described in the Plan and the Budgets (as defined below) and (b) whether objections might be made by the Debtor to the $30,000 claim asserted by Kit Bradshaw and Global Consultants ("Bradshaw"). While this Plan does not propose distribution to Bradshaw who has not yet filed a claim, the Debtor will be able to fund any allowed claim awarded to Bradshaw. There could be other differences but all have agreed that they will comply with the Plan.

The dispute concerning the identity of the general partner will be resolved in a court of competent jurisdiction after confirmation and the Plan includes provisions that will prevent Morgan Stanley from asserting a default arising from replacement of a general partner or claiming that the replacement is a sale or encumbrance in violation of their loan documents.

2.     The Debtor And Its Market.

In 2003, Gaylord Hall approached the owners of 6.1 acres of real property located at 1434 Centre Place Drive in Denton, Texas 76205 ("Property") about building a hotel and acquiring a Holiday Inn franchise/license agreement. After several months of discussions and meetings, the parties reached an agreement to proceed with the construction of a hotel at the Property and acquire a Holiday Inn franchise/license agreement. In 2004, Gaylord Hall obtained the Holiday Inn franchise/license agreement. In March 2007, the construction of the hotel at the Property was completed and started operating as The Holiday Inn & Suites Denton (the "Hotel").

The Hotel is part of Denton Station, which is a master planned mixed use development featuring retail, restaurants and multi-family housing as well as student housing. The Hotel is a four story interior corridor hotel that (a) offers 153 guest rooms including 28 suites (8 have kitchenettes)

and (b) has a bar and grill, 167 surface spaces, an indoor swimming pool, fitness room, Jacuzzi, 5,000 square feet of flexible conference and banquet space, 24 hour business center, 24 hour convenience store/gift shop area, guest laundry services, an ATM machine and a patio.  Each guest room has the following amenities: TV, armoire, desk and chair, side chair, end table, lamps, mini-refrigerator, wet bar (junior suites), cook top with four burners (executive suites), countertops and cabinets stocked with cookware, dishes and flatware (suites only), two telephones, wired for high-speed internet connection, iron/ironing board, coffeemaker, clock radios, hair dryer, microwave oven, floor-to-ceiling draperies and sheers, wall-mounted headboard, lounge chairs or sleeper sofa (Suites only), wood-finished side tables and/or coffee tables and wooden entry door with brass hardware, peephole, deadbolt and electronic "smart" lock.

The Hotel is approximately 30 miles northwest of Dallas, 20 miles northeast of Fort Worth and is ideally located in the center of the triangle between the University of North Texas, Downtown Denton and the Denton Regional Medical Center providing accessibility to all of the economic centers in the area.  Some of the major employers in the Denton area include University of North Texas, Denton Independent School District, Texas Woman's University, Denton County, Denton State School, Peterbilt Motors Company, City of Denton, Denton Regional Medical Center, Thermadyne Industries and Presbyterian Hospital of Denton.  The Hotel is approximately one mile from Denton Crossing, which is a 334,659 square foot shopping center built in 2004 containing stores like Kroger, Bed Bath & Beyond, Wal-Mart Supercenter, and Best Buy.  The Hotel is also near the following recreational opportunities: Lewisville Lake (approximately seven miles), Texas Motor Speedway (approximately 13 miles), North Lakes Park (approximately 4 miles) and Lake Ray Roberts (approximately 6 miles).

The Hotel is still proving to be a great place to stay for travelers. For example, on March 27, 2010, the Hotel received a three star rating after an AAA inspection/evaluation, which is above average for a Holiday Inn. The inspector commented that the "[h]ousekeeping and maintenance is impeccable." and "Staff was friendly and accommodating."

    3.    <u>Debtor's Financial And Operational Difficulties</u>.

    A.    Task Force Logistics, Inc.

The Debtor's hotel and property were previously owned by Lone Oaks Hospitality, Ltd. ("LOH"). In 2007, the construction lender, Colonial Bank, made demand on its note LOH was forced to locate additional financing to satisfy Colonial. LOH approached Task Force Logistics, Inc. ("TFL") about a loan. Eventually, TFL loaned approximately $1,500,000 to LOH pursuant to a note (the "TFL Note") and took a second lien behind Colonial pursuant to a deed of trust (the "TFL Deed of Trust").

LOH's difficulties with Colonial forced it to approach Morgan Stanley Capital Holdings, LLC ("Morgan Stanley") regarding refinancing the Colonial debt and this led to the first financing with Morgan Stanley in 2007. At the closing of that 2007 financing, TFL received $1,000,000 toward the TFL Note and agreed to execute a full release of the TFL Deed of Trust. As a condition to closing, Morgan Stanley required that LOH transfer the hotel and property to a newly-formed entity, the Debtor, as part of the refinancing. TFL now maintains that it mistakenly gave a full release of the TFL Deed of Trust and, since it says it was underpaid on the TFL Note at closing, that the Debtor owes TFL approximately $500,000 under the TFL Note. Debtor disputes that: (a) TFL is a secured creditor because TFL gave a full release of its lien; and (b) TFL is owed any debt by the Debtor arising from the TFL Note because the TFL Note was executed by LOH. TFL has not filed a claim

and is apparently unable to provide any further documentation supporting this alleged claim despite repeated requests. TFL's recent pleadings indicate that it believes that it continues to hold a second lien and that it may file a lawsuit to determine the extent of any purported lien. LO GP, LO Hospitality, Torreon and Rainier all agree that TFL has no claim against the Debtor arising from the TFL Note or TFL Deed of Trust. For these reasons, the Plan does not account for payment to TFL of any amounts owing under the TFL Note or TFL Deed of Trust.

Separate from the TFL Note and TFL Deed of Trust, one of Debtor's former representatives, Mike Blackwell, has recalled that TFL wired the sum of $200,000.00 directly to the Debtor's operating account in March 2008 (the "TFL Contribution"). At the same time, Gaylord Hall, the owner of the Debtor's general partner, wired an additional $150,000.00 to the Debtor. According to Mr. Blackwell, this $350,000.00 in transfers was used in connection with the 2008 refinancing with Morgan Stanley though this has not been documented. No note was executed and no other documentation is known to exist. Rainier and Torreon assert that the TFL Contribution was loaned to LO Hospitality rather than the Debtor and that TFL has no claims against the Debtor. The Debtor's general ledger shows an entry for an "owner contribution" of $349,974, but does not show who made the contribution. Again, TFL's counsel has been unable to provide any further documentation proving the TFL Contribution despite repeated requests. The Plan proposes to set the claim of TFL at $200,000.00 arising from the TFL Contribution and proposes to pay TFL the full amount of the TFL Contribution along with interest *provided* that the TFL Contribution is allowed by the Court as a claim. The Budgets (as defined below) include full payment to TFL and there is no distinction in the classification of the TFL Claim and the claims of other non-insider undisputed general unsecured creditors.

B.     Morgan Stanley Mortgage Capital Holdings, LLC

On July 30, 2007, the Debtor executed a (a) promissory note in the principal amount of $12,850,000.00 (the "Original Note") in favor of Morgan Stanley, (b) Deed of Trust and Security Agreement ("Deed of Trust") and (c) Assignment of Leases and Rents ("ALR"). The Deed of Trust and ALR are collectively referred to as Security Instruments. Approximately three days after executing the Note, a financial crisis hit the economy and interest rates rose 200 basis points in one day. Luckily for the Debtor, the Note contained a 6.81% fixed interest rate with a 30 year amortization with a balloon payment after 10 years. Approximately 60 days after the execution of the Note, Morgan Stanley approached the loan broker who had obtained the loan for the Debtor and informed him that Morgan Stanley would discount the loan by 10% if the Debtor could pay off the Note. The Debtor had no luck with refinancing the Note as the credit markets had collapsed.

Since the execution of the Note, Morgan Stanley has been very aggressive in its dealings with the Debtor. Morgan Stanley has over-escrowed taxes, insurance, FF&E to such a degree that the Debtor was eight days late on a mortgage payment in January 2008 and Morgan Stanley declared the Note in default. In approximately June 2008, the Debtor reached a deal with Morgan Stanley to restructure the Note for 6 months wherein the Debtor paid Morgan Stanley $120,360.00 in fees plus an approximate amount of $800,000.00 (which reduced the principal amount of the Note to $12,036,938.10) with an option to extend the loan an additional 6 months for payment of $120,360.00. Specifically, on June 2, 2008, the Original Note was amended and restated by (a) the amended and restated promissory note dated June 2, 2008 (effective May 8, 2008) in the principal amount of $12,036,938.10 ("Amended Note") in favor of Lender and (b) a Loan Reinstatement and

Modification Agreement. In December 2008, Morgan Stanley extended the Amended Note for another 6 months after the Debtor paid Morgan Stanley $120,360.00.

In January 2009, the previous management company declared a bonus of $200,000.00 and, without prior notification to the Debtor, took the money from the Debtor's accounts. The previous management company then demanded an immediate cash call payment of $150,000.00. The Debtor did not have the necessary funds to pay the $150,000.00 call. In February 2009, the Debtor filed a lawsuit against the previous management company over the $200,000.00. The Debtor reached a settlement with the previous management company, terminated the previous management company and DePalma Hotel Corporation ("DHC") took over the management duties of the Hotel. The termination of the previous management company created another default with Morgan Stanley.

On July 10, 2009, the Debtor further modified the Amended Note by entering into the (a) Second Loan Reinstatement and Modification Agreement, (b) Cash Management Agreement and (c) Restricted Account Agreement (collectively, the "Second Modification"). The Amended Note is secured by the Security Instruments and Second Modification, which purported to grant Lender, at a minimum, a lien in certain of the Debtor's assets, specifically the Property, and any additional land, improvements, easements, fixtures and personal property, leases and rents, insurance proceeds, condemnation awards, and tax refunds (the "Collateral") including, without limitation, its cash from the operation of the hotel. The Second Loan Modification reduced the $12,036,938.10 mortgage to $11,536,000.00 by paying an additional $500,000.00 in principal. In December 2009, Midland Loan Services, the loan servicing agent for Morgan Stanley, notified DHC that they had underestimated the tax escrow required by the Second Loan Modification. Midland Loan Services demanded payment of an additional $200,000.00 within 30 days. In January 2010, Midland Loan Services and the Debtor

entered into an agreement where Midland Loan Services would advance further funds for 30 days while the Debtor worked on obtaining the additional $200,000.00. Within the 30 day period, the Debtor had gathered approximately $140,000.00 of the $200,000.00 requested by Midland Loan Service. The Debtor requested an additional week to obtain the remaining funds. Morgan Stanley refused to extend the Amended Note and Second Loan Modification. As a result, the Debtor filed its chapter 11 petition on March 15, 2010.

On the Petition Date, Debtor was indebted to Morgan Stanley in the amount of $11,766,131.54. Morgan Stanley asserts that it is entitled to additional amounts of attorneys' fees and expenses and postpetition interest. Debtor asserts that Morgan Stanley is entitled to such amounts only to the extent permitted under 11 U.S.C. §506.

In connection with the 2009 refinancing with Morgan Stanley, Morgan Stanley obtained an appraisal from Cushman & Wakefield of Texas, Inc. ("Cushman & Wakefield") dated May 8, 2009 which found the Debtor's property to be valued at 14,000,000 on that date and a prospective value of $17,200,000 as of May 1, 2013 (the "First Morgan Stanley Report"). Debtor obtained a separate appraisal from a local appraiser, Michael W. Massey & Associates ("Massey"), who found the value to be $17,200,000 as of April 13, 2009. Following the Petition Date, Morgan Stanley obtained an appraisal from CB Richard Ellis dated April 16, 2010 (the "Second Morgan Stanley Report") which found the value of the property to be $9,100,000. The Debtor also obtained a second report from Massey dated April 26, 2010 who found the value to be $13,140,000 (the "Second Massey Report"). The Debtor fully believes that the Second Massey Report is correct and that there is equity in Morgan Stanley's collateral. Copies of any of these reports may be obtained from the undersigned counsel for further review.

C.    Holiday Hospitality Franchising, Inc.

On the Petition Date, the Debtor was in arrearages under the franchise agreement with Holiday Hospitality Franchising, Inc. ("HHFI") in the amount of $86,097.00. HHFI asserts that Debtor also owes additional amounts for attorneys' fees, costs and unpaid postpetition amounts.

4.    The Bankruptcy Filing and The Status Of The Bankruptcy Case.

On March 15, 2010, the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code. Soon thereafter, the Debtor filed (a) an Application pursuant to 11 U.S.C. §§ 327, 328 & 329 and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure for an order authorizing the retention of Hiersche, Hayward, Drakeley & Urbach, P.C.; (b) a Motion For Entry of Interim Order Authorizing Use Of Cash Collateral Pursuant to 11 U.S.C. § 363; (c) a Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a) and 366 Prohibiting Utilities from Discontinuing, Altering, or Refusing Service, and Establishing Procedures for Determining Adequate Assurances of Payment and (d) Emergency Motion to Approve Payment of Prepetition Wages, Salaries, Commissions, Reimbursable Expenses and benefits in the Ordinary Course of Business (and subsequent Amended Motion).

On March 18, 2010, the Court entered its Order wherein it approved the Debtor to pay prep-petition employee obligations. On March 19, 2010, the Court entered its Interim Order Regarding the use of cash collateral allowing the Debtor to use cash collateral until April 5, 2010 on certain terms (the court entered a subsequent agreed order regarding the use of cash collateral allowing the Debtor to use cash collateral until April 29, 2010 on certain terms).

On April 7, 2010, the Court entered its Order wherein it approved the employment of HHDU. On April 9, 2010, the Court entered its Order approving the adequate protection proposal made by

the Debtor, approved the Debtor's proposed procedures for dealing with objections and prohibited utilities from altering, refusing or discontinuing service to the Debtor for non-payment of prepetition debt.

On April 21, 2010, the Debtor filed an (a) Application to Employ Accountants, (b) Application to Employ Mike Massey as Expert Witness and (c) Application to Employ DePalma Hotel Corporation To Provide Additional Management to the Debtor and to Designate Joe N. DePalma as Chief Executive Officer. On April 29, 2010, the Debtor filed an Amended Application to Employ DePalma Hotel Corporation To Provide Additional Management to the Debtor and to Designate Joe N. DePalma as Chief Executive Officer. On May 3, 2010, the Debtor withdrew its Application to Employ Accountants. On May 7, 2010, the Court entered its Final Order Regarding the use of cash collateral allowing the Debtor to use cash collateral through the effective date of a confirmed plan of reorganization on certain terms (the "Cash Collateral Order"). On May 13, 2010, the Debtor filed another Application to Employ Accountants. On May 18, 2010, the Court entered its Order wherein it approved the employment of Massey as an expert witness. On May 19, 2010, the Court entered its Order wherein it approved the employment of DHC as the management company of the Debtor and approving DePalma as the CEO of the Debtor.

On May 19, 2010, TFL filed a motion for 2004 examination of Denton County Title Company. On May 21, 2010, TFL filed a motion for 2004 examination of LO Hospitality. On June 9, 2010, the Court entered an order granting TFL's motion for 2004 examination of Denton County Title Company (on June 11, 2010, the Court subsequently entered an agreed order granting the motion reflecting the parties agreement in resolution of the 2004 motion). The Court has not ruled on the motion for 2004 examination of LO Hospitality. On June 2, 2010, the Court entered its order

wherein it approved the employment of Crowder as Debtor's accountants.

On June 7, 2010, the Debtor filed a Disclosure Statement and Plan of Reorganization. On June 8, 2010, the Court entered an order setting the hearing on the Disclosure Statement for July 19, 2010. On July 12, 2010, TFL, Holiday Hospitality Franchising, Inc. and Morgan Stanley filed objections to the Debtor's disclosure statement (On July 13, 2010, TFL filed a supplemental objection).

On June 9, 2010, Morgan Stanley filed a Motion for Relief From Automatic Stay Under 11 U.S.C. § 362(d)(2) ("Lift Stay Motion"). Morgan Stanley attached the Second Morgan Stanley Report in support of the Lift Stay Motion which asserts that the value of Morgan Stanley's collateral is $9,100,000. Morgan Stanley asserts that, if the Court found that the property was valued at $9,100,000, then "cause" would exist to lift the stay because the Debtor would be unable to confirm a plan of reorganization. On June 23, 2010, the Debtor filed a Response in opposition to the Lift Stay Motion. The Debtor attached the Second Massey Report that showed the value of the property to be $13,140,000 and pointed out that the valuation rendered in the Second Massey Report would provide a significant equity cushion to Morgan Stanley such that the stay should not be lifted. The Court set the Lift Stay Motion for preliminary hearing on July 6, 2010. On July 1, 2010, the Debtor and Morgan Stanley filed a Joint Motion to reschedule the July 6, 2010 hearing on the Lift Stay Motion with the confirmation hearing on the Debtor's plan of reorganization. On July 6, 2010, the Court set the Lift Stay Motion for hearing on September 13, 2010. It is expected that the Confirmation Hearing will be set along with the Lift Stay Motion. On July 13, 2010, Morgan Stanley served notice of its intention to take the deposition of the Joe DePalma of DHC and the Debtor's valuation expert along with interrogatories, request for admission and requests for documents in connection with the

Plan and Disclosure Statement.

5.        Debtor's Performance Postpetition.

The following information shows the results of Debtor's operations since the Petition Date compared to the current year budget and to prior year actual results:

| Period | Prior Year Actual | Current Year Budget | Actual |
|--------|-------------------|--------|--------|
| 3/15-3/31 | (33,240)[2] | 33,229 | 26,303 |
| 4/1-4/30 | 70,972 | 75,320 | 105,047 |
| 5/1-5/31 | 42,261 | 26,820 | (19,009) |
| 6/1-6/30 | 21,170 | 50,890 | (43,806) |

These results reflect the recent openings of four (4) new nearby hotels which resulted in an increase of 23-24% supply in the marketplace combined with the summer vacation of the University of North Texas. Demand typically increases considerably with the opening of school in August and, in 2011, the University of North Texas will open a new football stadium that will further increase occupancies. DHC further notes that business travel is finally beginning to increase and estimates a gradual increase in occupancy rates in the area. DHC, with over forty years of experience in the hotel industry, will testify that their opinion is that the Debtor will be able to meet the forecasts shown in the Budgets because of the beginning overall upward trend of occupancies in the hotel industry and because of the Debtor's specific market opportunities.

6.        <u>Debtor's Ability to Fund Reorganization, Its Financial Forecast And Its Business Plan</u>.

The Debtor intends to reorganize its business through a restructuring of the debt owing to Morgan Stanley and continued operation of the Hotel resulting in payment of 100% of all valid claims

---

2      This entry includes information for the entire month of March rather than merely March 15 to March 31.

with interest. This plan gives the Debtor time to operate while providing Morgan Stanley reasonable payments and adequate collateralization. The Debtor's financial forecasts are attached hereto as Exhibits "B" and "C" and are incorporated herein by reference. Exhibit "B" reflects the Debtor's operating budget assuming that the Debtor is permitted to use the Reserves to fund its obligations to Morgan Stanley under the Plan ("Budget B"). Exhibit "C" reflects the Debtor's operating budget assuming that the Debtor is *not* permitted to use the Reserves to fund its obligation to Morgan Stanley under the Plan ("Budget C"). How different rulings on the use of the Reserves affects payments to creditors is explained in further detail in Article II, Sections 7, 9 and 12 below.

      7.    <u>Funds Available</u>.

As of June 30, 2010, the Debtor had cash on hand of $158,067.04 which included an operating account ($148,730.98), a managers account ($1,624.06) and a beverage account ($7,712) and an additional $126,239.29 in a separate reserve account set aside for payment of attorneys' fees, accountants' fees ($47,500.00) and taxes and other accruals ($78,739.29). Pursuant to the Cash Collateral Order, Debtor has submitted ½ of its monthly net operating expenses (as defined in the Cash Collateral Order) to Morgan Stanley which amounted to $85,198.95 and Debtor will continue to do so until confirmation of this Plan to the extent required under the Cash Collateral Order.

      The Debtor has no receivables of any significant value. As of the Petition Date, Morgan Stanley held the following approximate amounts in escrow pursuant to certain prepetition agreements: FFE Reserve Account ($113,420.88), Interest Reserve Account ($209,326.53), Insurance Reserve Account ($72,565.90), and Tax Reserve Account ($0) (collectively, the "Reserves"). Morgan Stanley had previously been using the Reserves to pay the applicable expenses but, upon the bankruptcy filing, stopped making such payments and asserted that the Reserves were

instead additional collateral. (Pursuant to an agreement approved by the Court, Morgan Stanley advanced certain funds from the Reserves to pay for the Debtor's insurance but this amount has been repaid). Upon information and belief, all of the Reserves are presently held by Morgan Stanley. The Debtor asserts that the Reserves are operating funds of the Debtor that Debtor can use to fund the Plan. Debtor proposes to use the Reserves to fund its restructured debt obligations to Morgan Stanley. Debtor asserts that Morgan Stanley was not entitled to withhold the Debtor's operating funds from the Debtor under the applicable documents. Morgan Stanley asserts that, in the event that the Reserves are found to be not available for use by the Debtor, then the Debtor will not be able to fund its Plan obligations. The Debtor asserts that, if the Reserves are not available for use in servicing the restructured Morgan Stanley debt, the Debtor will still be able to fund the Plan and payments to unsecured creditors will be completed by 2016 as shown in Budget C rather than 2015 as shown in Budget B.

8. <u>Potential Litigation</u>. There is no known litigation which might result in additional recoveries by the Debtor other than a possible lawsuit by the Debtor against its former management company, Hospitality Management Corporation ("HMC"). HMC had collected various overpayments from the Debtor and took other actions that damaged the Debtor that eventually led to difficulties with Morgan Stanley discussed earlier. HMC and Debtor entered into a settlement agreement but Debtor asserts that HMC has violated that agreement.

There is also potential litigation against Morgan Stanley that might result in the recovery of monies that Debtor may use to fund its obligations under the Plan. This is discussed above in further detail.

The Debtor's schedules reflect that $273,731.00 in payments were made in the 90 days prior to the Petition Date. Of that amount, $97,632.00 was paid for sales or property tax and $108,901.00 was paid to entities with contracts that the Debtor is assuming. None of these are recoverable.

Torreon and Rainier assert that the Debtor may able to recover certain monies paid by the Debtor to Bradshaw. Bradshaw was a party to an agreement with the Debtor whereby he attempted to locate capital for the Debtor. Torreon and Rainier assert that the Debtor paid Bradshaw in excess of $50,000.00 for those services.

TFL has indicated that it may initiate litigation to determine the extent of its alleged lien.

9.    <u>Summary of Claims</u>.

The Plan categorizes Debtor's claims as follows:

> <u>Class 1</u> – Morgan Stanley Claim. The amount of the Morgan Stanley Claim is $11,766,131.54. Morgan Stanley asserts that it is entitled to recovery of attorneys' fees and expenses and postpetition interest. Morgan Stanley holds a first lien in the Debtor's assets. Debtor does not dispute the Morgan Stanley Claim but has reserved the right to argue that the Reserves are the Debtor's operating funds and that it should be allowed to use the Reserves to fund its restructured debt to Morgan Stanley.

> <u>Class 2</u> – Secured Denton County/City Tax Claim. The Debtor scheduled the City of Denton as having a priority claim in the amount of $18,267.00 for occupancy taxes that had accrued through the Petition Date.[3] This claim will be paid the later of thirty days after the Effective Date or when it becomes due and this claim is included in Budget B and Budget C (the "Budgets"). The following claims were filed; County of Denton filed a secured claim in the amount of $32,156.00 (Claim #1); City of Denton filed a secured claim in the amount of $64,242.00 (Claim #16); and Denton ISD filed a secured claim in the amount of $143,612.00. All of the filed claims were for 2010 estimated real property taxes and, as noted, all will be paid when they become due. There are no delinquencies.[4]

---

3    The Debtor also scheduled an additional unsecured claim for the City of Denton in the amount of $21,245.14 for unpaid utilities. These are being paid as a Class 5 Unsecured Claim.

4    Sterling National Bank filed a secured claim in the amount of $15,000.00 and an unsecured claim in the amount of $33,531.00, but a review of the claim shows that it is a lease which is to be assumed and there is a nominal arrearage.

Class 3 – Priority Employee Claims. The Debtor's schedules reflect that the Debtor owed $46,918.00 in prepetition employee wages. This included wages for prepetition pay periods in the amount of $38,418.00 and a "stub period" of $8,500.00. Pursuant to Court order entered March 18, 2010 (Docket No. 16), the Debtor paid those amounts. Debtor is unaware of any additional prepetition wages owed.

Class 4 – Comptroller Claims. Debtor's schedules reflect that the Texas Comptroller is owed $19,139.62 for sales and occupancy taxes that had accrued through the Petition Date. These claims will be paid the later of thirty (30) days after the Effective Date or the date upon which they become due.

Class 5 – Unsecured Claims. The Debtor has $359,620.58 in undisputed non-insider unsecured trade payables unrelated to a contract being assumed (which includes the TFL Claim of $200,000). The Debtor is paying 100% of these with two and one half percent (2 1/2%) interest yearly through 2015-2016.[5] This interest rate is reasonable given that a Federal rate of .25% plus 2% would result in a 2.25% rate and a high-end 60 month CD rate would be 3%. In the event that the Debtor is permitted by the Court to use the Reserves to fund obligations to Morgan Stanley under the Plan, the Debtor will make the following payments: 2010 - $60,000; 2011 -$100,000; 2012-$33,000; 2013-$70,000; 2014-$70,000; and 2015-$71,573. In the event that the Debtor is *not* permitted by the Court to use the Reserves to fund obligations under the Plan, the Debtor will make the following payments: 2010-$0; 2011-$0; 2012-$20,000; 2013-$40,000; 2014-$55,000; 2015-$192,195; and 2016-$97,448. ***This assumes that the TFL Claim is allowed in full.*** In the event that the TFL Claim is not allowed, the above payment schedules would be reduced by $200,000 resulting in full payout to Class 5 Claimants in 2012 if the Reserve is used or 2015 if the Reserve is not used.

Class 6 – Subordinated Insider Claims. The Debtor scheduled the following unsecured claims as disputed which are being treated as Insider Claims and which are subordinated under the Plan or are being withdrawn: (a) Gaylord Hall - $57,576.00, which is being withdrawn; (b) Mike Blackwell - $173,917.00 which is being

---

[5]     Schedule F of the Debtor's schedules also includes the following debts which are *not* being paid as Class 5 Unsecured Claims: (a) certain parties to contracts with the Debtor who will be paid a cure amount of $106,241 upon assumption of their contracts; (b) Global Consultants in the amount of $30,000.00 which is disputed; (c) TFL in the amount of $1,300,000.00, which is being paid $200,000.00 as discussed above; and (d) Subordinated Insider Claims of Hall, Blackwell and Lacey in the amount of $312,487.00 which are being subordinated or else withdrawn.

withdrawn; and (c) Randy Lacey -$80,994.00. Lacey is subordinating his claim by agreement and in order that valid non-insider creditors be paid first. Interest is paid at the rate of 2.5%. Assuming the TFL Claim is allowed at $200,000, Subordinated Insider Claims are being paid in full by 2015 if the Reserves are used and 2016 if they are not. In the best case, if the TFL Claim is not allowed and the Reserves are used, Subordinated Insider Claims could be paid in full in 2014.

Class 7 – Current Partnership Interests- These are described in Article II, Paragraph 1 above.

Post-petition payables are current. The only known administrative claims are those owing to professionals which will be paid upon entry of a court order approving those fees. HHDU's fees and expenses through June 30, 2010 are $111,635 and $3,482.34, respectively. HHDU holds in trust $47,966.69 and the Debtor has been reserving $10,000 per month for payment of additional fees and the balance of that reserve is $35,000 as of June 30, 2010. The Budgets provide for an additional expense of $100,000 to HHDU upon confirmation. HHDU's fees and expenses may exceed such amounts. Additional professional fees may be accrued by the Debtor's appraiser and/or accountants depending on their use in connection with confirmation of the Plan. All professional fees are subject to approval by the Court.

The Debtor intends to assume the following contracts which have cure amounts owing:

| Vendor | Cure Amount |
| --- | --- |
| HHFI | $86,097.00[6] |
| DHC | $4,452.00 |
| Acxential Business Solutions | $3,832.00 |
| Alamo Leasing Co. | $1,664.00 |
| Champion Automatic Fire | $225.00 |
| CIT Technology | $548.00 |
| Denton Lawn Sprinkler | $3,044.00 |
| Ecolab | $2,278.00 |
| First Data Merchant Svcs. | $126.00 |

---

6    HHFI asserts that Debtor also owes attorneys' fees, costs and unpaid postpetition amounts.

| | |
|---|---|
| Kone, Inc. | $2,112.00 |
| Muzak, LLC | $646.00 |
| Sterling | $1,082.00 |
| Tharaldson Communications, Inc. | $135.00 |
| Total | $106,241.00 |

Debtor will have an additional administrative claim of $106,241.00 upon assumption of these agreements and this amount is reflected in the Budgets (Other contracts are assumed in the Plan which do not have cure amounts owing).

10. Summary of Plan.

The Debtor intends to continue operation of the Hotel and to reorganize its business by:

(a) restructuring the debt owing to Morgan Stanley into a 7 year note with a 25 year amortization. The Debtor proposes to fund the first three months of interest payments with the Reserves. The Reserves will be depleted for that purpose except that Morgan Stanley may maintain only a tax and insurance reserve equal to the amount of the prior year's tax and insurance obligation, as applicable. The Debtor proposes to set the value of Morgan Stanley's collateral as $11,766,131.54. The Plan also includes a provision that the replacement of a general partner, as described above, is not an event of default or sale or encumbrance and, in the event that change is not made, Morgan Stanley asserts that it may declare a postconfirmation nonmonetary default arising solely from the replacement of the general partner;

(b) assuming the franchise agreement with HHFI and curing the default upon the Effective Date;

(c) paying unsecured creditors 100% of their claims at 2.25% interest with yearly payments through 2015; and

(d) allowing the current equity owners to retain their equity ownership interests.

11. Future Management.

Regardless of the outcome of the dispute as to the general partner of the Debtor, both LO GP and Torreon have committed that DHC will continue to manage the Property, so the Plan proposes that the present management will continue to manage the Property. The Debtor proposes to assume

its agreement with DHC and DHC will continue to act as management company to the Debtor. DHC has considerable experience in hotel management.

12. <u>Anticipated Future Of The Company</u>.

Debtor anticipates that, with the present management, it will be able to fund its operations and satisfy its obligations under the Plan. DHC, with forty years in experience in hotel management, believes that the hotel industry cycle has already begun to improve over 2009 levels and will continue to improve and will reach its peak in 2016 or 2017. DHC believes that, with the decrease in new hotel construction caused by the economy and with the removal of aging hotels from the market, demand has now and will continue to outpace supply. DHC believes that the forecasts in the Budgets, which it prepared, are reasonable and are based on the historical cyclical nature of the hotel industry. Budget B shows that the Debtor will retire its obligations to Class 5 Unsecured Claims in 2015, will retire its obligations to Class 6 Subordinated Insider Claims in 2015, and service its debt to Morgan Stanley throughout the 7-year term to conclude in 2017 whereupon the Debtor will refinance the obligation or sell the property. Budget C shows that if the Court does not permit the use of the Reserves, there will be little or no payments to Class 5 Unsecured Claims in 2010-2012 but the Debtor can still service the Morgan Stanley debt and retire its debt to Class 5 Unsecured Claims in 2015. In the event that the TFL Claim is not allowed, Class 5 Unsecured Claims may be paid in full as early as 2013.

## ARTICLE III: SELECTED SIGNIFICANT
## EXCERPTS FROM THE PLAN OF REORGANIZATION

The following is a brief summary of the Plan attached as Exhibit "A", and is qualified in its entirety by the full text of the Plan itself. The Plan, if confirmed, will be binding upon the Debtor and

its creditors. All creditors are urged to read the Plan carefully. If and when the Plan is confirmed, the Debtor expects to be able to fully perform its obligations to all classes of creditors as set forth in the Plan through the operating revenues of the Debtor.

## ARTICLE 2

## CLASSIFICATION OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

2.1     The following is a designation of the Classes of Claims and Current Partnership Interests under this Plan. Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the following classes in accordance with section 1123(a)(1) of the Bankruptcy Code. A Claim or Current Partnership Interest shall be deemed classified in a particular Class only to the extent that the Claim or Current Partnership Interest qualifies within the description of that Class. A Claim or Current Partnership Interest is in a particular Class only to the extent that the Claim or Current Partnership Interest is an Allowed Claim or Current Partnership Interest in that Class.

2.2     Claims and Current Partnership Interests:

Class 1 – Morgan Stanley Claim

Class 2 – Secured Denton County/City Tax Claim

Class 3 – Priority Employee Claims

Class 4 – Comptroller Claims

Class 5 – Unsecured Claims

Class 6 – Subordinated Insider Claims

Class 7 – Current Partnership Interests

## ARTICLE 3

## IDENTIFICATION OF IMPAIRED CLASSES OF
## CLAIMS AND CURRENT PARTNERSHIP INTERESTS

3.1     Impaired Classes of Claims and Current Partnership Interests. Classes 2, 3, 4 and 7 are not impaired under the Plan. Classes 1, 5 and 6 are impaired under the Plan.

3.2    **Impairment Controversies.**  If a controversy asserted in an objection to confirmation or other written pleading arises as to whether any Class of Claims or Current Partnership Interest is impaired under the Plan, the Bankruptcy Court shall determine such controversy after notice and a hearing and, if no such pleading is filed, then the identity of any impaired class will be conclusively determined by Section 3.1 of the Plan.

# ARTICLE 4

## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

4.1    **Administrative Expenses.**  All Administrative Expenses against the Debtor shall be treated as follows:

(1)    **Administrative Expenses Bar Date.**  The holder of any Administrative Expense other than: (i) a claim for professional fees and expenses for services rendered up to and including the Confirmation Date, (ii) a liability incurred and paid in the ordinary course of business by the Debtor; or (iii) an Allowed Administrative Expense, must file with the Bankruptcy Court and serve on the Debtor and its counsel, notice of such Administrative Expense within fifteen (15) days after the Confirmation Date.  Such notice must identify:  (i) the name of the holder of such Claim; (ii) the amount of such Claim; (iii) the basis of such Claim; and (iv) all written documentation supporting such Claim.  Failure to file this notice timely and properly shall result in such claim for the Administrative Expense being forever barred and discharged.

(2)    **Allowance of Administrative Expenses.**  An Administrative Expense with respect to which notice has been properly filed pursuant to Section 4.1(a) of the Plan shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the filing and service of notice of such Administrative Expense.  If an objection is timely filed, the Administrative Expense shall become an Allowed Administrative Expense only to the extent Allowed by Final Order.

(3)    **Payment of Allowed Administrative Expenses.**  Each holder of an Allowed Claim for an Administrative Expense other than a professional holding such a claim shall receive, at the Debtor's option:  (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the tenth Business Day after such Claim becomes an Allowed Claim; (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iii) such other treatment as may be agreed to in writing by the holder of such Administrative Expense and the Debtor.

(4)    **Payment of Allowed Administrative Expenses To Professionals.**  Each holder of an Allowed Administrative Claim that is a professional shall be paid in full by Debtor on the date upon which an order approving such claim becomes final and non-appealable.  Debtor shall make payment of such fees and expenses in full.  Professional fees and expenses incurred after the Confirmation Date shall be the obligation of the Reorganized Debtor and shall be payable by the

Reorganized Debtor and/or Hall promptly and without the need for application to or approval by the Bankruptcy Court. Hall's guarantee of payment of professional fees and expenses is reaffirmed by Hall and shall continue until all of such fees and expenses are paid in full.

4.2     Priority Tax Claims.  Each holder of a Priority Tax Claim, unless addressed otherwise herein, shall receive, at the Debtor's option:  (a) the amount of such holder's Allowed Claim in one Cash payment on the Effective Date; or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Debtor.

4.3     Un-matured Secured Tax Claims.  Each holder of an Un-matured Secured Tax Claim shall be paid by the Debtor at the time the Un-matured Secured Tax Claim becomes due and payable and in accordance with the Debtor's ordinary practice.

# ARTICLE 5

## TREATMENT OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

5.1     Class 1 – Morgan Stanley Claim.        The amount of the Morgan Stanley Claim shall be $11,766,131.54 plus any and all amounts that Morgan Stanley is entitled to under Section 506 of the Bankruptcy Code.   No part of the Allowed Claim of Morgan Stanley shall be unsecured and nothing herein shall impair the Lien of Morgan Stanley in the Collateral.  On or before the Effective Date, the Debtor will execute the New Bank Note in the amount of the Morgan Stanley Claim which will supercede and replace the Current Bank Note. The New Bank Note will mature on a date that is eighty-four (84) months from the Effective Date at which time Debtor shall pay all outstanding principal and unpaid accrued interest.  The New Bank Note shall bear interest at the rate stated in the Current Bank Note provided that no default rate of interest may be charged on any default that may have occurred prior to the Effective Date.  Monthly payments of principal and accrued interest will be paid on the New Bank Note with the first payment being due on the first day of the first month following the Effective Date and with all other subsequent monthly payments being due on the first day of each succeeding month. The monthly payments shall be calculated based on a twenty-five (25) year amortization schedule. Payments shall first be applied to accrued interest, next to unpaid principal, then to any costs or expenses for which Borrower is obligated under the Loan Documents. The monthly payment obligations due under the New Bank Note will be made as follows: a) *first,* Morgan Stanley shall make such monthly payments from the Interest Reserve until depleted.  Morgan Stanley shall no longer charge or collect from the Debtor any funds to secure payment of Debtor's interest obligations; b) *second,* Morgan Stanley shall make such monthly payments from the Insurance Reserve until the Insurance Reserve holds an amount sufficient to pay Debtor's prior year insurance obligations.  Morgan Stanley shall no longer charge or collect any funds from the Debtor to secure payment of Debtor's insurance obligations in excess of such amounts; c) *third,* Morgan Stanley shall make such monthly payments from the Tax Reserve until the Tax Reserve holds an amount sufficient to pay Debtor's prior year tax obligations.  Morgan Stanley shall no longer charge or collect from the Debtor any funds to secure payment of Debtor's tax obligations in excess of such amounts; d) *fourth,* Morgan Stanley shall make such monthly payments from the FF&E Reserve until the FF&E Reserve

is depleted. Morgan Stanley shall no longer charge or collect from the Debtor any funds to secure Debtor's furniture, fixture and equipment obligations; d) *fifth,* Morgan Stanley shall make such monthly payments from any other monies paid to Morgan Stanley by the Debtor and held in reserve for future obligations; and e) *sixth,* the Debtor shall make all payments thereafter. Upon confirmation, any and all defaults that have occurred under the Loan Documents shall be deemed cured. The replacement of the Debtor's general partner shall not constitute an event of default or be construed as a sale or encumbrance under the Loan Documents. Once any Specified Reserve Account is either depleted or reduced to the maximum amount allowed herein, Morgan Stanley will pay the applicable expense from that Specified Reserve Account when it comes due. Morgan Stanley may thereafter charge Debtor an amount necessary to replenish a Specified Reserve Account only as allowed herein. The terms of the New Bank Note shall be identical to the terms of the Current Bank Note except to the extent inconsistent with the terms of the Plan.

  5.2  <u>Class 2 – Secured Denton County/City Tax Claims</u>.  Denton County/City shall retain any lien it currently holds and will receive payment in full of its Allowed Denton County/City Tax Claim upon the later of thirty (30) days after the Effective Date or the day upon which they become due.

  5.3  <u>Class 3 – Priority Employee Claims</u>.  Each holder of an Allowed Priority Employee Claim against the Debtor shall be paid in accordance with the Debtor's pre-petition custom and practice, if not already paid pursuant to order of the Bankruptcy Court entered March 18, 2010.

  5.4  <u>Class 4 – Comptroller Claims.</u>  The Texas Comptroller Of Public Accounts will receive on account of its Allowed Comptroller Claims one hundred (100%) percent of its Allowed Comptroller Claims to be paid on or before thirty (30) days after the Effective Date or the day upon which they become due.

  5.5  <u>Class 5 – Unsecured Claims</u>.  Each holder of an Allowed Unsecured Claim will receive on account of its Allowed Unsecured Claim one hundred (100%) percent of their Allowed Unsecured Claim to be paid in full before January 31, 2017. In the event that the Debtor is permitted by the Court to use the Reserves to fund obligations under the Plan, each holder of an Allowed Unsecured Claim will receive its proportionate share of the following yearly payments: 2010 - $60,000; 2011 - $100,000; 2012- $33,000; 2013-$70,000; 2014-$70,000; and 2015-$71,573. In the event that the Debtor is *not* permitted by the Court to use the Reserves to fund obligations under the Plan, each holder of an Allowed Unsecured Claim will receive its proportionate share of the following yearly payments: 2010-$0; 2011-$0; 2012-$20,000; 2013-$40,000; 2014-$55,000; 2015-$192,195; and 2016-$97,448.  Yearly payments are to be made on or before January 31 of the following year. Debtor is required to make such payments only until each holder of an Allowed Unsecured Claim is paid in full and not thereafter.  Simple interest at the rate of two and ½ percent (2.5%) *per annum* will accrue and be paid on the Unsecured Claims.

  5.6  <u>Class 6 - Subordinated Insider Claims</u>.  Upon full payment to all holders of Class 5 Allowed Unsecured Claims, each holder of an Allowed Subordinated Insider Claim will receive on

account of its Allowed Subordinated Insider Claim one hundred (100%) of their Allowed Unsecured Claim to be paid in full before January 31, 2017. Simple interest at the rate of two and ½ percent (2 1/2%) *per annum* will accrue and be paid on the Unsecured Claims.

5.7    Class 7 – Current Partnership Interests. All Current Partnership Interests in the Debtor shall be canceled on the Effective Date and New Partnership Interests shall be issued to the holders of Current Partnership Interests in the same percentage and amount as the Current Partnership Interests.

## ARTICLE 6

## ACCEPTANCE OR REJECTION OF PLAN

6.1    Classes Entitled to Vote. Each impaired Class of Claims and Current Partnership Interests shall be entitled to vote separately to accept or to reject the Plan. Any unimpaired Class of Claims or Current Partnership Interests shall not be entitled to vote to accept or to reject the Plan. Classes 1, 5 and 6 are impaired and holders of such Allowed Claims therefore are entitled to vote on the Plan.

6.2    Class Acceptance Requirement. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan. A Class of Partnership Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) of the number of the Allowed Current Partnership Interests in such Class that actually have voted on the Plan.

6.3    Cramdown. This Section shall constitute the Debtor's request, pursuant to section 1129(b)(1), that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) may not be met.

## ARTICLE 7

## MEANS OF IMPLEMENTATION OF THE PLAN

7.1    On the Effective Date, the Reorganized Debtor shall assume all obligations to pay all Allowed Claims pursuant to this Plan.

7.2    On the Effective Date, all right, title, and interest in and to the Assets shall vest in the Reorganized Debtor.

7.3    The Reorganized Debtor shall have the powers and duties specified in this Plan together with all other powers of a Texas limited partnership. Such powers shall include, without limitation, the power to object to Claims, to administer Cash and Cash on Hand and to operate the business of the Reorganized Debtor subject only to any limitations imposed by the Plan. The

Reorganized Debtor may operate without approval from the Bankruptcy Court.

7.4     The Reorganized Debtor shall own all Avoidance Actions and all Litigation Claims and shall have full power to institute, proceed to trial and appeal, settle or dismiss any Avoidance Action or Litigation Claim without approval from the Bankruptcy Court.

7.5     Upon the Effective Date, the Reorganized Debtor shall be authorized to issue the New Partnership Interests to the Current Partnership Interest Owners in the same percentage and amount as the Current Partnership Interests are held.  Each Current Partnership Interest Owner shall hold in the New Partnership Interest any and all rights they presently hold in the Current Partnership Interest.  The general partner of the Reorganized Debtor shall have all of the duties, responsibilities, and powers of a general partner of a Texas limited partnership.

7.6     Confirmation of the Plan shall be deemed to constitute a permanent injunction against maintenance or commencement of any action against Debtor arising out of any events occurring prior to the filing of this case and all holders of Claims against Debtor are permanently enjoined with respect to such Claims: (a) from commencing or continuing any action or proceeding of any kind with respect to any such Claim against the Reorganized Debtor and/or the Assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Assets and/or the Reorganized Debtor; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Assets and/or the Reorganized Debtor; (d) from asserting any right of subrogation or recoupment of any kind against any obligation due the Debtor or the Reorganized Debtor; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and all Claims and causes of action held by all Entities against the Debtor and the Reorganized Debtor are released and discharged except the obligations of the Reorganized Debtor pursuant to the provisions of the Plan; provided, however, that each holder of a Contested Claim may continue to prosecute its proof of Claim in the Bankruptcy Court and all holders of Claims and Partnership Interests shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan.

7.7     The Reorganized Debtor shall: (i) be solely responsible for pursuing and/or settling all causes of action owned by the Reorganized Debtor and for distribution of all cash distributions contemplated by the Plan; (ii) have the right and power to enter into any contract or agreements binding the Reorganized Debtor in connection with the performance of its duties; (iii) have power to issue or arrange for the issuance of its Partnership Interests to New Partnership Interest Owners; (iv) have power to borrow funds and/or obtain investors and/or sell or encumber its real estate for valid business purposes including funding any cash obligations pursuant to the Plan, funding expansion of Debtor's business as contemplated by Debtor's business plans submitted in support of confirmation of the Plan; (v) have power to do all acts contemplated by the Plan; and (vi) have sole discretion to settle or compromise any claim, cause of action, chose-in-action or litigation and settle any such claim, cause of action, chose-in-action or litigation, without approval of the Bankruptcy Court.

7.8     Subject to the following, the Debtor reserves the right to revoke and withdraw this

Plan before the entry of the Confirmation Order. If the Debtor revokes or withdraws this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or to prejudice in any manner the rights of the Debtor, or person in any further proceedings involving the Debtor or to provide the basis for any claim against Debtor.

## ARTICLE IV: FINANCIAL INFORMATION REGARDING DEBTOR

Debtor's Statement of Financial Affairs, detailed schedules of assets and liabilities, and amendments thereto, and the periodic Operating Reports and interim statements required to be filed by the Bankruptcy Court, have been filed with the Court. Due to the complexity and volume of data contained in said documents, this Disclosure Statement can only summarize such information. Other than information relating to valuation, all financial information contained in this Plan has been obtained from DHC. Budgetary information was compiled by DHC using an accrual method of accounting. Historical and factual information has been obtained primarily from Mike Blackwell, a former manager of the Debtor.

**ADDITIONAL FINANCIAL INFORMATION AND CLARIFICATION CAN BE FOUND IN THE ABOVE DESCRIBED DOCUMENTS ON FILE WITH THE U.S. BANKRUPTCY CLERK.**

## ARTICLE V: CONSIDERATIONS IN VOTING ON THE PLAN

The Debtor has proposed a Plan that it believes treats all creditors fairly and equitably and is in the best interest of the creditors. In order to assist the creditors in evaluating the Plan, the Debtor provides the following summary of items which Debtor believes to be significant considerations for creditors in deciding how to vote on the Plan. References are made to paragraphs in this Disclosure Statement and Plan of Reorganization which discuss and have summarized topics in greater detail.

**THE FOLLOWING IS ONLY A BRIEF SUMMARY AND SHOULD NOT BE RELIED**

**UPON EXCLUSIVELY FOR VOTING PURPOSES. YOU ARE URGED TO READ ALL OF THIS DISCLOSURE STATEMENT, THE PLAN OF REORGANIZATION IN FULL AND ALL OTHER RELEVANT ORDERS AND DOCUMENTS ON FILE IN THESE PROCEEDINGS.**

      1.    <u>Possible Tax Consequences</u>. Implementation of the Plan will result in income, gain, or loss for federal income tax purposes to holders of claims against and interests in Debtor. Tax consequences to a particular Creditor or holder of an interest in Debtor may depend on the particular circumstances or facts regarding the Claim of the Creditor or the interest of such holder in Debtor. To the extent that a holder of a Claim receives a distribution under the Plan which is less than the full amount of the Claim, and the remainder of the Claim is being discharged under the Plan, that holder of a Claim may be entitled to a deduction from taxable income to the extent of the realized loss on the Claim (but only to the extent the loss has not been recognized in prior tax years).

      Each holder of an interest in Debtor will recognize taxable income or gain as a result of the implementation of the Plan to the extent that the holder's allocable share of the gain from the transfer of the Property and/or income from cancellation of indebtedness due to the modification and/or discharge of Claims under the Plan.

**THE TAX CONSEQUENCES TO EACH CLAIMANT RESULTING FROM ANY REORGANIZATION OF DEBTOR OR LIQUIDATION OF DEBTOR'S ASSETS ARE COMPLEX AND MAY VARY AND WILL DEPEND UPON THE PARTICULAR CIRCUMSTANCES OF EACH CLAIMANT. CONSEQUENTLY, EACH CLAIMANT IS URGED TO CONSULT HIS OWN TAX ADVISOR WITH SPECIFIC REFERENCE TO HIS PARTICULAR CIRCUMSTANCES AND TO THE TAX CONSEQUENCES OF BOTH THE**

**PLAN AND ANY ALTERNATIVE TO THE PLAN AND NO CLAIMANT IS AUTHORIZED TO RELY FOR TAX ADVICE OR INFORMATION ON THIS DISCLOSURE STATEMENT.**

<u>**ARTICLE VI: LIQUIDATION ANALYSIS**</u>

1.      <u>Liquidation Analysis</u>

The liquidation value of the Debtor's real estate is less than the amount of Morgan Stanley's Claim of $11,766,131.54 because the Debtor would be forced to sell Property at a heavily discounted price if a buyer could even be located in this market.  The proceeds of sale would be insufficient to pay Morgan Stanley's Claim and unsecured creditors would receive nothing in the event the Debtor's real estate were foreclosed upon by Morgan Stanley or sold by a Chapter 7 trustee.  Creditors are receiving 100% of their claims under the Plan.

<u>Debtor's Recommendation:</u>

**BASED ON THE CONTENTS OF THIS DISCLOSURE STATEMENT, THE DEBTOR BELIEVES IT IS IN THE BEST INTERESTS OF ALL CREDITORS THAT THE PLAN AS PROPOSED BY THE DEBTOR BE APPROVED BY ITS CREDITORS. DEBTOR BELIEVES THAT REORGANIZATION WOULD PRODUCE MORE DISTRIBUTION TO CREDITORS THAN IF THE DEBTOR WERE LIQUIDATED.  ACCORDINGLY, THE DEBTOR RECOMMENDS THAT ITS CREDITORS VOTE TO CONFIRM THE PLAN AS FILED BY THE DEBTOR.**

(Remainder of the Page Intentionally Left Blank)

Dated: July 21, 2010.

**DENTON LONE OAK HOLDINGS, LP**

By:  /s/  *Joe N. DePalma*
        Joe N. DePalma, Chief Executive Officer

Submitted by:

HIERSCHE, HAYWARD, DRAKELEY
    & URBACH, P.C.

By:  /s/ *Russell W. Mills*
        Russell W. Mills (SBN 00784609)
        Jason M. Katz (SBN 24038990)

15303 Dallas Parkway, Suite 700
Addison, Texas  75001
Telephone:  (972) 701-7000
Facsimile:   (972) 701-8765