# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| In re:                      ) | |
|            ) | **Chapter 11** |
| **DENTON LONE OAK HOLDINGS, L.P.** ) | |
|           ) | **Case No. 10-40836** |
|       **Debtor.**         ) | |
| _____) | |

## OBJECTION OF HOLIDAY HOSPITALITY FRANCHISING, INC. TO DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT

TO THE HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

Holiday Hospitality Franchising, Inc. ("HHFI"), by and through its undersigned counsel, hereby files this Objection Of Holiday Hospitality Franchising, Inc. To Debtor's Second Amended Disclosure Statement (the "Objection"), and respectfully shows the Court as follows:

### SUMMARY

Denton Lone Oak Holdings, L.P. (the "Debtor") operates a Holiday Inn® Hotel and Suites (the "Hotel") at 1434 Centre Place Drive in Denton, Texas pursuant to a License Agreement dated September 18, 2002, as amended (the "License Agreement") with HHFI. A copy of the License Agreement is attached hereto as Exhibit A. The Debtor filed the Debtor's Second Amended Disclosure Statement [Docket No. 173] (the "Disclosure Statement") and Debtor's Second Amended Plan of Reorganization [Docket No. 174] (the "Plan") and now seeks approval of the Disclosure Statement. The underlying Plan proposes that the Debtor will assume the License Agreement pursuant to section 365 of the Bankruptcy Code and sell all of its assets to Rainer Capital Management, L.P. ("Rainer"), subject to higher bids, pursuant to section 363 of the Bankruptcy Code. HHFI asserts this Objection in response to the Disclosure Statement, because the

1430554

License Agreement is personal and not assignable under applicable law or under the License Agreement's own terms absent HHFI's consent. Assignment of the License Agreement without HHFI's consent or without certain modifications to the Plan and Disclosure Statement comporting with the requirements of the License Agreement would make the Plan unconfirmable. Additionally, if the Debtor intends to assume the License Agreement, it should update the cure amount that must be paid to HHFI in the Disclosure Statement. Otherwise, the Disclosure Statement fails to provide a fair estimate of the costs of assumption of the License Agreement. For these reasons, the Disclosure Statement should not be approved unless such modifications are made. HHFI is willing to work with the Debtor towards achieving a mutually agreeable plan. However, as currently drafted, HHFI must interpose this objection.

## BACKGROUND

1.      On or about September 18, 2002, the Debtor entered into the License Agreement with HHFI giving the Debtor the non-exclusive right to use the Holiday Inn® system in the operation of the Hotel. Pursuant to the terms of the License Agreement, the License is personal and as such is not transferable absent the consent of HHFI, the Licensor. Section 10(B) of the License Agreement provides:

### B. Transfer by Licensee

Licensee understands and acknowledges that *the rights and duties set forth in this License are personal to Licensee*, and that Licensor has granted this License in reliance on the business skill, financial status, and personal character of Licensee (if Licensee is an individual), and upon the owners, members, partners or stockholders of Licensee (if Licensee is an entity such as a partnership, company or corporation ("Entity")). Accordingly, *neither Licensee nor any immediate or remote successor to any part of Licensee's interest* in the License, nor any individual or entity which directly or indirectly owns an Equity Interest (as that term is defined herein) in Licensee or the License, *shall sell, assign, transfer, convey, pledge, mortgage, encumber or give away, any direct or indirect interest in the License or Equity Interest in Licensee*, except as provided in this License.

Any purported sale, assignment, transfer, conveyance, pledge, mortgage, or encumbrance by operation of law or otherwise, of any interest in the License or any Equity Interest in Licensee not in accordance with the provisions of this License, shall be null and void and shall constitute a material breach of this License, for which Licensor may terminate without opportunity to cure pursuant to paragraph 12.D of this License.

(emphasis added).

2.      The License Agreement also prohibits a transfer of the License Agreement in connection with a change of ownership of the hotel and specifically provides:

### H.      Change of Ownership

(1)            This License is not transferable.  If Licensee (i) receives an offer to purchase or lease the Hotel or any portion thereof, (ii) desires to sell or lease the Hotel or any portion thereof, (iii) wishes to convey the Hotel, Hotel site, or any Equity Interest in the Hotel, Licensee shall give prompt written notice thereof to Licensor, stating the identity of the prospective transferee, purchaser or lessee and the terms and conditions of the transferee, purchaser or lessee and terms and conditions of the conveyance, including a copy of any proposed agreement and all other information with respect thereto, which Licensor may reasonably require.

(2)            Under the provisions of this License, (i) any Transfer of Equity Interests (other than a permitted Transfer) or (ii) Transfer of all or a substantial part of the Hotel or Hotel site (if the Hotel or Hotel site owned directly or indirectly by Licensee or by an individual or Entity that owns any Equity Interest in Licensee), to a new owner who desires to operate the Hotel as a Holiday Inn or Crowne Plaza hotel brand, shall constitute a change of ownership requiring submittal of an application for a new license.

3.      Section 16(D) of the License Agreement[1] provides as follows:

**Additional Transfer Provisions**.  Notwithstanding anything else herein to the contrary, **Lone Oak GP, LLC** shall maintain an equity interest as general partner of Licensee and the current stockholders of **Lone Oak GP, LLC** shall remain unchanged or any such termination of equity interest or change in stockholder representation in the general partner shall constitute a change of ownership of this License resulting in the termination of this License.

(emphasis in original).

---

[1] This section is part of the Fourth Addendum to License Agreement.

4. Any change of ownership application would have to be approved by HHFI and a new license agreement would need to be issued. If HHFI does not approve the application and the conveyance occurs, the License Agreement will "terminate pursuant to paragraph 12.D . . . and Licensor shall be entitled to all of its remedies." <u>See</u> 10.H.(3)-(4) of the License Agreement.

5. In addition, the License Agreement prohibits a transfer of the License in connection with a sale of the real estate. Section 10(I) of the License Agreement provides as follows:

### I.        Transfer of Real Estate

If the real property used in the operation of the Hotel is owned directly or indirectly by Licensee or by an individual or Entity that owns any Equity Interest in Licensee and Licensee, or that individual or Entity proposes to transfer all or a substantial part of such property to a third party, such transfer shall constitute a transfer under the provisions of this License requiring an application for a new license agreement, unless Licensee receives Licensor's prior written consent for the transaction.

6. Section 2 of the License Agreement includes a grant to the Debtor of a non-exclusive license to use certain intellectual property, which includes various trademarks (the "Marks"). The license of the Marks is an integral and essential part of the License Agreement and required for operation of the Hotel as a Holiday Inn® Hotel and Suites.

7. The Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on March 15, 2010 (the "Petition Date").

8. On September 16, 2010, the Debtor filed the Disclosure Statement and Plan wherein the Debtor proposes to assume the License Agreement and sell it assets to RCM pursuant to section 363 of the Bankruptcy Code. The sale would be subject to higher bids.

9. The Debtor's attempt to assign the License Agreement without HHFI's consent is contrary to the express terms of the License Agreement and applicable law. As a result HHFI objects to approval of the Disclosure Statement.

## <u>ARGUMENT</u>

10.     Section 1125(b) of the Bankruptcy Code prohibits the post-petition solicitation of the acceptance or rejection of a plan from the holder of a claim or interest, unless there is transmitted to such holder a written disclosure statement approved by the Court as containing "adequate information." Adequate information is defined as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

11.     Disclosure is the means that Congress has chosen to ensure that confirmation is achieved fairly in a manner that protects the parties in interest. The disclosure statement hearing is intended to be "one of, if not the major procedural hearing in a reorganization case" because "[i]f adequate disclosure is provided to all creditors and stockholders whose rights are to be affected, then they should be able to make an informed judgment of their own, rather than having the court or the Securities and Exchange Commission inform them in advance of whether the proposed plan is a good plan." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 226-227 (1977). Therefore, the disclosure statement must set forth "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." <u>In re Jeppson</u>, 66 B.R. 269, 292 (Bankr. D. Utah 1986).

12.     Moreover, a disclosure statement should not be approved where it presents a plan that cannot be confirmed. <u>In re Quigley Co, Inc.</u>, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); <u>In re Beyond.com Corp.</u>,

289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved.") *(citing* In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001)); In re United States Brass Corp., 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible").

13.     The Debtor's proposed sale transactions and terms of the Plan violate the terms of the License Agreement and the Bankruptcy Code.  HHFI does not consent to the proposed Plan as currently drafted.  The Court should not approve the Disclosure Statement until these issues are adequately addressed.

## I.     THE LICENSE AGREEMENT IS NOT ASSIGNABLE UNDER ITS EXPRESS TERMS OR APPLICABLE NON-BANKRUPTCY LAW

14.     The Debtor cannot, as a matter of law, assume and assign the License Agreement without HHFI's consent.  Section 365(c)(1) of the Bankruptcy Code provides that a trustee may not assume or assign any executory contract . . . , whether or not such contract . . . prohibits or restricts assignment of rights or delegation of duties, if –

> 1 (A) applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, and
>
> (B) such party does not consent to such assumption or assignment.

See 11 U.S.C. § 365(c)(1).

15.     Here applicable non-bankruptcy law clearly prohibits assignment of the License Agreement.  The law is well settled that a party may not assign a contract that is "personal" to that party.  In re Catapult Entertainment, Inc., 165 F.3d 747, 750 (9th Cir. 1999).  Whether the

personality of one or both of the parties is material depends upon the intention of the parties, as evidenced by the language used in the contract and the nature of the contract itself.  In re Magness, 972 F.2d 689, 696 (6th Cir. 1992).  Franchise agreements, such as the one at issue here, have been held to be personal service contracts.  See N. Am. Financial Group, Ltd. v. S.M.R. Enters., Inc., 583 F.Supp. 691, 699 (N.D. Ill. 1984) (court refused to grant specific performance of franchise agreement, finding it was, in part, personal services contract).  Under the typical franchise agreement, the franchisee undertakes to conduct a business or sell products and services in accordance with a program designed by a franchisor, and the franchisor assists the franchisee through advertising, promotion and other services.  Id. at 699.  The License Agreement is such an agreement.  Moreover, the License Agreement contains trademarks, which cannot be assigned without the HHFI's consent under applicable law.

16.     The Lanham Trademark Act (the "Lanham Act") governs the parties rights with respect to HHFI's federally registered Marks, and is the "applicable law" under section 365(c)(1) of the Bankruptcy Code.  See Wellington Vision, Inc. v. Pearle Vision, Inc. (In re Wellington Vision, Inc.), 364 B.R. 129, 135 (S.D. Fla. 2007) (stating that "the Lanham Act is the 'applicable law' by which the exception to assumption and assignment is triggered via section 365(c)); In re Travelot Co., 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002) (trademark law is the 'applicable law' under section 365(c)(1)).  The Lanham Act provides protection to HHFI as the registrant of its Marks.  15 U.S.C. § 1072.

17.     As part of the many protections afforded to HHFI under the Lanham Act, a party, for example, can be held liable for infringing a trademark when the party "without the consent of the registrant . . . use[s] in commerce any reproduction  . . . of a registered mark in connection with the sale . . . of any goods."  15 U.S.C. § 1114.  Also, a party can be held liable for civil damages if he

"uses in commerce any . . . word . . . symbol . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person." 15 U.S.C. § 1125.

18.     Because a trademark, by definition, is used to identify goods or services with a person or business, a trademark cannot be assigned apart from the goodwill of the business with which the mark has been associated.  15 U.S.C. § 1060(a)(1) (a mark "shall be assignable with the goodwill of the business in which the mark is used").  Further, the owner of a trademark may grant a license or permission to use a trademark to another party, and must also retain quality control over the party's use of the mark in the contract.  Travelot Co., 286 B.R. at 455.

19.     Similar to non-exclusive patents and copyrights, trademark licenses are personal and cannot be assigned without the licensor's consent.  See Wellington Vision, 364 B.R. at 135 (the Lanham Act prevents assignment without licensor's consent); In re N.C.P. Mktg. Group, Inc., 337 B.R. 230, 236 (D. Nev. 2005), aff'd 279 Fed. Appx 561 (9th Cir. 2008).  Since federal trademark law permits use of a registered trademark only by persons licensed to do so, a trademark license is not freely assignable and "a licensor need not accept performance from or render performance to an entity other than the licensee."  Travelot, 286 B.R. at 455.

20.     In this case, Section 10(B) of the License Agreement specifically provides that "the rights and duties set forth in this License are personal to Licensee, and that Licensor has granted this License in reliance on the business skill, financial status, and personal character of Licensee . . . ."  In addition, Section 10(H) of the License Agreement specifically provides that the License is non-transferable.  Give that applicable non-bankruptcy law clearly prohibits the assignment of personal licenses and non-exclusive intellectual property licenses, bankruptcy courts and appellate courts

have consistently refused to allow debtors to assume and assign such licenses, and this Court should hold no differently.  See In re Sunterra Corp., 361 F.3d 257 (4th Cir. 2004); Catapult, 165 F.3d 747 (9th Cir. 1999); In re West Electronics, 852 F.2d 79 (3d Cir. 1988); Wellington Vision, 364 B.R. at 135; N.C.P. Marketing Group, 337 B.R. 230; Travelot, 286 B.R. 447.[2]

21.    The Plan contains several provisions that would violate the terms of the License Agreement with respect to transferring the License Agreement.  The Debtor is proposing to cancel current equity interests and sell all assets to RCM, who would assume the obligations under the Plan.  Without HHFI's consent and issuance of a new license agreement, this sale would violate the terms of the License Agreement.  The sale to RCM is also subject to higher bids and this auction process is described in Section 7.5 of the Disclosure Statement and Section 7.5 of the Plan.  However, there is no language stating that the bidders would need to meet HHFI's qualifications as a licensee for operation of the Hotel.

22.    Based on the foregoing, this Court should deny approval of the Disclosure Statement to the extent the Debtor is attempting to assign the License Agreement under the Plan or until such modifications are made to the Disclosure Statement and Plan to comport with the requirements of the License Agreement and applicable law.

## II.    IF ASSUMPTION IS PROPOSED, THE DISCLOSURE STATEMENT SHOULD UPDATE THE ESTIMATED CURE AMOUNT THAT DEBTOR WILL NEED TO PAY ON THE EFFECTIVE DATE

23.    Assumption of an executory contract, such as the License Agreement, requires cure of defaults, compensation for losses relating to the defaults and adequate assurance of future performance.  11 U.S.C. § 365(b)(1).  Accordingly, if the Debtor intends to assume the License Agreement, it shall be required to cure all defaults under the License Agreement, including all

---

[2] Because the Debtor actually intends to assign the License Agreement, the issue of the "actual test" versus the "hypothetical test" is not applicable here.

monetary and non-monetary defaults on or before the effective date of the Plan. This includes, but is not limited to, payment of all unpaid pre-petition license fees, post-petition license fees and reimbursement of attorney's fees and costs.

24.     The Disclosure Statement currently states that the HHFI cure amount is $86,097.27 plus attorney fees and expenses. HHFI filed Proof of Claim No. 20 (the "Proof of Claim") on April 30, 2010, in the amount of $86,097.27 plus any additional contractual or other claims it has or may have against the Debtor, including for reasonable attorney fees. Section 14(J) of the License Agreement states that HHFI is entitled to reimbursement of its attorney fees and expenses. HHFI has incurred $22,567.39 in attorney fees and expenses through September 30, 2010 and expects to incur additional attorney fees and costs before the effective date of the Plan. Thus, the Debtor must pay at least $108,664.66 plus additional attorney fees and expenses to HHFI on the effective date of the Plan.

25.     Courts have acknowledged that a debtor seeking to assume a contract must pay attorney fees and expenses where the contract provides for them. See In re Travelers Casualty & Surety Co. of Am., 549, U.S. 443, 452 (2007) ("we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed."); Andrew v. KMIR Corp. (In re Bullock), 17 B.R. 438, 439 (9th Cir. B.A.P. 1982) (lessor's attorney's fees incurred in adversary proceeding should be paid as part of curing debtor's default on lease and in compensation for lessor's actual pecuniary loss); In re Crown Books Corp., 269 B.R. 12 (Bankr. D. Del. 2001) (awarding attorney's fees as part of cost to cure defaults); In re Entertainment, Inc., 223 B.R. 141, 152-54 (Bankr. N.D. Ill. 1998) (finding that charges for attorneys' fees had to be paid as a condition to assumption of lease); In re Von Keisler, 166 B.R. 620, 621 (Bankr. N.D. Tex. 1994) (observing that assumption of contract would require the debtors to compensate the movants for any

"actual pecuniary loss" resulting from the default, which would include attorney's fees, among other things); In re Westview 74th St.. Drug Corp., 59 B.R. 747, 752-54 (Bankr. S.D.N.Y. 1986) (payment of attorney fees required as condition to lease assumption); see also Ogle v. Fidelity & Deposit Co. of Md., 586 F.3d 143 (2d Cir. 2009) (ruling that section 506(b) of the Bankruptcy Code does not expressly disallow an unsecured creditor's contractual claims for attorneys' fees).

26.    Absent disclosure of updated cure amounts that the Debtor will be required to pay to HHFI, the Disclosure Statement will not contain adequate information as required by section 1125(b) of the Bankruptcy Code, because no class of creditor will be able to determine what sums are necessary for the Debtor to fulfill its Plan obligations on the effective date.

## CONCLUSION

27.    The Disclosure Statement should not be approved because the Plan is not confirmable unless specific modifications are made.  The Debtor cannot assign the License Agreement without the consent of HHFI.  The Disclosure Statement also does not contain an accurate estimate of the cure claim that Debtor shall be required to pay to HHFI upon plan confirmation.  Therefore HHFI objects to the Disclosure Statement on the basis that it lacks adequate information for a creditor to reasonably evaluate the Plan, and HHFI respectfully requests that the Court either (i) deny approval of the Disclosure Statement without prejudice or (ii) require the Debtor to amend the Disclosure Statement to address HHFI's concerns.  HHFI reserves all of its rights with respect to the Debtor's proposed cure or treatment of the License Agreement and any provision of the Plan.

Dated: October 1, 2010.

KILPATRICK STOCKTON LLP

By: /s/ Paul M. Rosenblatt
    Paul M. Rosenblatt (GA Bar # 614522)
    Jeffrey P. Fuller (GA Bar # 344016)
    1100 Peachtree Street, Suite 2800
    Atlanta, Georgia 30309-4530
    (404) 815-6321 (Telephone)
    (404) 541-3373 (Facsimile)

*Counsel for Holiday Hospitality Franchising, Inc.*

# EXHIBIT A

# FOURTH ADDENDUM TO LICENSE AGREEMENT

This Fourth Addendum ("Addendum") is made and entered into as of this 2nd day of August , 2007, by and between Holiday Hospitality Franchising, Inc., a Delaware corporation ("Licensor") and Lone Oak Hospitality Ltd., a Texas limited partnership, ("Licensee") and Denton Loan Oak Holdings, L.P., a Texas limited partnership. This Addendum supplements that certain License Agreement, dated September 18, 2002, between Licensor and Licensee, relating to the license to operate the Holiday Inn® Hotel & Suites hotel to be located at the intersection of I-35 and Teasley Blvd., Denton, TX / #9284 (the "Hotel") (the "License"). To the extent there is any conflict between the License and this Addendum, this Addendum shall govern and control.

1.      The License is hereby amended by deleting the Licensee name of "Lone Oak Hospitality Ltd." wherever it appears, including but not limited to the cover page, page one (1), the License signature block and Attachment A, and replacing it with the following:

   "Denton Loan Oak Holdings, L.P."

2.      The entity type noted on the second line of the first page of the License is deleted in its entirety and replaced with the following:

   "a Texas limited partnership"

3.      The "Ownership of Licensee" section of Attachment A is deleted in its entirety and replaced with the following:

Ownership of Licensee:

| | | | |
|---|---|---|---|
| **DENTON LOAN OAK HOLDINGS, L.P.** | | | **100%** |
| Lone Oak GP, LLC, general partner | | | 1% |
| Gaylord Hall, member | | 100% | |
| Lone Oak Hospitality LTD., limited partner | | | 99% |
| Lone Oak Hospitality Texas, LLC, general partner | | 1% | |
| Gaylord Hall, member | 100% | | |
| Teasley Partners, Ltd., limited partner | | 60% | |
| Teasley Street, LLC, general partner | 1% | | |
| Glenn Gunter, member | 50% | | |
| Dr. Randy Lacey, member | 50% | | |
| Waterford Investors Ltd., Inc., limited partner | 56.2% | | |
| Glenn Gunter, shareholder | 100% | | |
| Dr. Randy Lacy, limited partner | 29.5% | | |
| Bunker Investments, Inc., limited partner | 13.3% | | |
| Glen Gunter, member | 100% | | |
| Rustown Homes, Inc., limited partner | | 39% | |
| Gaylord Hall, shareholder | 40% | | |
| Jacqueline Hall, member | 60% | | |

All future changes will be calculated based on the above; however, Gaylord Hall, Glenn Gunter, and J.R. Lacey shall maintain 51% equity interest in the Licensee. Failure to do so shall constitute a change of ownership of the License resulting in termination of this License.

4. The "Fee owners (names & addresses):" portion of Attachment "A" of the License is hereby deleted in its entirety and replaced with the following:



> Fee owners (names & addresses):
> Denton Loan Oak Holdings, L.P.
> 9341 Loma Vista Drive
> Dallas, TX 75243

5. License is hereby further amended by deleting Paragraph 16.D. in its entirety and replacing it with the following new Paragraph 16.D.:

> 16.D. **Additional Transfer Provisions.** Notwithstanding anything else herein to the contrary, **Lone Oak GP, LLC** shall maintain an equity interest as general partner of Licensee and the current stockholders of **Lone Oak GP, LLC** shall remain unchanged or any such termination of equity interest or change in stockholder representation in the general partner shall constitute a change of ownership of this License resulting in the termination of this License.

6. Except as expressly stated in this Addendum, no further additions, modification or deletions to the License are intended by the parties or made by this Addendum. All other terms and conditions of the License remain in full force and effect, including the Guaranty.

### [SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the parties have executed this Addendum as of the day and year first above written:

| | |
|---|---|
| **DENTON LOAN OAK HOLDINGS, L.P.** | **HOLIDAY HOSPITALITY FRANCHISING, INC.** |

By:   Lone Oak GP, LLC,
      Its General Partner

By: _Gaylord Hall_           By: _Jenny Tidwell_
    Gaylord Hall              Jenny Tidwell
    Manager                Vice President
                                Franchise Administration

Witness: _Dawn S. Gomez_    Attest: _____
                                    Asst. Secretary

**PREVIOUS ENTITY:**

**DENTON LOAN OAK HOLDINGS, L.P.**

By:   Lone Oak Hospitality
      Texas, LLC,
      Its General Partner

By: _Gaylord Hall_
    Gaylord Hall
    Manager

Witness: _Dawn S. Gomez_

## THIRD ADDENDUM TO LICENSE AGREEMENT

This Third Addendum ("Addendum") is made and entered into as of this _8th_ day of _March_____, 2006, by and between Holiday Hospitality Franchising, Inc., a Delaware corporation ("Licensor") and Gaylord Hall, individually, ("Licensee") and Lone Oak Hospitality Ltd., a Texas limited partnership. This Addendum supplements that certain License Agreement, dated September 18, 2002, between Licensor and Licensee, relating to the license to operate the Holiday Inn® Hotel & Suites hotel to be located at the intersection of I-35 and Teasley Blvd., Denton, TX / #9284 (the "Hotel") (the "License"). To the extent there is any conflict between the License and this Addendum, this Addendum shall govern and control.

1.     The License is hereby amended by deleting the Licensee name of "Gaylord Hall" wherever it appears, including but not limited to the cover page, page one (1), the License signature block and Attachment A, and replacing it with the following:

"Lone Oak Hospitality Ltd."

2.  The entity type noted on the second line of the first page of the License is deleted in its entirety and replaced with the following:

"a Texas limited partnership"

3. The Notices: section of Paragraph 14.F. is hereby amended by adding to "Licensee":

"Attn: Gaylord Hall, Principle Correspondent"

4.  The "Ownership of Licensee" section of Attachment A is deleted in its entirety and replaced with the following:

Ownership of Licensee:

| | | | |
|---|---|---|---|
| **LONE OAK HOSPITALITY LTD.** | | | 100% |
| Lone Oak Hospitality Texas, LLC, general partner | | 1% | |
| Gaylord Hall, member | 50% | | |
| Jacqueline Hall, member | 50% | | |
| Teasley Partners, Ltd., limited partner | | 60% | |
| Teasley Street, LLC, general partner | 1% | | |
| Glenn Gunter, member | 50% | | |
| Dr. Randy Lacey, member | 50% | | |
| Waterford Investors Ltd., Inc., limited partner | 56.2% | | |
| Glenn Gunter, shareholder | 100% | | |
| Dr. Randy Lacy, limited partner | 29.5% | | |
| Bunker Investments, Inc., limited partner | 13.3% | | |
| Glen Gunter, member | 100% | | |
| Rustown Homes, Inc., limited partner | | 39% | |
| Gaylord Hall, shareholder | 100% | | |

S:\Holiday Inn\Franchise Admin\Master\Addendum\NCRA-MTA.doc

All future changes will be calculated based on the above; however, Gaylord Hall, Melvin Sanders, Glenn Gunter, and J.R. Lacey shall maintain 51% equity interest in the Licensee. Failure to do so shall constitute a change of ownership of the License resulting in termination of this License.

5.     The "Fee owners (names & addresses):" portion of Attachment "A" of the License is hereby deleted in its entirety and replaced with the following:

> Fee owners (names & addresses):
> Lone Oak Hospitality Ltd.
> 9341 Loma Vista Drive
> Dallas, TX 75243

6.     The License is hereby further amended by adding the attached Additional Guaranty to the License. This additional Guaranty will be in addition to the Guaranty previously signed and presently a part of the License.

7.     The License is hereby further amended by adding this Special Stipulation as Paragraph 16.D.:

> 16.D. **Additional Transfer Provisions.** Notwithstanding anything else herein to the contrary, Lone Oak Hospitality Texas, LLC shall maintain an equity interest as general partner of Licensee and the current stockholders of Lone Oak Hospitality Texas, LLC shall remain unchanged or any such termination of equity interest or change in stockholder representation in the general partner shall constitute a change of ownership of this License resulting in the termination of this License.

8.     Except as expressly stated in this Addendum, no further additions, modification or deletions to the License are intended by the parties or made by this Addendum. All other terms and conditions of the License remain in full force and effect, including the Guaranty.

(Signatures on following page)

IN WITNESS WHEREOF, the parties have executed this Addendum as of the day and year first above written:

**LONE OAK HOSPITALITY LTD.**

    By:    Lone Oak Hospitality
              Texas, LLC,
              Its General Partner

    By: _____
           Gaylord Hall
           Manager

**HOLIDAY HOSPITALITY FRANCHISING, INC.**

By: _____
    John Merkin
    Vice President, Franchise Operations

Witness: _____

Attest: _____
    Asst. Secretary

**PREVIOUS ENTITY:**

By: _____
    Gaylord Hall
    Individually

Witness: _____

## GUARANTY

As an inducement to Holiday Hospitality Franchising, Inc. ("Licensor") to execute the above License dated _____ March 8, 2007 _____ between Licensor and Gaylord Hall, ("Licensee"), for the Holiday Inn Hotel & Suites Hotel hotel located at Intersection of I-35 and Teasley Blvd. NE Quadrant, ("License"), the undersigned (sometimes referred to as the "guarantor(s)"), jointly and severally, hereby unconditionally warrant to Licensor and its successors and assigns that all of Licensee's representations in the License and the application submitted by Licensee to obtain the License are true, and guarantee that all of Licensee's obligations under the above License, including any amendments thereto whenever made (all hereafter referred to collectively as the "License"), will be punctually paid and performed.

Upon default by the Licensee and notice from Licensor, the undersigned will immediately make each payment and perform each obligation required of Licensee under the License. Without affecting the obligations of the undersigned under this Guaranty, Licensor may without notice to the undersigned extend, modify or release any indebtedness or obligation of Licensee or any of the guarantor(s), or settle, adjust or compromise any claims against Licensee or any of the guarantor(s). The undersigned waive notice of amendment of the License and notice of demand for payment or performance by Licensee.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

The Guaranty constitutes a guaranty of payment and performance and not of collection, and each of the guarantors specifically waives any obligation of Licensor to proceed against Licensee or any money or property held by Licensee or by any other person or entity as collateral security, by way of set off or otherwise. The undersigned further agree that this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment of any of the guaranteed obligations is rescinded or must otherwise be restored or returned by Licensor upon the insolvency, bankruptcy or reorganization of Licensee or any of the undersigned, all as though such payment had not been made.

This Guaranty shall become valid as of the Term Commencement Date of the License which is _____ March 8, 2007 _____. It shall be deemed made and entered into in the State of Georgia, and the undersigned agree that this Guaranty and the obligations provided for hereunder shall be governed and construed in all respects by the internal laws and decisions (except any conflicts of law provisions) of the State of Georgia, including all matters of construction, validity, enforceability and performance.

To the extent permitted by law, the undersigned (i) consent and submit, at Licensor's election and without limiting Licensor's rights to commence an action in any other jurisdiction, to the personal jurisdiction and venue of any courts (federal, superior, or state) situated in the County of DeKalb, State of Georgia; (ii) waive any claim, defense or objection in any such proceeding based on lack of personal jurisdiction, improper venue, forum non conveniens or any similar

basis; and (iii) expressly waive personal service of process and consent to service by certified mail, postage prepaid, directed to the last known address of the undersigned, which service shall be deemed completed within ten (10) days after the date of mailing thereof.

The undersigned agree to pay Licensor all expenses, including reasonable attorneys' fees and court costs, incurred by Licensor, its parents, subsidiaries, affiliates, and their successors and assigns, to remedy any defaults of or enforce any rights under this Guaranty or the License, effect termination of this Guaranty or the License, or collect any amounts due under this Guaranty or the License.

**IN WITNESS WHEREOF**, each of the undersigned has signed this Guaranty under Seal, as of the date of the above License.

Witnesses:

_____

_____

Phyllis A. Sacey

Guarantors:

_____
Jacqueline Hall, legal signature
Address: _9341 Loma Vista_
Address: _Dallas, TX 75243_
SSN: _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_

_____
Glenn Gunter, legal signature
Address: _4653 Seneca_
Address: _FT Worth Tx 76137_
SSN: _520-33 7302_

_____
Dr. Randy Lacey, legal signature
Address: _16306 E. Lake Shore Drive_
Address: _Austin TX 78734_
SSN: _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_



**INTERCONTINENTAL.**
H O T E L S   G R O U P

InterContinental Hotels Group
Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ichotelsgroup.com

February 3, 2006

**VIA FACSIMILE (214-340-9606)**

Mr. Gaylord Hall
9341 Loma Vista Drive
Dallas, TX 75243

RE:    **LICENSE AGREEMENT DATED SEPTEMBER 18, 2002 ("LICENSE") BETWEEN GAYLORD HALL, INDIVIDUALLY ("LICENSEE") AND HOLIDAY HOSPITALITY FRANCHISING, INC. ("LICENSOR") FOR THE HOLIDAY INN® HOTEL & SUITES HOTEL HOTEL TO BE LOCATED AT DENTON, TX /#9284 (THE "HOTEL")**

Dear Mr. Hall:

We have received a request from representatives of Licensee to extend the milestone dates for commencement of construction and completion for the Hotel. As requested and as an accommodation, we are pleased to confirm the following changes:

       1.    The License is hereby amended by deleting in its entirety the last sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

       Notwithstanding the occurrence of any events constituting force majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and shall otherwise be made ready to open for business in accordance with the License not later than **September 1, 2006.**

As a convenience for you, this letter will serve as an amendment to the License for the Hotel to reflect the new milestone dates above, unless we receive your written objection within 10 days of the date of this letter. If you so notify us that you are not in agreement with any of the extended milestone dates, then the original milestone dates will remain unchanged.

Please note that this extension does not change or affect in any way any other aspect of the License, and it does not change or affect in any way the Licensee's obligation to continue to comply with other requirements and milestones of the License.

Sincerely,

*Melinda Immelman*

Melinda Immelman
Manager
Franchise Administration

        



**INTERCONTINENTAL**
H O T E L S   G R O U P

InterContinental Hotels Group
Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ichotelsgroup.com

September 7, 2005

<u>**VIA TWO DAY DELIVERY**</u>

Mr. Gaylord Hall
9341 Loma Vista Drive
Dallas, TX 75243

RE:   **LICENSE AGREEMENT DATED SEPTEMBER 18, 2002 ("LICENSE") BETWEEN GAYLORD HALL, INDIVIDUALLY ("LICENSEE") AND HOLIDAY HOSPITALITY FRANCHISING, INC. ("LICENSOR") FOR THE HOLIDAY INN® HOTEL & SUITES HOTEL HOTEL TO BE LOCATED AT DENTON, TX /#9284 (THE "HOTEL")**

Dear Mr. Hall:

We have received a request from representatives of Licensee to extend the milestone dates for commencement of construction and completion for the Hotel. As requested and as an accommodation, we are pleased to confirm the following changes:

　　　1.　　The License is hereby amended by deleting in its entirety the first sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

　　　　　Construction of the Hotel shall commence on or before **October 17, 2005.**

As a convenience for you, this letter will serve as an amendment to the License for the Hotel to reflect the new milestone dates above, unless we receive your written objection within 10 days of the date of this letter. If you so notify us that you are not in agreement with any of the extended milestone dates, then the original milestone dates will remain unchanged.

Extensions of commencement of construction dates are usually only granted when accompanied by the standard extension fee; however, the Extension Committee has waived this requirement at this time. Please be advised that failure to commence construction by the date set forth in the Addendum or otherwise meet any milestone date could result in an issuance of a notice of default and termination. Be further advised that if you request additional time for commencement of construction or any other milestone date and the request is approved, you may be required to pay the standard extension fee at that time.

Please note that this extension does not change or affect in any way any other aspect of the License, and it does not change or affect in any way the Licensee's obligation to continue to comply with other requirements and milestones of the License.

Sincerely,

Melinda Immelman
Manager
Franchise Administration & Licensing

cc:　　Greg Aden
　　　　Robert Ekman
　　　　Cindy Sepp
　　　　Ejayce Fox

        


**InterContinental.**
H O T E L S   G R O U P

InterContinental Hotels Group
Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ichotelsgroup.com

July 18, 2005

**VIA TWO DAY DELIVERY**

Gaylord Hall
9341 Loma Vista Drive
Dallas, TX 75243

RE:   LICENSE AGREEMENT DATED SEPTEMBER 18, 2002 (THE "LICENSE") BETWEEN
GAYLORD HALL, INDIVIDUALLY ("LICENSEE") AND HOLIDAY HOSPITALITY
FRANCHISING, INC.   ("LICENSOR") FOR THE HOLIDAY INN® HOTEL & SUITES
HOTEL HOTEL TO BE LOCATED AT DENTON, TX /#9284 (THE "HOTEL")

Dear Mr. Hall:

We have received a request from representatives of Licensee to extend the milestone dates for commencement
of construction and completion for the Hotel.  As requested and as an accommodation, we are pleased to
confirm the following changes:

    1.    The License is hereby amended by deleting in its entirety the first sentence of the second Paragraph
of Paragraph 15.A.(3)(c), and replacing it with the following:

         Construction of the Hotel shall commence on or before **September 1, 2005**.

As a convenience for you, this letter will serve as an amendment to the License for the Hotel to reflect the new
milestone dates above, unless we receive your written objection within 10 days of the date of this letter. If you
so notify us that you are not in agreement with any of the extended milestone dates, then the original milestone
dates will remain unchanged.

Extensions of commencement of construction dates are usually only granted when accompanied by the standard
extension fee; however, the Extension Committee has waived this requirement at this time.  Please be advised
that failure to commence construction by the date set forth in the Addendum or otherwise meet any milestone
date could result in an issuance of a notice of default and termination. Be further advised that if you request
additional time for commencement of construction or any other milestone date and the request is approved, you
may be required to pay the standard extension fee at that time.

Please note that this extension does not change or affect in any way any other aspect of the License, and it does
not change or affect in any way the Licensee's obligation to continue to comply with other requirements and
milestones of the License.

Sincerely,

*Melinda Immelman*

Melinda Immelman
Manager
Franchise Administration & Licensing

cc:    Greg Aden
       Robert Ekman
       Ejayce Fox

        

## SECOND ADDENDUM TO LICENSE AGREEMENT

This Second Addendum (the "ADDENDUM") is made and entered into as of this 11th day of July, 2005, by and between Holiday Hospitality Franchising, Inc., (formerly known as Holiday Inns Franchising, Inc.) a Delaware corporation ("Licensor") and Gaylord Hall, individually ("Licensee"). This Addendum supplements that certain License Agreement (the "Agreement") dated September 18, 2002, between the parties, relating to a license to operate a Holiday Inn Hotel & Suites hotel to be located at Intersection of I-35 and Teasley Blvd. NE Quadrant, TX / #9284 (the "Hotel"). To the extent there is any conflict between the Agreement and this Addendum, this Addendum shall govern and control.

1. The Agreement is hereby amended as follows:

   A. Attachment "A" is further amended to delete the "Number of approved guest suites as 25".

   B. Attachment "A" is further amended to reflect the number of approved guest rooms 153.

2. Except as expressly stated in this Addendum, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Addendum. All other terms and conditions of the Agreement are in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the day and year first above written:

LICENSEE:

LICENSOR:

**HOLIDAY HOSPITALITY FRANCHISING, INC.**

By: _Gaylord Hall_
 Gaylord Hall
 Individually

By: _Jenny Tidwell_
 Jenny Tidwell
 Vice President
 Franchise Administration

Witness: _____

Attest: _____
 Asst. Secretary

S:\Holiday Inn\Franchise Admin\Master\Addendum\BCfs2fs



**InterContinental Hotels Group**
Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ichotelsgroup.com

March 21, 2005

**VIA TWO DAY DELIVERY**

Mr. Gaylord Hall
9341 Loma Vista Drive
Dallas, TX 75243

RE:  **LICENSE AGREEMENT DATED SEPTEMBER 18, 2002 ("LICENSE") BETWEEN GAYLORD HALL, INDIVIDUALLY ("LICENSEE") AND HOLIDAY HOSPITALITY FRANCHISING, INC. ("LICENSOR") FOR THE HOLIDAY INN® HOTEL & SUITES HOTEL HOTEL TO BE LOCATED AT DENTON, TX /#9284 (THE "HOTEL")**

Dear Mr. Hall:

We have received a request from representatives of Licensee to extend the milestone dates for commencement of construction and completion for the Hotel. As requested and as an accommodation, we are pleased to confirm the following changes:

     1.  The License is hereby amended by deleting in its entirety the first sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

         Construction of the Hotel shall commence on or before **July 15, 2005**.

     3.  The License is hereby amended by deleting in its entirety the last sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

         Notwithstanding the occurrence of any events constituting force majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and shall otherwise be made ready to open for business in accordance with the License not later than **July 15, 2006**.

As a convenience for you, this letter will serve as an amendment to the License for the Hotel to reflect the new milestone dates above, unless we receive your written objection within 10 days of the date of this letter. If you so notify us that you are not in agreement with any of the extended milestone dates, then the original milestone dates will remain unchanged.

Extensions of commencement of construction dates are usually only granted when accompanied by the standard extension fee; however, the Extension Committee has waived this requirement at this time. Please be advised that failure to commence construction by the date set forth in the Addendum or otherwise meet any milestone date could result in an issuance of a notice of default and termination. Be further advised that if you request additional time for commencement of

        

Six Continents Hotels, Inc.
A Member of the InterContinental Hotels Group



INTERCONTINENTAL.
HOTELS GROUP

InterContinental Hotels Group
Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ichotelsgroup.com

November 24, 2004

**VIA TWO DAY DELIVERY**

Gaylord Hall
9341 Loma Vista Drive
Dallas, TX 75243

**RE: LICENSE AGREEMENT DATED SEPTEMBER 18, 2002 (THE "LICENSE") BETWEEN GAYLORD HALL, INDIVIDUALLY ("LICENSEE") AND HOLIDAY HOSPITALITY FRANCHISING, INC. ("LICENSOR") FOR THE HOLIDAY INN ® HOTEL & SUITES HOTEL TO BE LOCATED AT DENTON, TX / #9284 (THE "HOTEL")**

Dear Mr. Hall:

We have received a request from representatives of Licensee to extend the milestone dates for commencement of construction and completion for the Hotel. As requested and as an accommodation, we are pleased to confirm the following changes:

      1.    The License is hereby amended by deleting in its entirety the first sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

            Construction of the Hotel shall commence on or before **March 1, 2005**.

      2.    The License is hereby amended by deleting in its entirety the last sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

            Notwithstanding the occurrence of any events constituting force majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and shall otherwise be made ready to open for business in accordance with the License not later than **March 1, 2006**.

As a convenience for you, this letter will serve as an amendment to the License for the Hotel to reflect the new milestone dates above, unless we receive your written objection within 10 days of the date of this letter. If you so notify us that you are not in agreement with any of the extended milestone dates, then the original milestone dates will remain unchanged.

Extensions of commencement of construction dates are usually only granted when accompanied by the standard extension fee; however, the Extension Committee has waived this requirement at this time. Please be advised that failure to commence construction by the date set forth in the Addendum or otherwise meet any milestone date could result in an issuance of a notice of default and termination. Be further advised that if you request additional time for commencement of

     

Six Continents Hotels, Inc.
A Member of the InterContinental Hotels Group

construction or any other milestone date and the request is approved, you may be required to pay the standard extension fee at that time.

Please note that this extension does not change or affect in any way any other aspect of the License, and it does not change or affect in any way the Licensee's obligation to continue to comply with other requirements and milestones of the License.

Sincerely,

Melinda Immelman
Manager
Franchise Administration & Licensing

cc:     Greg Aden
        Robert Ekman
        Cindy Sepp
        Detra Williams



InterContinental Hotels Group
Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ichotelsgroup.com

September 16, 2004

**VIA 2-DAY COURIER**

Gaylord Hall
9341 Loma Vista Drive
Dallas, TX 75243

**RE:** **LICENSE AGREEMENT DATED SEPTEMBER 18, 2002 (THE "LICENSE") BETWEEN GAYLORD HALL, INDIVIDUALLY ("LICENSEE") AND HOLIDAY HOSPITALITY FRANCHISING, INC. ("LICENSOR") FOR THE HOLIDAY INN HOTEL & SUITES HOTEL HOTEL TO BE LOCATED AT DENTON, TX /#9284 (THE "HOTEL")**

Dear Mr. Hall:

We have received a request from representatives of Licensee to extend the milestone dates for commencement of construction and completion for the Hotel. As requested and as an accommodation, we are pleased to confirm the following changes:

      1.    The License is hereby amended by deleting in its entirety the first sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

            Construction of the Hotel shall commence on or before **November 15, 2004**.

      3.    The License is hereby amended by deleting in its entirety the last sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

            Notwithstanding the occurrence of any events constituting force majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and shall otherwise be made ready to open for business in accordance with the License not later than **December 6, 2005**.

As a convenience for you, this letter will serve as an amendment to the License for the Hotel to reflect the new milestone dates above, unless we receive your written objection within 10 days of the date of this letter. If you so notify us that you are not in agreement with any of the extended milestone dates, then the original milestone dates will remain unchanged.

Extensions of commencement of construction dates are usually only granted when accompanied by the standard extension fee; however, the Extension Committee has waived this requirement at this time. Please be advised that failure to commence construction by the date set forth in the Addendum or otherwise meet any milestone date could result in an issuance of a notice of default and termination. Be further advised that if you request additional time for commencement of

     

Six Continents Hotels, Inc.
A Member of the InterContinental Hotels Group

construction or any other milestone date and the request is approved, you may be required to pay the standard extension fee at that time.

Please note that this extension does not change or affect in any way any other aspect of the License, and it does not change or affect in any way the Licensee's obligation to continue to comply with other requirements and milestones of the License.

**Please note, this is the last ground break extension with or without a fee Licensor will grant.**

Sincerely,

Jenny Tidwell
Vice President
Franchise Administration

cc:     Greg Aden
        Robert Ekman
        Cindy Sepp
        Detra Williams

## ADDENDUM TO LICENSE AGREEMENT

This Addendum (the "ADDENDUM") is made and entered into as of this __11__ day of May, 2004, by and between Holiday Hospitality Franchising, Inc., a Delaware corporation ("Licensor") and Gaylord Hall, Individually ("Licensee"). This Addendum supplements that certain License Agreement dated September 18, 2002, between the parties (the "License"), relating to a license to operate a Holiday Inn Hotel & Suites Hotel hotel to be located at Denton, TX / #9284 (the "Hotel"). To the extent there is any conflict between the License, and this Addendum, this Addendum shall govern and control.

1.      The License is hereby amended by deleting in its entirety the first sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

   Construction of the Hotel shall commence on or before **August 30, 2004**.

2.      The License is hereby amended by deleting in its entirety the last sentence of the second Paragraph of Paragraph 15.A.(3)(c), and replacing it with the following:

   Notwithstanding the occurrence of any events constituting force majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and shall otherwise be made ready to open for business in accordance with the License not later than **August 30, 2005**.

3.      Except as expressly stated in this Addendum, no further additions, modifications or deletions to the License are intended by the parties or made by this Addendum. All other terms and conditions of the License are in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the day and year first above written:

LICENSEE:                                   LICENSOR:

                                            **HOLIDAY HOSPITALITY
                                            FRANCHISING, INC.**

By: _Gaylord Hall_                          By _Jenny Tidwell_
      Gaylord Hall                             Jenny Tidwell
      Individually                             Vice President
                                               Franchise Administration

Witness: _____                  Attest: _____
                                                   Assistant Secretary

S:\Holiday Inn\Franchise Admin\Master\Addendum\Ground Break Addendum.doc

LOCATION:  Intersection of I-35 and
                Teasley Blvd. NE Quadrant
                Denton, TX

LOCATION #:  9284

DATE: September 18, 2002

# HOLIDAY HOSPITALITY FRANCHISING, INC.

## HOLIDAY INN HOTEL & SUITES HOTEL
## NEW DEVELOPMENT
## LICENSE AGREEMENT

### WITH

### GAYLORD HALL

### LICENSEE

# HOLIDAY HOSPITALITY FRANCHISING, INC.

## LICENSE AGREEMENT TABLE OF CONTENTS

1. **THE LICENSE:** ..................................................................................................................**1**

  A.  THE HOTEL: ............................................................................................................. 1
  B.  THE SYSTEM: ............................................................................................................ 1

2. **GRANT OF LICENSE:** ....................................................................................................**2**

3. **LICENSEE'S RESPONSIBILITIES:** .................................................................................**2**

  A.  OPERATIONAL AND OTHER REQUIREMENTS: ............................................................... 2
  B.  UPGRADING OF THE HOTEL: ...................................................................................... 4
  C.  FEES: ....................................................................................................................... 4

4. **LICENSOR'S RESPONSIBILITIES:** ................................................................................**6**

  A.  TRAINING: ................................................................................................................ 6
  B.  RESERVATION SERVICES: ........................................................................................... 6
  C.  CONSULTATION ON OPERATIONS, FACILITIES AND MARKETING: .................................. 6
  D.  MAINTENANCE OF STANDARDS: .................................................................................. 7
  E.  APPLICATION OF MANUAL: ......................................................................................... 7
  F.  OTHER ARRANGEMENTS FOR MARKETING, ETC.: ........................................................ 7
  G.  LICENSOR'S USE OF OTHER ADVERTISING/PROMOTIONAL SUPPORT FUNDS: ................. 7
  H.  USE OF SERVICES CONTRIBUTION: .............................................................................. 7

5. **APPEALS, CHANGES IN THE MANUAL:** ........................................................................**8**

  A.  APPEALS: .................................................................................................................. 8
  B.  CHANGES IN THE MANUAL: ........................................................................................ 8
  C.  DECISIONS ON APPEAL: .............................................................................................. 8
  D.  LIMITATION ON APPEAL RIGHTS: ................................................................................ 8

6. **IAHI:** ...........................................................................................................................**9**

  A.  MEMBERSHIP: ........................................................................................................... 9
  B.  FUNCTION OF COMMITTEES: ....................................................................................... 9

7. **PROPRIETARY RIGHTS:** ...............................................................................................**9**

  A.  OWNERSHIP OF SYSTEM: ............................................................................................ 9
  B.  TRADEMARK DISPUTES: ............................................................................................ 10
  C.  PROTECTION OF NAME AND MARKS: ......................................................................... 10

8. **RECORDS AND AUDITS:** .............................................................................................**10**

  A.  MONTHLY STATEMENTS: ........................................................................................... 10
  B.  PREPARATION AND MAINTENANCE OF RECORDS: ...................................................... 10
  C.  AUDIT: ................................................................................................................... 11
  D.  ANNUAL FINANCIAL STATEMENTS: ........................................................................... 11

9. **INDEMNITY AND INSURANCE:** ...................................................................................**11**

  A.  INDEMNITY: ............................................................................................................ 11
  B.  INSURANCE: ............................................................................................................ 11
  C.  EVIDENCE OF INSURANCE: ....................................................................................... 12

10. **TRANSFER:** ...............................................................................................................**13**

  A.  TRANSFER BY LICENSOR: ......................................................................................... 13
  B.  TRANSFER BY LICENSEE: .......................................................................................... 13
  C.  TRANSFER OF EQUITY INTERESTS THAT ARE NOT PUBLICLY TRADED: ........................ 14
  D.  TRANSFERS OF PUBLICLY-TRADED EQUITY INTERESTS: ............................................. 14
  E.  TRANSFER OF THE LICENSE: ..................................................................................... 15
  F.  TRANSFERS OF EQUITY INTEREST IN THE LICENSE UPON DEATH OR TO FAMILY MEMBERS: ........ 16

G.    REGISTRATION OF A PROPOSED TRANSFER OF EQUITY INTERESTS: ............................................................16
H.    CHANGE OF OWNERSHIP: ...........................................................................................................................16
I.     TRANSFER OF REAL ESTATE: .....................................................................................................................17
J.     MANAGEMENT OF THE HOTEL: ..................................................................................................................17

**11.   CONDEMNATION AND CASUALTY: .......................................................................................17**

A.    CONDEMNATION: .......................................................................................................................................17
B.    CASUALTY: ...............................................................................................................................................18
C.    NO EXTENSIONS OF TERM: .......................................................................................................................18

**12.   TERMINATION: ....................................................................................................................................18**

A.    EXPIRATION OF TERM: ..............................................................................................................................18
B.    TERMINATION BY LICENSEE ON ADVANCE NOTICE: .................................................................................18
C.    TERMINATION BY LICENSOR ON ADVANCE NOTICE: ................................................................................19
D.    IMMEDIATE TERMINATION BY LICENSOR: ...............................................................................................19
E.    DE-IDENTIFICATION OF HOTEL UPON TERMINATION: ...............................................................................20
F.    PAYMENT OF LIQUIDATED DAMAGES: ......................................................................................................21

**13.   RELATIONSHIP OF PARTIES: ...........................................................................................................21**

A.    NO AGENCY RELATIONSHIP: ....................................................................................................................21
B.    LICENSEE'S NOTICES TO PUBLIC CONCERNING INDEPENDENT STATUS: .....................................................21

**14.   MISCELLANEOUS: ..............................................................................................................................22**

A.    SEVERABILITY AND INTERPRETATION: ......................................................................................................22
B.    BINDING EFFECT: .....................................................................................................................................22
C.    EXCLUSIVE BENEFIT: ...............................................................................................................................22
D.    ENTIRE AGREEMENT: ...............................................................................................................................22
E.    LICENSOR WITHHOLDING CONSENT: ........................................................................................................22
F.    NOTICES: ..................................................................................................................................................23
G.    AUTHORITY: .............................................................................................................................................23
H.    GENERAL RELEASE AND COVENANT NOT TO SUE: ...................................................................................23
I.     PERFORMANCE OF THE WORK: .................................................................................................................24
J.     REIMBURSEMENT OF EXPENSES: ..............................................................................................................24
K.    DESCRIPTIVE HEADINGS: ..........................................................................................................................24
L.    CAPITAL RESERVE: ..................................................................................................................................24

**15.   BRAND PROVISIONS: .........................................................................................................................25**

**16.   SPECIAL STIPULATIONS: ..................................................................................................................27**

**GUARANTY ....................................................................................................................................................30**

**ATTACHMENT "A" ........................................................................................................................................32**

**Holiday Hospitality Franchising, Inc.**
**Three Ravinia Drive, Atlanta, Georgia 30346**

### License Agreement

This License dated ꂄсептемber \8 , 2002 (the "Term Commencement Date"), between Holiday Hospitality Franchising, Inc., a Delaware corporation ("Licensor"), and Gaylord Hall (individually, "Licensee") whose address is 9341 Loma Vista Drive, Dallas, TX 45243.

### The Parties Agree As Follows:

## 1.    THE LICENSE:

Licensor operates and licenses a system designed to provide a distinctive, high quality hotel service to the public under the names "Crowne Plaza®" and "Holiday Inn®" (the "System"). High standards established by Licensor are the essence of the System. Future investments may be required of Licensee under this License Agreement ("License"). Licensee has independently investigated the risks of the business to be operated hereunder, including current and potential market conditions, competitive factors and risks; has read Licensor's Uniform Offering Circular for Prospective Franchisees ("UFOC"); and has made an independent evaluation of all such facts. Neither Licensor nor any other person on Licensor's behalf has made any representation to Licensee concerning this License not fully set forth herein. Aware of the relevant facts, Licensee desires to enter into this License in order to obtain a license to use the System in the operation of the specific brand of hotel identified in paragraph 15.A(1) below located at Intersection of I-35 and Teasley Blvd. NE Quadrant, Denton, TX (the "Hotel").

### A.    The Hotel:

The Hotel comprises all structures, facilities, appurtenances, furniture, fixtures, equipment, and entry, exit, parking and other areas from time to time located on the land identified by Licensee to Licensor in anticipation of this License, or located on any land from time to time approved by Licensor for additions, signs or other facilities. The Hotel now includes the facilities listed on Attachment "A" hereto. No change in the number of approved guest rooms or suites and no other significant change in the Hotel or in the manner in which the Hotel rooms and services are offered to the public (including timesharing and condominium Hotel projects not involving short term stays by transient guests) may be made without Licensor's approval. Licensee represents that it is entitled to possession of the Hotel during the entire license term without restrictions that would interfere with anything contemplated in this License. Throughout this License, the words "room" and "guest room" are intended to include the word "suites" unless otherwise indicated.

### B.    The System:

The System is composed of all elements which are designed to identify Holiday Inn hotels and/or Crowne Plaza hotels to the consuming public or are designed to be associated with those hotels or to contribute to such identification or association and all elements which identify or reflect the quality standards and business practices of such hotels, all as specified in

this License or as designated from time to time by Licensor. The System at present includes, but is not limited to, the service marks Holiday Inn®, Holiday Inn Garden Court℠, Crowne Plaza®, Holiday Inn Express®, Holiday Inn Express® Hotel & Suites, Holiday Inn® Hotel & Suites, Holiday Inn Select®, Holiday Inn SunSpree Resort®, Holiday Inn® Resort, Holiday Inn Family Suites Resort℠, Crowne Plaza® Suites, Crowne Plaza® Resort, and Staybridge Suites® by Holiday Inn® (as appropriate to the specific hotel operation to which it pertains), Holidex® and such other service marks and such copyrights, trademarks and similar intellectual property rights made available to licensees of the System by reason of this License; all rights to domain names and other identifications or elements used in electronic commerce as may be designated from time to time by Licensor in accordance with Licensor's specifications to be part of the System; access to a reservation service operated in accordance with specifications established by Licensor from time to time; distribution of advertising, publicity and other marketing programs and materials; the furnishing of training programs and materials; confidential or proprietary information standards, specifications and policies for construction, furnishing, operation, appearance and service of the Hotel, and other requirements as stated or referred to in this License and from time to time in Licensor's Standards Manual (the "Manual") or in other communications to Licensee; and programs for inspecting the Hotel, measuring and assessing service, quality and consumer opinion and consulting with Licensee. Under a separate UFOC and applicable license agreement, and under our normal qualifications and procedures, Licensor offers licenses for an extended stay hotel brand under the name "Staybridge Suites." Licensor may add elements to the System or modify, alter or delete elements of the System in its sole discretion from time to time.

## 2.    GRANT OF LICENSE:

Licensor hereby grants to Licensee a non-exclusive license to use the System only at the Hotel, but only in accordance with this License and only during the "License Term" beginning with the Term Commencement Date and terminating under paragraph 12 hereof. The License applies to the location specified herein and to no other location. Licensee acknowledges that Licensor, its divisions, subsidiaries, affiliates and parents are and may in the future be engaged in other business activities including activities involving transient lodging and related activities, and that Licensee is acquiring no rights hereunder other than the right to use the System as specifically defined herein in accordance with the terms of this License. This License does not limit Licensor's right or the rights of any parent, subsidiary or affiliate of Licensor, to use or license the System or any part thereof or to engage in or license any business activity at any other location. Licensee acknowledges that Licensor's rights to use and/or license the System, referenced immediately above, pre-date this agreement and are not limited or changed by the terms of this agreement. Licensee agrees that by acknowledging those rights, the parties do not intend to make Licensor's exercise of such rights subject to rules applicable to contractual performance or the exercise of contractual discretion under this License.

## 3.    LICENSEE'S RESPONSIBILITIES:

### A.    Operational and Other Requirements:

During the License Term, Licensee will:

(1)    maintain a high moral and ethical standard and atmosphere at the Hotel;
(2)    maintain the Hotel in a clean, safe and orderly manner and in first class condition;

2

(3)   provide efficient, courteous and high-quality service to the public;

(4)   operate the Hotel 24 hours a day every day except as otherwise permitted by Licensor based on special circumstances;

(5)   strictly comply in all respects with the Manual and with all other policies, procedures and requirements of Licensor which may be from time to time communicated to Licensee;

(6)   strictly comply with all of Licensor's standards and specifications for goods and services used in the operation of the Hotel and other reasonable requirements to protect the System and the Hotel from unreliable sources of supply;

(7)   strictly comply with Licensor's requirements as to:

   (a)   the types of services and products that may be used, promoted or offered at the Hotel;

   (b)   the types and quality of services and products that, to supplement services listed on Attachment A, must be used, promoted or offered at the Hotel;

   (c)   the use, display, style and type of signage and of all other forms of identification at or pertaining to the Hotel, including but not limited to any use of the Holiday Inn or Crowne Plaza name or any other of Licensor's service marks, trademarks or copyrights (in all formats, including but not limited to print, electronic or other media), which are seen by members of the consuming public or used to identify the Hotel to actual or prospective consumers;

   (d)   directory and reservation service listings of the Hotel;

   (e)   training of persons to be involved in the operation of the Hotel;

   (f)   participation in all marketing, reservation service, advertising, training and operating programs designated by Licensor as System-wide (or area-wide) programs in the best interests of hotels using the System; provided that with regard to area-wide programs, Licensee may request Licensor's approval that Licensee need not participate, reasonable approval not to be withheld;

   (g)   maintenance, appearance and condition of the Hotel; and

   (h)   quality and types of services offered to customers at the Hotel.

(8)   use such automated guest service and/or hotel management and/or telephone or telecommunication system(s) which Licensor deems to be in the best interests of the System, including any additions, enhancements, supplements, or variants thereof which may be developed during the term hereof;

(9)   participate in and use those reservation services which Licensor deems to be in the best interests of the System, including any additions, enhancements, supplements or variants thereof which may be developed during the term hereof;

(10)  adopt all improvements or changes to the System as may be from time to time designated by Licensor;

(11)  strictly comply with all governmental requirements, pay all taxes, and maintain all governmental licenses and permits necessary to operate the Hotel in accordance with the System;

(12) permit inspection of the Hotel by Licensor's representatives at any time and give them free lodging for such time as may be reasonably necessary to complete their inspections;

(13) promote the Hotel on a local or regional basis subject to Licensor's requirements as to form, content and prior approvals;

(14) insure that no part of the Hotel or the System is used to further or promote a competing business or other lodging facility, except as Licensor may approve for businesses or lodging facilities owned, licensed, operated or otherwise approved by Licensor or its parents, divisions, subsidiaries, and affiliates;

(15) use every reasonable means to encourage use of Holiday Inn and Crowne Plaza facilities everywhere by the public;

(16) in all respects use Licensee's best efforts to reflect credit upon and create favorable public response to the names "Holiday Inn" and "Crowne Plaza";

(17) promptly pay to Licensor all amounts due Licensor, its parents, subsidiaries and affiliates as royalties or fees, whether or not arising out of this License, or for goods or services purchased by Licensee for use at the Hotel; and

(18) Comply with Licensor's reasonable requirements concerning confidentiality of information, and in particular Licensee shall not disclose without Licensor's written permission, information pertaining to Licensor's marketing and reservations programs that have not been disclosed to the public.

## B.    Upgrading of the Hotel:

Using the same requirements applicable generally to hotels under the System operated by Licensor and its licensees in the same category as the Hotel, Licensor may at any time during the term hereof require substantial modernization, renovation and other upgrading of the Hotel. Limited exceptions from those requirements may be made by Licensor based on local conditions or special circumstances. If the upgrading requirements contained in this paragraph 3.B cause Licensee undue hardship, Licensee may terminate the License by complying with paragraph 12.B. The provisions of the preceding sentence are not applicable to the Work as defined in this License or to future upgrading requirements due to conversions, relicensing, product quality inspections of the Hotel, Standards Manual requirements or a request for change of ownership by Licensee.

## C.    Fees:

(1) For each month (or part of a month) during the License Term, Licensee will pay to Licensor by the 15th of the following month:

    (a) a royalty of 5%, of the Gross Rooms Revenue attributable to or payable for rental of guest rooms at the Hotel with no deduction for any item including but not limited to no adjustment for the cost of any food and beverage items provided or made available to a guest as an incident of a guest room rental, however with deductions for sales and room taxes only ("Gross Rooms Revenue"); and

4

(b)    a "Services Contribution" equal to the percentage of Gross Rooms Revenue set forth in paragraph 15.A(2)(a) below, to be used by Licensor for marketing, reservations, and other related activities which, in Licensor's sole business judgment as to the long-term interests of the System, support marketing, reservations and other related functions. Costs which a Licensee incurs in the acquisition, installation or maintenance of reservations services, equipment or training, or in its own marketing activities, do not constitute payment of the "Services Contribution". The Services Contribution is subject to change by Licensor from time to time if either approved by: (i) a majority of members (which shall be counted on the basis of one hotel, one vote) of the System who represent a majority of the hotels to be subject to the increase; or (ii) approved by a majority of the members of the System or the "IAHI" (the franchisee association or successor sanctioned as such by Licensor) at a meeting of System licensees or at an annual IAHI meeting either as may be convened by Licensor upon no less than 45 days' advance notice. Licensor may, in its sole discretion, upon 30 days' prior written notice, increase this Contribution by an amount not to exceed 1% of Gross Rooms Revenue and such increase shall be effective for a period no longer than 12 months; provided that, in the event of such increase, Licensor shall not make such a discretionary increase again for a period of 24 months after the expiration of any such increase; and

(c)    a monthly Technology Fee of $8.74 for each guest room at the Hotel to be used by Licensor for provision of technology services, such as, but not limited to satellite communications services to the Hotel, plus such increases as Licensor may judge reasonable, but in no case exceeding in any calendar year 10% of the fee in effect at the beginning of that year; and

(d)    all fees due for Travel Agent Commission Programs and Field Marketing Co-op programs attributable to the Hotel; and

(e)    an amount equal to any sales, gross receipts or similar tax imposed on Licensor and calculated solely on payments required hereunder, unless the tax is an optional alternative to an income tax otherwise payable by Licensor.

Licensor may, at its election, require Licensee to pay all outstanding fees by electronic funds transfer/direct debit of account or other similar technology designed to accomplish the same purposes.

Licensee will operate the Hotel so as to maximize gross rooms revenue of the Hotel consistent with sound marketing and industry practice and will not engage in any conduct which reduces gross rooms revenue of the Hotel in order to further other business activities.

(2)    A standard initial fee as set forth in Licensor's then current UFOC will be charged upon application for any guest rooms to be added to the Hotel.

(3)    Additional royalties may be charged on revenues (or upon any other basis, if so determined by Licensor) from any activity if it is added at the Hotel by mutual agreement and:

(a)      it is not now offered at System hotels generally and is likely to benefit significantly from or be identified significantly with the Holiday Inn or Crowne Plaza name or other aspects of the System; or

(b)      it is designed or developed by or for Licensor.

(4)      Charges may be made for optional products or services accepted by Licensee from Licensor, either in accordance with current practice or as developed in the future.

(5)      Each payment under this paragraph 3.C, except the standard initial fee, shall be accompanied by the monthly statement referred to in paragraph 8.A. Licensor may apply any amounts received under this paragraph 3.C to any amounts due under this License. If any amounts are not paid when due, such non-payment shall constitute a breach of this License and, in addition, such unpaid amounts will accrue interest beginning on the first day of the month following the due date at 1 1/2% per month or the maximum interest permitted by applicable law, whichever is less.

(6)      Local and regional marketing programs and related activities may be conducted by Licensee, but only at Licensee's expense and subject to Licensor's requirements. Reasonable charges may be made for optional advertising materials ordered or supplied by Licensor to Licensee for such programs and activities.

(7)      Licensor shall comply with Licensee's reasonable requirements concerning confidentiality of information.

## 4.    LICENSOR'S RESPONSIBILITIES:

### A.    Training:

During the License Term, Licensor will continue to specify and provide required and optional training services and programs at various locations. A fee may be charged for certain required and optional training services. Travel, lodging and other expenses of Licensee and its employees will be borne by Licensee. Reasonable charges also may be assessed for training materials.

### B.    Reservation Services:

During the License Term, so long as Licensee is in full compliance with its material obligations hereunder, Licensor will afford Licensee access to reservation service for the Hotel on terms consistent with this License.

### C.    Consultation on Operations, Facilities and Marketing:

During the License Term, Licensor will, from time to time at Licensor's discretion, make available to Licensee consultation and advice in connection with operations, facilities and marketing. Licensor may from time to time furnish to Licensee names of suppliers or recommend to Licensee suppliers of goods and services required or useful in the operation of the Hotel; however, Licensor is not obligated to furnish any such names or to continue doing so, and Licensee is under no obligation to use any such supplier, unless expressly required to do so by the terms of this License, the Manual or otherwise. In identifying or recommending suppliers, Licensor exercises its business judgment based on its information as of that date and its sense of the long-term interests of the System. Licensor's identification or recommendation of a supplier is not a warranty of the financial condition or performance of any supplier or of any other factor,

and Licensee's use of an identified or recommended supplier that sells products or services meeting Licensor's standards and specifications may facilitate compliance with those standards and specifications, but it is not a substitute for such compliance.

**D.**     **Maintenance of Standards:**

Licensor will conscientiously seek to maintain high standards of quality, cleanliness, appearance and service at all hotels using the System so as to promote, protect and enhance the public image and reputation of the Holiday Inn and Crowne Plaza names and to increase the demand for services offered by the System. Licensor's judgment in such matters shall be controlling in all respects, and it shall have wide latitude in making such judgments.

**E.**     **Application of Manual:**

All hotels operated under the System will be subject to the Manual, as it may from time to time be modified or revised by Licensor, including limited exceptions from compliance which may be made based on local conditions, type of hotel or special circumstances.

**F.**     **Other Arrangements for Marketing, Etc.:**

Licensor may enter into arrangements for development, reservation services, marketing, operations, administrative, technical and support functions, facilities, programs, services and/or personnel with any other entity, and may use any facilities, programs, services or personnel used in connection with the System, in connection with any business activities of its parents, subsidiaries, divisions or affiliates.

**G.**     **Licensor's Use of Other Advertising/Promotional Support Funds:**

To the extent that advertising and/or promotional support and/or funding may become available to Licensor's parents, affiliates or subsidiaries and/or Licensor from third parties on account of the totality of the activities of Licensor's parents, affiliates and subsidiaries, including hotels operated under the System, such support and/or funding may be used or designated by Licensor's parents, affiliates or subsidiaries, or Licensor, to benefit such enterprises in the aggregate, in such proportion and manner as Licensor's parents, affiliates or subsidiaries, or Licensor determines reasonably promotes the totality of such enterprises, exercising reasonable good faith business judgment with respect to such determination, provided that any such support or funding coming from activities of the System shall be used for the benefit of the System.

**H.**     **Use of Services Contribution:**

Licensor will make available and use Services Contribution funds computed on the basis generally applicable to licensees of the System. Licensor is not obligated to expend funds for marketing, reservations or related services in excess of the amounts received from licensees using the System and those funds made available by Licensor as set forth above. Local and regional marketing programs and related activities may be conducted by Licensee but only at Licensee's expense and subject to Licensor's requirements. Reasonable charges may be made for optional advertising materials ordered or used by Licensee for such programs and activities.

7

## 5. APPEALS, CHANGES IN THE MANUAL:

### A. Appeals:

Decisions, other than termination notices or decisions of Licensor's Franchise Committee, made on behalf of Licensor specifically with reference to the Hotel may be appealed to Licensor's Franchise Committee if done promptly after Licensee has diligently sought relief through Licensor's normal channels of authority. With the approval in writing of any member of the Franchise Committee, the decision may be further appealed to the Executive Committee of Licensor's Board of Directors.

### B. Changes in the Manual:

Each change in the Manual must be explained in writing to Licensee at least 30 days before it goes into effect. Licensor's Franchise Committee or its equivalent must approve any such change and must determine that the change was formulated in good faith in the best interests of the System, after seeking the advice and counsel of the Rules of Operation Committee of the IAHI.

### C. Decisions on Appeal:

Licensor shall have the right to decide appeals under this paragraph 5, solely on the basis of written submissions. No appeal will suspend a decision or change, until and unless the appeal is successful. Any action taken by Licensor in the enforcement of this License that is shown to be arbitrary or capricious will be rescinded by Licensor to the extent feasible, but wide discretion and latitude will be allowed to the judgment of Licensor in the discharge of its overriding responsibility to maintain and improve the standards, performance and facilities of the hotels using the Holiday Inn, Holiday Inn Hotel & Suites, Crowne Plaza, Holiday Inn Express, Holiday Inn Express Hotel & Suites, Holiday Inn Garden Court, Holiday Inn SunSpree Resort, Holiday Inn Resort, Holiday Inn Family Suites Resort, Crowne Plaza Resort, Crowne Plaza Suites, Holiday Inn Select, Staybridge Suites, or any other Holiday Inn or Crowne Plaza hotel brand or Holiday Inn or Crowne Plaza name. Licensor will conscientiously seek to maintain high standards of quality, cleanliness, appearance and service at all hotels using the System so as to promote, protect and enhance the public image and reputation of all Holiday Inn and Crowne Plaza hotel brand names or any other Holiday Inn or Crowne Plaza name, and to increase the demand for services offered by the System. The Manual will apply to all hotels operated under the System by Licensor and its licensees. Limited exceptions from compliance may be made based on local conditions or special circumstances.

### D. Limitation on Appeal Rights:

Licensee will not be arbitrary, capricious or unreasonable in exercising its appeal (or any other) rights under this License, and will use them only for the purpose for which intended.

## 6. IAHI:

### A. Membership:

Licensee, other licensees of the System, and Licensor are eligible for membership in the IAHI and are entitled to vote at its meetings on the basis of one hotel, one vote, provided that Licensee or Licensor, as the case may be, has paid all its dues and fees owing to the IAHI. The purposes of the IAHI will be to consider and discuss, and make recommendations on common problems relating to the operation of System hotels. Licensor will seek the advice and counsel of the IAHI Board of Directors and its Rules of Operation, Advertising and Reservation Committees.

### B. Function of Committees:

IAHI committees, their functions and their members will be subject to approval in writing by Licensor, which approval will not be unreasonably withheld. Recognizing that the IAHI must function in a manner consistent with the best interests of all persons using the System, the Licensee and Licensor will use their best efforts to cause the governing rules of the IAHI to be consistent with this License.

## 7. PROPRIETARY RIGHTS:

### A. Ownership of System:

The Licensee acknowledges and will not contest, either directly or indirectly, Licensor's unrestricted and exclusive ownership of the System and any element(s) or component(s) thereof, or that Licensor has the sole right to grant licenses to use all or any element(s) or component(s) of the System. Licensee specifically agrees and acknowledges that Licensor is the owner of all right, title and interest in and to the marks Holiday Inn, Holiday Inn Hotel & Suites, Crowne Plaza, Holiday Inn Express, Holiday Inn Express Hotel & Suites, Holiday Inn SunSpree Resort, Holiday Inn Resort, Holiday Inn Family Suites Resort, Crowne Plaza Suites, Crowne Plaza Resort, Holiday Inn Select, Staybridge Suites and all other marks, names or other elements associated with the System or derived therefrom (including but not limited to domain names or other identifications or elements used in electronic commerce), together with the goodwill symbolized thereby, and that Licensee will not contest directly or indirectly the validity or ownership of the marks either during the term of this License or after its termination. All improvements and additions whenever made to or associated with the System by the parties hereto or anyone else, and all service marks, trademarks, copyrights, and service mark, trademark, domain name or similar registrations at any time used, applied for or granted in connection with the System, and all goodwill arising from Licensee's use of Licensor's marks shall inure to the benefit of and become the property of Licensor. Upon expiration or termination of this License, no monetary amount shall be assigned as attributable to any goodwill associated with Licensee's use of the System or any element(s) or component(s) of the System including any trademarks or service marks licensed hereunder.

9

**B.    Trademark Disputes:**

Licensor will have the sole right and responsibility to handle disputes with third parties concerning use of all or any part of the System, and Licensee will, at its reasonable expense, extend its full cooperation to Licensor in all such matters. All recoveries made as a result of disputes with third parties regarding use of the System or any part thereof shall be for the account of Licensor. Licensor need not initiate suit against alleged imitators or infringers, and may settle any dispute by grant of a license or otherwise. Licensee will not initiate any suit or proceeding against alleged imitators or infringers or any other suit or proceeding to enforce or protect the System.

**C.    Protection of Name and Marks:**

Both parties will make every effort consistent with the foregoing to protect and maintain the names and marks "Holiday Inn", "Holiday Inn Express", and "Crowne Plaza" and their distinguishing characteristics (and the other service marks, trademarks, slogans, etc., associated with the System). Licensee agrees to execute any documents deemed necessary by Licensor or its counsel to obtain protection for Licensor's marks or to maintain their continued validity and enforceability. Licensee agrees to use the names and marks associated with the System only in the manner authorized by Licensor and acknowledges that any unauthorized use thereof shall constitute infringement of Licensor's rights.

**8.    RECORDS AND AUDITS:**

**A.    Monthly Statements:**

At least monthly, Licensee shall prepare a statement which will include all information concerning Gross Rooms Revenue, other revenues generated at the Hotel, room occupancy rates, reservation data and other information required by Licensor that may be useful in connection with marketing and other functions of Licensor, its parents, subsidiaries, divisions or affiliates (the "Data"). The Data shall be the property of Licensor. The Data will be permanently recorded and retained by Licensee as may be reasonably required by Licensor. By the third of each month, Licensee will submit to Licensor a statement setting forth the Data and reflecting the computation of the amounts then due under paragraph 3.C. The statement will be in such form (including but not limited to electronic transmission or automatic capture) and detail as Licensor may reasonably request from time to time, and may be used by Licensor for its reasonable purposes.

**B.    Preparation and Maintenance of Records:**

Licensee will, in a manner and form satisfactory to Licensor and utilizing accounting and reporting standards as reasonably required by Licensor, prepare on a current basis (and preserve for no less than 4 years), complete and accurate records concerning Gross Rooms Revenue and all financial, operating, marketing and other aspects of the Hotel, and maintain an accounting system which fully and accurately reflects all financial aspects of the Hotel and its business. Such records shall include but not be limited to books of account, tax returns, governmental reports, register tapes, daily reports, and complete quarterly and annual financial statements (profit and loss statements, balance sheets and cash flow statements).

202 #9284

## C. Audit:

Licensor may require Licensee to have the Gross Rooms Revenue or other monies due hereunder computed and certified as accurate by a certified public accountant. During the License Term and for two years afterward, Licensor and its authorized agents will have the right to verify information required under this License by requesting, receiving, inspecting and auditing, at all reasonable times, any and all records referred to above wherever they may be located (or elsewhere if reasonably requested by Licensor). If any such inspection or audit discloses a deficiency in any payments due hereunder, and the deficiency in any payment is willful or exceeds 5% of the correct amount and is not offset by overpayment, Licensee shall immediately pay to Licensor the deficiency and interest thereon as provided in paragraph 3.C(5) and Licensee shall also immediately pay to Licensor the entire cost of the inspection and audit, including but not limited to travel, lodging, meals, salaries and other expenses of the inspecting or auditing personnel. If the audit discloses an overpayment, Licensor will immediately refund it to Licensee.

## D. Annual Financial Statements:

Licensee will submit to Licensor as soon as available but not later than 90 days after the end of Licensee's fiscal year, and in a format as reasonably required by Licensor, complete financial statements for such year. Licensee will certify them to be true and correct and to have been prepared in accordance with generally accepted accounting principles consistently applied, and any false certification will be a breach of this License.

## 9. INDEMNITY AND INSURANCE:

### A. Indemnity:

Licensee will indemnify Licensor, its parents, and its subsidiaries and affiliates and their officers, directors, employees, agents, successors and assigns against, hold them harmless from, and promptly reimburse them for all payments of money (fines, damages, legal fees, expenses, etc.) by reason of any claim, demand, tax, penalty, or judicial or administrative investigation or proceeding whenever asserted or filed (even where negligence of Licensor and/or its parents, subsidiaries and affiliates is alleged) arising from any claimed occurrence at the Hotel or any act, omission or obligation of Licensee or anyone associated or affiliated with Licensee or the Hotel. At the election of Licensor, Licensee will also defend Licensor and/or its parents, subsidiaries and affiliates and their officers, directors, employees, agents, successors and assigns against same. In any event, Licensor will have the right, through counsel of its choice, to control any matter to the extent it could directly or indirectly affect Licensor and/or its parents, subsidiaries or affiliates or their officers, directors, employees, agents, successors or assigns. Licensee agrees to pay Licensor all expenses including attorney's fees and court costs, incurred by Licensor, its parents, subsidiaries or affiliates, and their successors and assigns to remedy any defaults of or enforce any rights under the License, effect termination of the License or collect any amounts due under the License.

### B. Insurance:

During the License Term, Licensee will comply with all insurance requirements of any lease or mortgage covering the Hotel, and Licensor's specifications for insurance as to the

amount and type of coverage as may be reasonably specified by Licensor from time to time in writing, and will in any event maintain on the Hotel as a minimum, the following insurance underwritten by an insurer approved by Licensor:

(1) employer's liability with minimum limits of $5,000,000 per occurrence if the Hotel is licensed as a Holiday Inn Express brand hotel and $10,000,000 per occurrence if the Hotel is licensed as any other brand; and

(2) worker's compensation insurance; and

(3) employment practices liability insurance (including coverage for harassment, discrimination and wrongful termination, and covering defense and indemnity costs) with a limit of $500,000 per loss if the Hotel is licensed as a Holiday Inn Express brand hotel and $1,000,000 per loss if the Hotel is licensed as any other brand hotel, naming Licensor and its parents, subsidiaries and affiliates as additional insureds; and

(4) the holder of the liquor license will maintain liquor liability insurance with single limit coverage for personal and bodily injury and property damage of at least $10,000,000 for each occurrence naming Licensor and its parents, subsidiaries and affiliates, (and Licensee if applicable) as additional insureds; and

(5) commercial general liability insurance, (including coverage for product liability, completed operations, contractual liability, host liquor liability and fire legal liability) and comprehensive automobile liability insurance (including hired and non-owned liability) with single-limit coverage for personal and bodily injury and property damage of at least $5,000,000 for each occurrence if the Hotel is licensed as a Holiday Inn Express brand hotel and $10,000,000 per occurrence if the Hotel is licensed as any other brand, naming Licensor and its parents, subsidiaries and affiliates as additional insureds. In connection with all construction at the Hotel during the License Term, Licensee will cause the general contractor to maintain comprehensive general liability insurance (including coverage for product liability, completed operations and contractual liability) and comprehensive automobile liability insurance (including hired and non-owned liability) with limits of at least $5,000,000 per occurrence if the Hotel is licensed as a Holiday Inn Express brand hotel and $10,000,000 per occurrence if the Hotel is licensed as any other brand for personal and bodily injury and property damage underwritten with insurers approved by Licensor. Licensor and its parents, subsidiaries and affiliates will be named as additional insureds.

(6) If multiple locations are insured on policies containing an aggregate limit, then the aggregate limit must apply on a per location aggregate basis.

All policies must be written on a fully insured basis. Deductibles or self-insured retentions are subject to approval on an individual basis.

## C. Evidence of Insurance:

At all times during the License Term, Licensee will furnish to Licensor certificates of insurance evidencing the term and limits of coverage in force, names of applicable

insurers and persons insured, and a statement that coverage may not be canceled, altered or permitted to lapse or expire without 30 days' advance written notice to Licensor. Revised certificates of insurance shall be forwarded to Licensor each time a change in coverage or insurance carrier is made by Licensee, and/or upon renewal of expired coverages. At Licensor's option, Licensee may be required to provide certified insurance policy copies.

## 10.    TRANSFER:

### A.    Transfer by Licensor:

Licensor shall have the right to transfer or assign this License or any of Licensor's rights or obligations hereunder to any person or legal entity.

### B.    Transfer by Licensee:

Licensee understands and acknowledges that the rights and duties set forth in this License are personal to Licensee, and that Licensor has granted this License in reliance on the business skill, financial status, and personal character of Licensee (if Licensee is an individual), and upon the owners, members, partners or stockholders of Licensee (if Licensee is an entity, such as a partnership, company or corporation ("Entity")). Accordingly, neither Licensee nor any immediate or remote successor to any part of Licensee's interest in the License, nor any individual or entity which directly or indirectly owns an Equity Interest (as that term is defined herein) in Licensee or the License, shall sell, assign, transfer, convey, pledge, mortgage, encumber, or give away, any direct or indirect interest in the License or Equity Interest in Licensee, except as provided in this License. Any purported sale, assignment, transfer, conveyance, pledge, mortgage, or encumbrance by operation of law or otherwise, of any interest in the License or any Equity Interest in Licensee not in accordance with the provisions of this License, shall be null and void and shall constitute a material breach of this License, for which Licensor may terminate without opportunity to cure pursuant to paragraph 12.D of this License.

(1)    For the purposes of this paragraph 10, the term "Equity Interests" shall mean any ownership, membership, stock or partnership interests in Licensee and the interests of any partner, whether general or limited, in any partnership, with respect to such partnership, and of any stockholder, member or owner of any corporation or company with respect to such corporation or company, which partnership, corporation or company is the Licensee hereunder or which partnership, corporation or company owns a direct or indirect beneficial interest in Licensee. References in this License to "publicly-traded Equity Interests" shall mean any Equity Interests which are traded on any securities exchange or are quoted in any publication or electronic reporting service maintained by the National Association of Securities Dealers, Inc. or any of its successors.

(2)    If Licensee is an Entity, Licensee represents that the Equity Interests in Licensee are directly and (if applicable) indirectly owned, as shown in Attachment "A."

(3)    In computing changes of Equity Interest, limited partners will not be distinguished from general partners, and Licensor's judgment will be final if there is any question as to the definition of Equity Interest or as to the

202 #9284

computation of relative Equity Interests, including transfers of Equity Interests, the principal considerations being:

(a) direct and indirect power to exercise control over the affairs of the Licensee;

(b) direct and indirect right to share in Licensee's profits; and

(c) amounts directly or indirectly exposed at risk in the Licensee's business.

**C. Transfer of Equity Interests That Are Not Publicly Traded:**

(1) Except where otherwise provided in this License, Equity Interests in the Licensee that are not publicly-traded may be transferred, issued, or eliminated with Licensor's prior written consent, which will not be unreasonably withheld, provided that after the transaction:

(a) 50% or less of all Equity Interests in Licensee will have changed hands since Licensee first became a party to this License, or

(b) 80% or less of all Equity Interests in Licensee will have changed hands since Licensee first became a party to this License, and no Equity Interest(s) will be held by other than those who held them when Licensee first became a party to this License.

(2) In computing the percentages referred to in paragraph 10.C(1) above, limited partners will not be distinguished from general partners, and Licensor's judgment will be final if there is any question as to the definition of "Equity Interests" or as to the computation of relative Equity Interests, the principal considerations being:

(a) direct and indirect power to exercise control over the affairs of Licensee;

(b) direct and indirect right to share in Licensee's profits; and

(c) amounts directly or indirectly exposed at risk in the Licensee's business.

**D. Transfers of Publicly-Traded Equity Interests:**

(1) Except as otherwise provided in this License, publicly-traded Equity Interests in the Licensee may be transferred without Licensor's consent but only if:

(a) immediately before the proposed transfer, the transferor owns less than 25% of the Equity Interest of Licensee; and

(b) immediately after the transfer, the transferee will own less than 25% of the Equity Interest of Licensee; and

(c) the transfer is exempt from registration under federal securities law.

(2) Publicly-traded Equity Interests may be transferred with Licensor's written consent, which may not be unreasonably withheld, if the transfer is exempt from registration under federal securities law.

(3) The chief financial officer of Licensee shall certify annually to Licensor that Licensee is in compliance with the provisions of this paragraph 10.D. Such certification shall be delivered to Licensor with the Annual Financial Statements referred to in paragraph 8.D.

14

**E.    Transfer of the License:**

(1)    Licensee, if a natural person, may with Licensor's consent, which will not be unreasonably withheld, transfer the License to Licensee's spouse, parent, sibling, niece, nephew, descendant, or spouse's descendant, provided that:

    (a)    adequate provision is made for the management of the Hotel; and

    (b)    the transferee executes a new license agreement for the unexpired term of this License, on the standard form then being used to license new Hotels under the System, except the fees charged thereunder shall be the same as those contained herein including any adjustments to such fees as may have been implemented from time to time in accordance with the terms of this License; and

    (c)    Licensee guarantees, in Licensor's usual form, the performance of the transferee's obligations under the newly executed license agreement.

(2)    If Licensee is a natural person, he may, without the consent of Licensor, upon 30 days' prior written notice to Licensor, transfer the License to a corporation entirely owned by him, provided that:

    (a)    adequate provision is made for the management of the Hotel; and

    (b)    the transferee executes a new license agreement for the unexpired term of this License on the standard form then being used to license new Hotels under the System, except the fees charged then shall be the same as those contained herein including any adjustments to such fees as may have been implemented from time to time in accordance with the terms of this License; and

    (c)    the Licensee guarantees, in Licensor's usual form, the performance of the new licensee's obligations under the newly executed license agreement.

(3)    If Licensee is a natural person, upon Licensee's death, the License will pass in accordance with Licensee's will, or, if Licensee dies intestate, in accordance with the laws of intestacy governing the distribution of Licensee's estate, provided that:

    (a)    adequate provision has been made for management of the Hotel; and

    (b)    Licensor gives written consent, which consent will not be unreasonably withheld; and

    (c)    the transferee is one or more of the decedent's spouse, parents, siblings, nieces, nephews, descendants, or spouse's descendants and;

    (d)    Licensee's heirs or legatees promptly advise Licensor and the transferee promptly executes a new license agreement for the unexpired term of this License, on the standard form then being used to license new Hotels under the System, except the fees charged thereunder shall be the same as contained herein including any adjustments to such fees as may have been implemented from time to time in accordance with the terms of this License.

15

**F.** **Transfers of Equity Interest in the License Upon Death or To Family Members:**

    (1)    If an Equity Interest is owned by a natural person, the Equity Interest will pass upon such person's death, in accordance with such person's will or, if such person dies intestate, in accordance with the laws of intestacy governing the distribution of such person's estate, provided that:

        (a)    adequate provision is made for management of the Hotel; and

        (b)    Licensor gives written consent, which consent will not be unreasonably withheld; and

        (c)    the transferee is one or more of the decedent's spouse, parents, siblings, nieces, nephews, descendants, or spouse's descendants and;

        (d)    transferee assumes, in writing, on a continuing basis, the decedent's guarantee, if any, of the Licensee's obligations hereunder.

**G.** **Registration of a Proposed Transfer of Equity Interests:**

If a proposed transfer of an Equity Interest in the Licensee requires registration under any federal or state securities law, Licensee shall:

    (1)    Request the Licensor's consent at least 45 days before the proposed effective date of the registration; and

    (2)    Accompany such request with one payment of a non-refundable fee of $25,000; and

    (3)    Reimburse Licensor for expenses incurred by Licensor in connection with review of the materials concerning the proposed registration, including without limitation, attorney's fees and travel expenses; and

    (4)    Agree in writing, and all participants in the proposed offering subject to registration agree in writing, to fully indemnify Licensor in connection with the registration; furnish the Licensor all information requested by Licensor; avoid any implication of Licensor's participation in, or endorsing the offering; and use the Licensor's service marks and trademarks only as authorized by Licensor.

**H.** **Change of Ownership:**

    (1)    This License is not transferable. If Licensee (i) receives an offer to purchase or lease the Hotel or any portion thereof, (ii) desires to sell or lease the Hotel or any portion thereof, (iii) wishes to convey the Hotel, Hotel site, or any Equity Interest in the Hotel, Licensee shall give prompt written notice thereof to Licensor, stating the identity of the prospective transferee, purchaser or lessee and the terms and conditions of the conveyance, including a copy of any proposed agreement and all other information with respect thereto, which Licensor may reasonably require.

    (2)    Under the provisions of this License, (i) any Transfer of Equity Interests (other than a permitted Transfer) or (ii) Transfer of all or a substantial part of the Hotel or Hotel site (if the Hotel or Hotel site is owned directly or indirectly by Licensee or by an individual or Entity that owns any Equity

Interest in Licensee), to a new owner who desires to operate the Hotel as a Holiday Inn or Crowne Plaza hotel brand, shall constitute a change of ownership requiring submittal of an application for a new license.

(3) Licensor shall process such change of ownership application in accordance with Licensor's then current procedures, criteria and requirements regarding fees, upgrading of the Hotel, credit, operational abilities and capabilities, prior business dealings, market feasibility and other factors deemed relevant by Licensor. If such change of ownership application is approved, Licensor and the new owner shall, upon surrender of the License, enter into a new license agreement. The new license agreement shall be on Licensor's then current form and contain Licensor's then current terms (except for duration), and if applicable, the new license agreement will contain specified upgrading and other requirements.

(4) If a change of ownership application for the proposed new owner is not approved by Licensor and the conveyance of the Hotel or Equity Interest to the proposed new owner occurs, then this License shall terminate pursuant to paragraph 12.D hereof and Licensor shall be entitled to all of its remedies.

## I.  Transfer of Real Estate:

If the real property used in the operation of the Hotel is owned directly or indirectly by Licensee or by an individual or Entity that owns any Equity Interest in Licensee and Licensee, or that individual or Entity proposes to transfer all or a substantial part of such property to a third party, such transfer shall constitute a transfer under the provisions of this License requiring an application for a new license agreement, unless Licensee receives Licensor's prior written consent for the transaction.

## J.  Management of the Hotel:

Licensee must at all times retain and exercise direct management control over the Hotel's business. Licensee shall not enter into any lease, management agreement, or other similar arrangement for the operation of the Hotel or any part thereof (including without limitation, food and/or beverage service facilities) with any individual or Entity other than Licensee, without the prior written consent of Licensor.

## 11.  CONDEMNATION AND CASUALTY:

### A.  Condemnation:

Licensee shall, at the earliest possible time, give Licensor full notice of any proposed taking by eminent domain. If Licensor acknowledges that the Hotel or a substantial part thereof is to be taken, Licensor will give due and prompt consideration, without any obligation, to transferring the License to a nearby location selected by Licensee and approved by Licensor as promptly as reasonably possible and in any event within four months of the taking, provided that Licensee has promptly filed an application to transfer the License to such new location. If the new location is approved by Licensor, and the transfer authorized by Licensor, and if Licensee opens a new hotel at the new location in accordance with Licensor's specifications within two years of the closing of the Hotel, the new hotel will thenceforth be

17

deemed to be the Hotel licensed under this License. If a condemnation takes place and a new hotel does not, for whatever reason, become the Hotel under this License in strict accordance with this paragraph (or if it is reasonably evident to Licensor that such will be the case), the License will terminate forthwith upon notice thereof by Licensor to Licensee.

**B.   Casualty:**

If the Hotel is damaged by fire or other casualty, Licensee will expeditiously repair the damage. If the damage or repair requires closing the Hotel, Licensee will immediately notify Licensor; will repair or rebuild the Hotel in accordance with Licensor's standards; will commence reconstruction within four months after closing; will expeditiously continue on an uninterrupted basis with such reconstruction and will reopen the Hotel for continuous business operations as soon as practicable (but in any event within 24 months after closing of the Hotel), giving Licensor ample advance notice of the date of reopening. If the Hotel is not reopened in accordance with this paragraph, the License will forthwith terminate upon notice thereof by Licensor to Licensee. Notwithstanding anything else herein to the contrary, during the time the Hotel is closed, Licensee shall pay Licensor a monthly royalty of 2% of Gross Rooms Revenue based on the average monthly Gross Rooms Revenue for the preceding 12 months prior to the date of closing or if the Hotel has not been in the System for 12 months, based on the average monthly Gross Rooms Revenue for the period during which the Hotel has been in operation in the System. Said payment shall be in lieu of all other System fees under paragraph 3.C of this License.

The License may be replaced by a new license agreement as provided in paragraph 10 and the License may terminate as provided in this paragraph 11 without liquidated damages.

**C.   No Extensions of Term:**

Nothing in this paragraph 11 will extend the License Term but Licensee shall not be required to make any payments pursuant to paragraph 3.C(1) and (3), except as provided in paragraph 11.B above, for periods during which the Hotel is closed by reason of condemnation or casualty.

**12.   TERMINATION:**

**A.   Expiration of Term:**

This License will expire without notice ten (10) years from the date of the opening of the Hotel in the System, subject to earlier termination as set forth herein, and this License is not renewable. The parties recognize the difficulty of ascertaining damages to Licensor resulting from premature termination of the License, and have provided for liquidated damages which represent their best estimate as to the damages arising from the circumstances in which they are provided.

**B.   Termination by Licensee on Advance Notice:**

Licensee may terminate the License as provided in paragraph 3.B, by giving at least 12 but less than 15 months' advance notice to Licensor accompanied by a lump sum

18

payment as an early termination fee, and not as a penalty or in lieu of any other payments required under this License, equal to the total of all amounts required under paragraph 3.C for the 12 calendar months of operation preceding the notice or if the Hotel has been in operation in the System for less than 12 months, the greater of (i) 12 times the monthly average of such amounts for the period during which the Hotel has been in operation in the System, or (ii) 12 times such amounts as are due for the one month preceding the termination.

C.    **Termination by Licensor on Advance Notice:**

(1)    In accordance with notice from Licensor to Licensee, this License will terminate (without any further notice unless required by law), provided that:
  (a)    the notice is mailed at least 30 days (or longer, if required by law) in advance of the termination date; and
  (b)    the notice reasonably identifies one or more breaches of the Licensee's obligations; and
  (c)    the breach(es) are not fully remedied within the time period specified in the notice.

(2)    If Licensee shall have engaged in a violation of this License, for which a notice of termination was given and termination failed to take effect because the default was remedied during the then preceding 12 months, the period given to remedy defaults will, if and to the extent permitted by law, thereafter be 10 days instead of 30.

(3)    In any judicial proceeding in which the validity of termination is at issue, Licensor will not be limited to the reasons set forth in any notice sent under this paragraph.

(4)    Licensor's notice of termination or suspension of services shall not relieve Licensee of its obligations under this License.

D.    **Immediate Termination by Licensor:**

This License may be terminated by Licensor immediately (or at the earliest time permitted by applicable law) if:

(1)    (a)    Licensee or any guarantor of Licensee's obligations hereunder shall generally not pay its debts as they become due, or shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or
  (b)    Licensee or any such guarantor shall commence any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or
  (c)    Licensee or any such guarantor shall take any corporate or other action to authorize any of the actions set forth above in paragraphs (a) or (b); or

19

(d)     any case, proceeding or other action against Licensee or any such guarantor shall be commenced seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action: (i) results in the entry of any order for relief against it which is not fully stayed within seven business days after the entry thereof, or (ii) remains undismissed for a period of 45 days; or

(e)     an attachment remains on all or a substantial part of the Hotel or of Licensee's or any such guarantor's assets for 30 days; or

(f)     Licensee or any such guarantor fails, within 60 days of the entry of a final judgment against Licensee in any amount exceeding $50,000, to discharge, vacate or reverse the judgment, or to stay execution of it, or if appealed, to discharge the judgment within 30 days after a final adverse decision in the appeal; or

(2)     Licensee voluntarily or involuntarily loses possession or the right to possession of all or a significant part of the Hotel, except as otherwise provided in paragraph 11; or

(3)     Licensee contests in any court or proceeding Licensor's ownership of the System or any part of it, or the validity of any service marks or trademarks associated with Licensor's business; or

(4)     A breach of paragraph 10 occurs; or

(5)     Licensee fails to continue to identify the Hotel to the public as a System hotel, engages in any action that violates Licensor's proprietary rights under paragraph 7 or ceases to operate the Hotel as a System hotel; or

(6)     Any action is taken toward dissolving or liquidating Licensee or any guarantor hereunder, if it is an Entity, except for any such actions resulting from the death of a partner; or

(7)     Licensee (or any principal stockholder, owner, member or partner of Licensee as the case may be) is, or is discovered to have been, convicted of a felony (or any other offense if it is likely to adversely reflect upon or affect the Hotel, the System or Licensor in any way); or

(8)     Licensee maintains false books and records of account or submits false reports or information to Licensor; or

(9)     Licensee knowingly fails to comply with the requirements of the License and/or the Manual on safety, security, or privacy for its guests at the Hotel, or on the reputation of the management, employees or operation of the Hotel, and such failure may significantly adversely reflect upon or affect the Hotel, the System or Licensor, its parents, subsidiaries and affiliates in any way.

### E.    De-Identification of Hotel Upon Termination:

Licensee will take whatever action is necessary to assure that no use is made of any part of the System at or in connection with the Hotel after the License Term ends. This will involve, among other things, returning to Licensor the Manual and all other materials proprietary

to Licensor, ceasing the use of any of Licensor's trademarks or service marks, physical changes of distinctive System features of the Hotel, including removal of the primary freestanding sign down to the structural steel, and all other actions required to preclude any possibility of confusion on the part of the public and to ensure that the Hotel is no longer using all or any part of the System or otherwise holding itself out to the public as a Holiday Inn or Crowne Plaza hotel. Anything not done by Licensee in this regard within 30 days after termination, may be done at Licensee's expense by Licensor or its agents who may enter upon the premises of the Hotel for that purpose.

### F. Payment of Liquidated Damages:

If the License terminates pursuant to paragraph 12.C or 12.D above, Licensee will promptly pay Licensor (as liquidated damages for the premature termination only, and not as a penalty nor as damages for breaching the License nor in lieu of any other payment) a lump sum equal to the total amounts required under paragraph 3.C(1), (3) and (4) during the 36 calendar months of operation preceding the termination or such shorter period as equals the unexpired License Term at the time of termination; or if the Hotel has not been in operation in the System for 36 months, the greater of:

(1)     36 times the monthly average of such amounts for the period during which the Hotel has been in operation in the System, or

(2)     36 times such amounts as are due for the one month preceding such termination.

## 13. RELATIONSHIP OF PARTIES:

### A. No Agency Relationship:

Licensee is an independent contractor. Neither party is the legal representative nor agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever. Licensor and Licensee expressly acknowledge that the relationship intended by them is a business relationship based entirely on and circumscribed by the express provisions of this License and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this License.

### B. Licensee's Notices to Public Concerning Independent Status:

Licensee will take such steps as are necessary and such steps as Licensor may from time to time reasonably request to minimize the chance of a claim being made against Licensor for anything that occurs at the Hotel or for acts, omissions or obligations of Licensee or anyone associated or affiliated with Licensee or the Hotel. Such steps may, for example, include giving notice in guest rooms, public rooms and advertisements and on business forms and stationery, etc., making clear to the public that Licensor is not the owner or operator of the Hotel and is not accountable for what happens at the Hotel. Unless required by law, Licensee will not use the word Holiday, Crowne Plaza or Staybridge or any similar word in its corporate, partnership or trade name, nor authorize or permit such use by anyone else. Licensee will not use the word, Holiday, Holiday Inn, Crowne Plaza or Staybridge or any other name or mark associated with the System to incur any obligation or indebtedness on behalf of Licensor.

21

## 14.  MISCELLANEOUS:

### A.  Severability and Interpretation:

The remedies provided in this License are not exclusive.  In the event any provision of this License is held to be unenforceable, void or voidable as being contrary to the law or public policy of the United States or any other jurisdiction entitled to exercise authority hereunder, all remaining provisions shall nevertheless continue in full force and effect, unless deletion of the provision(s) deemed unenforceable, void or voidable impairs the consideration for this License in a manner which frustrates the purpose of the parties or makes performance commercially impracticable.  In the event any provision of this License requires interpretation, such interpretation shall be based on the reasonable intention of the parties in the context of this transaction without interpreting any provision in favor of, or against, any party hereto by reason of the draftsmanship of the party or its position relative to the other party.

### B.  Binding Effect:

This License shall become valid when executed and accepted by Licensor at Atlanta, Georgia. It shall be deemed made and entered into in the State of Georgia, and shall be governed and construed under, and in accordance with, the laws and decisions (except any conflicts of law provisions) of the State of Georgia. In entering into this License, Licensee acknowledges that it has sought, voluntarily accepted and become associated with Licensor who is headquartered in Atlanta, Georgia. The choice of law designation permits, but does not require, that all suits concerning this License shall be filed in the State of Georgia.

### C.  Exclusive Benefit:

This License is exclusively for the benefit of the parties hereto, and it may not give rise to liability to a third party.  No agreement between Licensor and anyone else is for the benefit of Licensee.

### D.  Entire Agreement:

This is the entire agreement between the parties pertaining to the licensing of the Hotel and supersedes all previous negotiations and agreements between the parties pertaining to the licensing of the Hotel as a Holiday Inn or Crowne Plaza brand hotel.  No change in this License will be valid unless in writing signed by both parties.  No failure to require strict performance or to exercise any right or remedy hereunder will preclude requiring strict performance or exercising any right or remedy in the future.

### E.  Licensor Withholding Consent:

Licensor's consent, whenever required, may be withheld if any breach by Licensee exists under this License.  Approvals and consents by Licensor will not be effective unless evidenced by a writing duly executed on behalf of Licensor.

**F.  Notices:**

Notices will be effective hereunder when and only when they are reduced to writing and delivered personally or mailed by Federal Express or comparable overnight or express delivery service, by facsimile transmission or by certified mail to the appropriate party at its address, hereinafter set forth, or to such person and at such address as may subsequently be designated by one party to the other.

> Licensor:    Holiday Hospitality Franchising, Inc.
>              Three Ravinia Drive, Suite 2800
>              Atlanta, Georgia  30346
> Attn:        Vice President, Franchise Administration
>
> Licensee:    Gaylord Hall
>              9341 Loma Vista Drive
>              Dallas, TX 75243

**G.  Authority:**

Licensee represents and warrants to Licensor that the entities and persons signing this License on behalf of Licensee are duly authorized to do so and to bind Licensee to enter into and perform this License. Licensee further represents and warrants to Licensor that Licensee and the entities and persons signing this License on behalf of Licensee have obtained all necessary approvals and that their execution, delivery and performance of this License will not violate, create a default under or breach any charter, bylaws, agreement or other contract, license, permit, order or decree to which they are a party or to which they are subject or to which the Hotel is subject. If Licensee has not already done so prior to the execution of this License, Licensee agrees to submit to Licensor by the date specified by Licensor all of the documents and information that Licensor required or requested in the license application and in connection with the licensing process. Licensee acknowledges that its breach of the representations and warranties in this paragraph, its failure to comply with Licensor's requirements for the submission of information and documents, or any omission or misrepresentation of any material fact in the information or documents submitted to Licensor in connection with the license application and/or the licensing process will constitute a material breach of Licensee's obligations under this License.

**H.  General Release and Covenant Not to Sue:**

Licensee and its respective heirs, representatives, successors and assigns, hereby release, remise and forever discharge Licensor and its parents, subsidiaries and affiliates and their directors, employees, agents, successors and assigns from any and all claims, whether known or unknown, of any kind or nature, absolute or contingent, if any there be, at law or in equity, from the beginning of time to and including, the date of Licensor's execution of this License, and Licensee and its respective heirs, representatives, successors and assigns do hereby covenant and agree that they will not institute any suit or action at law or otherwise against Licensor, directly

23

or indirectly relating to any claim released hereby by Licensee. This release and covenant not to sue shall survive the termination of this License. Licensee shall take whatever steps are necessary or appropriate to carry out the terms of this release and covenant not to sue upon Licensor's request.

## I. Performance of the Work:

Licensee agrees to perform the construction and renovation work including, without limitation, the purchase of furniture, fixtures and equipment set forth on Paragraph 15.A attached hereto and incorporated herein by reference ("the Work"). Licensee acknowledges that its agreement to perform the Work is an essential element of the consideration relied upon by Licensor in entering into the License and agrees that, notwithstanding any other provision of the License, Licensee may be authorized to use the System at the Hotel prior to completion of the Work only during such time as Licensee is actively meeting its performance obligations in full compliance with the requirements of Paragraph 15.A. Licensee's failure to perform the Work in accordance with Licensor's requirements and specifications (including the progress, milestone, completion and other dates specified in Paragraph 15.A) shall constitute a material breach of Licensee's obligations under the License.

## J. Reimbursement of Expenses:

Licensee agrees to pay Licensor all expenses, including reasonable attorney's fees and court costs, incurred by Licensor, its parents, subsidiaries, affiliates, and their successors and assigns, to remedy any defaults of or enforce any rights under the License, effect termination of the License or collect any amounts due under the License.

## K. Descriptive Headings:

The descriptive headings in this License are for convenience only and shall not control or affect the meaning or construction of any provision in this License.

## L. Capital Reserve:

Licensor may establish capital reserve requirements on Licensee ("Reserve") in an amount not in excess of 6% of Gross Rooms Revenue annually to be used for capital expenditures and upgrading of the Hotel including renovation of guest rooms, guest room corridors and other public spaces and replacement of furniture, fixtures and equipment. Licensor shall give Licensee no less than ninety (90) days notice of any such Reserve requirements as the same may be established or changed by Licensor from time to time, and in such event, Licensee shall establish an escrow reserve account funded monthly in a bank selected by Licensee. Licensee shall make expenditures from such account for the purposes hereinbefore specified in accordance with Licensor's requirements. Licensee acknowledges that the Reserve may not be sufficient to maintain the Hotel as a first class facility in accordance with Licensor's standards and Licensee shall promptly provide any necessary additional funds to meet Licensor's product quality and consumer quality requirements.

202 #9284

## 15. BRAND PROVISIONS:

### A. Holiday Inn New Development Provisions.

(1) This License constitutes a license to operate a **Holiday Inn Hotel & Suites** brand hotel as a new development.

(2) The following terms apply to this License because the Hotel will operate as a Holiday Inn or Holiday Inn Hotel & Suites brand hotel:

    (a) The percentage of Gross Rooms Revenue that Licensee will pay to Licensor as the Services Contribution, as referenced in paragraph 3 above, is 2.5%.

(3) The following terms apply to this License because the Hotel is a new development.

(a) Licensee acknowledges that its agreement to perform and complete the Work that is more particularly described in paragraph 14.I is an essential element of the consideration relied upon by Licensor in entering into the License and agrees that, notwithstanding any other provision of the License, Licensee may be authorized to use the system at the Hotel prior to completion of the Work only during such time as Licensee is actively meeting its performance obligations in full compliance with the requirements of paragraph 14.I and paragraph 15.A(3)(c).

In the event Licensor terminates this License due to Licensee's breach of any of its obligations under the License prior to the time that Licensee is authorized to use the system at the Hotel, Licensee shall pay the Licensor (as liquidated damages for the premature termination only, and not as a penalty nor as damages for breaching the license nor in lieu of any other payment), a lump sum equal to 2-1/2 times the amount of the Application Fees that would be due and owing for the Hotel, based on the proposed number of rooms for the Hotel or the minimum application fee required, as disclosed in Item 5 of the Uniform Franchising Offering Circular, whichever is appropriate, and irrespective of whether, in fact, any such Application Fees have been paid for the Hotel.

    (b) Licensee shall not commence its operation of the System at the Hotel unless and until it receives Licensor's written authorization to do so.

    (c) On or before a date three months after the date of the License, Licensee shall submit preliminary plans. On or before a date six months after the date of the License, Licensee shall submit final plans, specifications and drawings for the Hotel, including its proposed equipment, furnishing, facilities and signs with such detail and containing such information as Licensor may request (collectively "Plans"). The Plans as submitted to Licensor shall

conform to then prevailing System standards, including the construction standards set forth in the Manual. Construction shall not begin unless and until Licensor has approved the Plans. Thereafter, no change shall be made to the Plans without the advance consent of Licensor. Notwithstanding the foregoing, after the Plans have been approved, if in the course of actual construction any change in the Plans occurs, Licensee shall notify Licensor promptly. Licensee shall cause the Hotel to be constructed according to the Plans approved by Licensor, and Licensor shall determine whether construction has been completed in accordance with the Plans.

Construction of the Hotel shall commence on or before July 30, 2003. Commencement of construction shall mean excavation and poured footings with a finished building slab. Once the construction has commenced, it shall continue uninterrupted (except for interruption by reason of events constituting force majeure) until construction is completed. Notwithstanding the occurrence of any events constituting force majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and shall otherwise be made ready to open for business in accordance with the License not later than June 30, 2004.

Extension requests for commencement of construction of a new development hotel brand may be considered on a basis of monthly increments up to a six-month period for any one extension. Requests for a six month extension must be accompanied by a sum equal to ½ of the amount of the then current standard minimum of Application Fees based on the proposed number of rooms for the Hotel, and irrespective of whether, in fact, any such Application Fees have been paid for the Hotel. Requests for less than six months must be accompanied by a sum that will be calculated in accordance with the preceding sentence, then prorated according to the period of time requested. Approval of extension requests is not automatic. The Licensee will be responsible for any expenses which may be incurred by Licensor in the processing of an extension request.

If an extension request is approved and construction is commenced within the extension period, the extension fee paid will be refunded, without interest, less the expenses incurred in processing the extension request. If construction does not commence within the extension period, Licensor may refund or retain the extension fee at its sole discretion.

The Hotel shall not be opened for business as the specific brand hotel identified in paragraph 15.A(1) above unless and until:

202 #9284

(i)     Licensor has approved and accepted, in advance, in writing (a) the construction of the Hotel in accordance with the Plans and Licensor's requirements; (b) the installation of all items of equipment, furniture, signs, computer terminals and related supplies and other items and (c) the staffing and training of such staff necessary to operate the Hotel in accordance with Licensor's requirements;

(ii)    no accounts are past due to Licensor, its parent, divisions, subsidiaries or affiliated companies by Licensee;

(iii)   Licensee is in full compliance with all of the terms of this License.

Notwithstanding anything else herein to the contrary, Licensor may authorize Licensee to open and operate the Hotel as the specific brand hotel identified in paragraph 15.A(1) above even though Licensee has not fully complied with the terms of this License, provided that Licensee agrees to fulfill all remaining terms of this License on or before the dates designated by Licensor.

## 16. SPECIAL STIPULATIONS:

### A. Site Control.

Licensee expressly understands and agrees that control of the Location by Licensee is a condition precedent to the granting of the license and the final ratification of this License by Licensor. Accordingly, the license is granted and this License is provided only on a conditional basis, subject to Licensor's receipt of satisfactory evidence of Licensee's control of the Location in accordance with the provisions of this paragraph. Unless Licensor receives and Licensee delivers a copy of the recorded deed or other documentary evidence satisfactory to Licensor that Licensee has fee simple title to the Location or an executed lease of the Location for the term of the License within ninety (90) days from the Term Commencement Date, Licensor shall have the right to terminate the License by written notice to Licensee. Such right shall expire upon Licensor's receipt and acceptance of a copy of the fully executed lease or recorded deed showing such leasehold interest or fee simple title in Licensee.

### B. Change of Ownership Rights.

Notwithstanding Paragraph 10, if Licensee is not then in default under this License, a new license agreement may be issued to a new applicant upon Licensee's written request, the applicant's submission of a completed application on Licensor's then current form, the applicant's qualification under Licensor's then current standards for new licensees, and Licensor's approval of the application including market viability, without payment of the then current application fee provided the request is received within ninety (90) days of execution of this License and Gaylord Hall, Melvin Sanders, Glenn Gunter and J.R. Lacey collectively maintain a 51% equity interest in the applicant. A non-refundable processing charge of $5,000 will be charged if the request is received after ninety (90) days. Licensor may require the execution of its then current standard form of license agreement, which agreement shall have a term equal to the remaining balance of the original term of this License, a new or supplemental guarantee agreement and related agreements by the applicant and its principals, payment of all System Fees and other amounts due under this

License, payment of other amounts then owed Licensor, Six Continents Hotels, Inc. and their affiliated companies by Licensee, the applicant, or their respective affiliates and principals, reasonable renovation and upgrading of the Hotel to System standards applicable to entering conversion Hotels at that time, and execution of general releases by Licensee and each of its principals as conditions precedent to the execution of the Change of Ownership License Agreement. Under no circumstances shall any such Change of Ownership have the effect of releasing Licensee from its obligations hereunder or releasing the liability of any guarantor of Licensee's obligations, arising or accruing prior to, or in respect of events occurring prior to, the execution of the Change of Ownership License Agreement with the new applicant.

### C.  Condition To Opening.

Notwithstanding Paragraph 15.A.(3)(c), Licensee acknowledges and agrees that Licensor shall not authorize the opening of the Hotel within the System until the Holiday Inn Hotel located at 1500 Dallas Drive, Denton, TX 76205/#1880, leaves the System.

(Signatures on following page.)

202 #9284

**IN WITNESS WHEREOF,** the parties have executed this License, as of the date first stated above.

By: _Gaylord Hall_
    Gaylord Hall
    Individually

Witness: _____

**Licensor:**

**HOLIDAY HOSPITALITY FRANCHISING, INC.**

By: _Judy D. Bloodworth_
    Judy D. Bloodworth
    Vice President
    Franchise Administration & Licensing

Attest: _____
    Assistant Secretary

29

## GUARANTY

As an inducement to Holiday Hospitality Franchising, Inc. ("Licensor") to execute the above License, the undersigned (sometimes referred to as the "guarantor(s)"), jointly and severally, hereby unconditionally warrant to Licensor and its successors and assigns that all of Licensee's representations in the License and the application submitted by Licensee to obtain the License are true, and guarantee that all of Licensee's obligations under the above License, including any amendments thereto whenever made (all hereafter referred to collectively as the "License"), will be punctually paid and performed.

Upon default by the Licensee and notice from Licensor, the undersigned will immediately make each payment and perform each obligation required of Licensee under the License. Without affecting the obligations of the undersigned under this Guaranty, Licensor may without notice to the undersigned extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. The undersigned waive notice of amendment of the License and notice of demand for payment or performance by Licensee.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

The Guaranty constitutes a guaranty of payment and performance and not of collection, and each of the guarantors specifically waives any obligation of Licensor to proceed against Licensee on any money or property held by Licensee or by any other person or entity as collateral security, by way of set off or otherwise. The undersigned further agree that this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment of any of the guaranteed obligations is rescinded or must otherwise be restored or returned by Licensor upon the insolvency, bankruptcy or reorganization of Licensee or any of the undersigned, all as though such payment has not been made.

This Guaranty shall become valid when executed and accepted by Licensor at Atlanta, Georgia. It shall be deemed made and entered into in the State of Georgia, and the undersigned agree that this Guaranty and the obligations provided for hereunder shall be governed and construed in all respects by the internal laws and decisions (except any conflicts of law provisions) of the State of Georgia, including all matters of construction, validity, enforceability and performance.

To the extent permitted by law, the undersigned (i) consent and submit, at Licensor's election and without limiting Licensor's rights to commence an action in any other jurisdiction, to the personal jurisdiction and venue of any courts (federal, state or local) situated in the County of DeKalb, State of Georgia; (ii) waive any claim, defense or objection in any such proceeding based on lack of personal jurisdiction, improper venue, forum non conveniens or any similar basis; and (iii) expressly waive personal service of process and consent to service by certified mail, postage prepaid, directed to the last known address of the undersigned, which service shall be deemed completed within ten (10) days after the date of mailing thereof.

The undersigned agree to pay Licensor all expenses, including reasonable attorneys' fees and court costs, incurred by Licensor, its parents, subsidiaries, affiliates, and their successors and assigns, to remedy any defaults of or enforce any rights under this Guaranty or the License, effect

termination of this Guaranty or the License, or collect any amounts due under this Guaranty or the License.

**IN WITNESS WHEREOF,** each of the undersigned has signed this Guaranty under Seal, as of the date of the above License.

Witnesses:

Guarantors:

_Gaylord Hall_

Gaylord Hall, legal signature
Address: 9341 Loma Vista Drive
        Dallas, TX 75243
SSN: 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

Mrs. Gaylord Hall, legal signature
Name (please print): _____
Address: 9341 Loma Vista Drive
        Dallas, TX 75243
SSN: _____

31

## ATTACHMENT "A"

Facilities and Services (paragraph 1):

Site-Area and general description:     4 story, interior corridor

Fee owners (names and addresses):    Gaylord Hall
9341 Loma Vista Drive
Dallas, TX 45243

Leases (parties, terms, etc.) if any: N/A

Separate parcels for signs: N/A

Number of approved guest rooms (including suites):   110

Number of approved suites: 25

Restaurants and lounges (number, seating capacity, names and description): Lobby Bar

Holidome indoor recreation center: N/A

Gift shop: N/A

Other concessions and shops: N/A

Parking facilities (number of spaces, description): 85 +/- spaces

Swimming pool: N/A

Other facilities and services: Fitness Center; Banquet/meeting room(s) with seating capacity(ies) ranging from 80 to 100.

Ownership of Licensee (paragraph 10):
       **Gaylord Hall, individually**                                      **100%**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was filed electronically with the Court's CM/ECF filing system which in turn will generate an electronic notice of filing to all parties registered to receive electronic notice from the Court on July 12, 2010.


/s/  Paul M. Rosenblatt
Paul M. Rosenblatt